**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SimpleAir, Inc., | Civil Action No. 2:14-cv-00011-JRG |
| Plaintiff, | **Jury Demanded** |
| vs. | |
| Google Inc., et al., | |
| Defendants. | |
| SimpleAir, Inc., | Civil Action No. 2:13-cv-00937-JRG |
| Plaintiff, | **Jury Demanded** |
| vs. | |
| Google Inc., | |
| Defendant. | |

**SimpleAir, Inc.'s Opening Claim Construction Brief**

# Table of Contents

I.     Introduction ............................................................................................................. 1

II.    "an information source" ........................................................................................ 2

    A.     "the Internet" ............................................................................................ 2

    B.     replace "one or more" with "a" ............................................................... 3

III.   "data," "data from an information source," and "generating data" ...................... 3

    A.     "data" ........................................................................................................ 4

    B.     "data from an information source" ........................................................... 7

    C.     "generating data" ..................................................................................... 8

IV.    "a central broadcast server" ................................................................................. 9

    A.     omitting "capable of receiving data from a plurality of information
         sources" ................................................................................................... 10

    B.     replacing "data" with "the content of a message" ............................... 11

    C.     replacing "transmission to one or more selected remote computing
         devices" with "transmission to multiple remote computing devices" ................. 12

    D.     omitting the construction of "server" .................................................... 13

V.     "process data [with/using] at least one parser" .............................................. 13

    A.     "programs" .............................................................................................. 14

    B.     "correspond to the content of the message" .......................................... 14

VI.    "an information gateway…the information gateway configured to build data
    blocks from the parsed data and assign addresses to the data blocks" ............ 15

    A.     indefiniteness ......................................................................................... 16

    B.     "assign addresses to data blocks" ......................................................... 17

VII.   "a transmission gateway" .................................................................................... 18

VIII.  "communicatively coupled" ................................................................................. 20

IX.    "receivers" ............................................................................................................ 22

X.     "whether said devices are online or offline from a data channel associated with
    [the/each] remote computing device" ................................................................. 23

XI.    "a viewer" .............................................................................................................. 24

XII.   "contextual graphics" ........................................................................................... 26

XIII.  "subscriber database" ........................................................................................... 27

XIV.   The Court's prior constructions control because they were adopted as express
    definitions in the prosecution history. ............................................................... 27

**<u>Table of Authorities</u>**

**Cases**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) ............................................................ 13

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013). ............................................................ 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ............................................................ 3

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013) .......................................................... 28

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430 (Fed. Cir. 1988) .......................................................... 28

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) .......................................................... 29

*Golden Bridge Tech., Inc. v. Apple Inc.*,
758 F.3d 1362 (Fed. Cir. 2014) .............................................. 2, 28, 29, 30, 31

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014).................................................................... 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................................... 15, 18

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ............................................................ 7

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......................................................... 28

# Index of Exhibits

| Exhibit # | Description of Exhibit |
|---|---|
| 1 | U.S. Patent 8,572,279 ('279 Patent) |
| 2 | U.S. Patent 8,601,154 ('154 Patent) |
| 3 | U.S. Patent 7,035,914 ('914 Patent) |
| 4 | *Markman* Order issued May 20, 2013 in SimpleAir v. Microsoft et al., Case No. 2:11-cv-416 (E.D. Tex.) (*Google I Markman* Order) |
| 5 | *Markman* Order issued September 2, 2011 in SimpleAir v. Apple et al., Case No. 2:09-cv-289 (E.D. Tex.) (*AWS Markman* Order) |
| 6 | Declaration of Dr. James Knox submitted in support of SimpleAir's Opening Claim Construction brief in *Google I* |
| 7 | Declaration of Dr. James Knox submitted in support of SimpleAir's Opening Claim Construction brief in *AWS* |
| 8 | SimpleAir's Opening Claim Construction brief in *Google I* |
| 9 | Defendants' responsive *Markman* brief in *Google I* |
| 10 | SimpleAir's reply *Markman* brief in *Google I* |
| 11 | SimpleAir's Opening Claim Construction brief in *AWS* |
| 12 | Defendants' responsive *Markman* brief in *AWS* |
| 13 | SimpleAir's reply *Markman* brief in *AWS* |
| 14 | Memorandum Opinion and Order re Google's Renewed Motions for Judgment as a Matter of Law in *Google I* |
| 15 | Google's Renewed Motion for Judgment as a Matter of Law regarding non-infringement in *Google I* |
| 16 | Excerpts from *Google I* trial transcript for proceedings held on January 13, 2014 |
| 17 | Excerpts from October 25, 2013 deposition of David Eastburn |
| 18 | Excerpts from August 8, 2013 30(b)(6) deposition of Francesco Nierieri |
| 19 | Excerpts from March 1, 2013 deposition of Dr. Anthony Acampora |
| 20 | Google's 1st Petition for Covered Business Method Review of '914 Patent (12'23'13) |
| 21 | Google's 2nd Petition for Covered Business Method Review of '914 Patent (8'6'14) |
| 22 | Google's Petition for Covered Business Method Review of '279 Patent (10'29'14) |
| 23 | Google's Petition for *Inter Partes* Review of '279 Patent (10'29'14) |
| 24 | Google's Petition for Covered Business Method Review of '154 Patent (10'29'14) |
| 25 | Google's Petition for *Inter Partes* Review of '154 Patent (10'29'14) |
| 26 | SimpleAir's preliminary response to Google's 1st Petition for Covered Business Method Review of '914 Patent (4'9'14) |
| 27 | SimpleAir's preliminary response to Google's 2nd Petition for Covered Business Method Review of '914 Patent (11'13'14) |
| 28 | Order denying Google's 1st Petition for Covered Business Method of '914 Patent (5'13'14) |
| 29 | Order denying Google's 2nd Petition for Covered Business Method of '914 Patent (1'22'15) |
| 30 | *Curriculum Vitae* of Dr. James Knox |
| 31 | Inventor Declaration submitted on 11/28/2012 in Re-exam 9/009,906 |

| 32 | Comments on statement of reasons for patentability filed in Re-exam 9/009,906 |
| 33 | Inventor Declaration submitted on 12/12/2012 in Re-exam 9/009,906 |

## I. Introduction

SimpleAir asserts U.S. Patents 8,572,279 and 8,601,154 against Google and its wholly-owned subsidiary YouTube (collectively, "Google").  The Court has previously construed eight of the twelve terms in dispute here.  SimpleAir asserted two related patents—U.S. Patents 7,035,914 and 6,021,433—against *Google* in *SimpleAir v. Microsoft* et al., 2:11-cv-416 (E. D. Tex.) (*Google I* case).  The specification for the '279 and '154 patents asserted here is identical to the specification for the '914 and '433 patents asserted in *Google I.*  Moreover, there is substantial overlap in the claims of the four patents.

As a result, for eight of the twelve disputed terms, the Court has previously construed (1) the exact term; or (2) a closely related term. [1]  Because the Court's prior constructions were correct, SimpleAir proposes constructions here that (1) are identical to the Court's prior construction when the claim language is identical; or (2) modified only to account for differences in the claim language of a phrase.  Google, by contrast, reargues positions that it already raised, and the Court rejected, in *Google I.*  Google also asserts that five terms are indefinite—even though Google and its experts had no trouble understanding and applying these phrases in *Google I* and in Google's six Petitions for post-grant review of the patents.

In this Opening Brief, we show that the Court should adopt SimpleAir's proposed constructions for two independently sufficient reasons.  (1) SimpleAir's constructions define each term according to its ordinary meaning to one of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history.  (2) Under the Federal Circuit's recent decision in *Golden Bridge*, SimpleAir's constructions have become binding prosecution

---

[1] Moreover, these same claim terms were also construed in an earlier case asserting the '914 patent against Apple and RIM.  *SimpleAir v. AWS Convergence,* et al., case no. 2:09-cv-289 (MHS) (E.D. Tex.) (*AWS* case).  In the *AWS* case, the Court (Judge Everingham) reached the same conclusions and adopted the same constructions that were adopted in *Google I.*

history definitions because SimpleAir has adopted them in post-grant proceedings before the

Patent Office. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1366 (Fed. Cir. 2014).

## II.    "an information source"

| SimpleAir's construction | Google's construction |
| --- | --- |
| one or more content or on-line service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages or e-mails. | the Internet, a content provider, or an online service provider that provides data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages, or e-mails. |

The term "an information source" appears in the claims of the '914 patent and was

construed in the *Google I* case.  SimpleAir's proposed construction is identical to the Court's

prior construction, and the Court should adopt it again for the same reasons.  Ex. 4 (*Google I*

Markman) at 27-28; *see* ex. 8 (*Google I* Opening Markman Brief) at 4-6; ex. 10 (*Google I* Reply

*Markman* Brief) at 13-14.  Google seeks to change the Court's construction in two ways, which

are addressed in turn below.

### A.    "the Internet"

Google seeks to add the phrase "the Internet" at the beginning of the construction.  This

change would allow the "information source" limitation to be satisfied simply by pointing to the

Internet itself—rather than a content provider or service provider *on* the Internet.  Google cites

the following passage from the specification to support their proposal:

> As is illustrated in FIG. 1, information sources 12, such as the Internet, on-line
> services and other information sources, provide data feeds, including real time
> data feeds, to a network of servers 33 in the central broadcast server 34."

'279, 7:59–62.  Google made this same exact proposal, citing the same passage from the

specification, in the *Google I* case.  Ex. 9 (Responsive *Markman* Brief) at 17-18.  As we

explained in responding to this argument in the prior case, the statement that Google relies on is

not referring to the Internet itself—it is using the term loosely to describe the information

sources located on the Internet.  We know this because this very statement states that "information sources, such as the Internet… provide data feeds…to a network of servers in the central broadcast server." '433, 7:42-46 (emphasis added).  As Google's expert in *Google I* conceded, the Internet itself doesn't "provide data feeds."  Rather, the Internet is a "transport mechanism" and "it is the information sources or websites that provide data feeds to the central broadcast server over the internet." Ex. 19 (Acampora Deposition) at 51:1-12; *see id*. at 49:4-10 ("a user would connect to the internet and through the internet *gain access to information providers*" (emphasis added)).

For these reasons, the Court rejected Google's proposal to add "the Internet" to the construction of "an information source" in *Google I*.  Ex. 4 (*Google I Markman* at 27). ("To include 'Internet' in the term 'information source' and then allow an interpretation of 'Internet' to extend to a mere network connection (without any access to a source of information), would eviscerate the meaning of 'information source.'").

**B.     replace "one or more" with "a"**

Google seeks to replace "one or more" in the Court's prior construction with "a."  "An indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).  All the asserted claims are drafted in "comprising" form.  Accordingly, "an information source" carries the meaning of "one or more information sources" in the asserted claims.  *See id.*

**III.     "data," "data from an information source," and "generating data"**

| SimpleAir's constructions | Google's constructions |
|---------------------------|------------------------|

| | |
|---|---|
| *data*: any type of digital information suitable for digital transmission or computer use.<br><br>*data from an information source*: [no additional construction necessary]<br><br>*generating data*:  producing data to be transmitted to the central broadcast server by creating or combining data | *data*: content of a message (such as news, weather, sports, or financial information).<br><br>*data from an information source*: data created at an information source.<br><br>*generating data*: the information source creating data to be transmitted to the central broadcast server. |

## A. "data"

The previously asserted claims include the term "data" but the parties did not seek a construction in the prior cases.  The term appears in the claims in the context of data that is being transmitted "to remote computing devices."  The specification confirms this context.  '279, 1:29-33; *id*. at 3:30-35 ("data parsed from a plurality of incoming data feeds from existing information sources is prepared for optimized wireless transmission and then transmitted nationwide to … computing devices").  In this context, the ordinary meaning of "data" is any type of digital information suitable for digital transmission or computer use.  Knox. Decl. ¶¶16-18; *Wiley Electrical and Electronic Engineering Dictionary* 164 (IEEE Press 2004) (*data*: "Information which is represented in a manner suitable for digital transmission or computer use"); *IEEE Standard Dictionary of Electrical and Electronics Terms* 250 (1996) (*data*: "A representation of facts, concepts, or instructions in a formalized manner suitable for communication, interpretation or processing by a programmable digital computer").  SimpleAir's construction defines "data" according to its ordinary meaning.

Google seeks to limit the term "data" to the "content of a message (such as news, weather, sports, or financial information)."  Google interprets the "contents of a message" to

include only the "payload" (*i.e.* the data that is intended to be displayed to the end user), and to exclude all other data. [2]  Google's proposal is incorrect.

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  As demonstrated above, the ordinary meaning of "data" is not limited to the "content of a message." Moreover, none of the dictionaries that Google cites defines "data" as limited to the content of a message.  Google's sources define "data" to mean "<u>factual information (such as text, numbers, sounds, and images)</u> in a form that can be processed by a computer."  Dkt. 59-2 (Google's 4-3 chart) at 18 (citing Webster's New World Dictionary of Computer Terms (7th ed. 1999)).  "Factual information" includes (a) the payload of a message; (b) data in a message that conveys factual information about the urgency of the message or about the intended recipient, or factual information used to direct the message to the intended recipient); (c) "numbers" in a message (*e.g.* a check sum) that convey factual information used to assure that the message has been correctly transmitted and decoded, and even (d) data that is not within a "message" at all. *See* dkt. 59-2 (Google's Supporting Evidence) at 16-17; Knox Decl. ¶¶16-22.

Moreover, the specification contains no express definition or disclaimer limiting "data" to the "content of a message."  Instead, the specification uses the term "data" to refer to any type of digital information.  The "data" in the preferred embodiment that is transmitted from the information source to the central broadcast server includes information that is not the "content of

---

[2] Google argued at trial and in its post-trial motions in *Google I* that the term "data" in the phrase "parsing said <u>data</u> with parsers" of the '914 patent meant "payload."  The Court rejected this argument.  *See, e.g.,* Ex. 14 (*Google I* Order re JMOLs) at 9-10 (summarizing Google's argument and rejecting it because "the Court is not persuaded that Google must parse only the payload of a message in order to meet the 'parsing' limitation").  Google's construction of "data" here is an attempt to resurrect the argument that certain claim steps must be performed on the "payload" rather than on other data.

the message," such as a header, packet data, data to ensure proper transmission, and error

correction data:

> <u>Data</u> is transmitted from an information source to the central broadcast
> server **34** as discrete message blocks …. In particular, <u>each data packet</u>
> transmitted by the information source 12 <u>includes a header, packet data and</u>
> <u>information to ensure proper transmission to the central broadcast server 34</u>.
> Additionally, <u>an error correction code is typically added to each packet prior to</u>
> <u>transmission</u>". '279, 11:44-64.

The specification also uses the term "data" to describe information—such as "subscription data"

and "diagnostic data"—that is not even part of a "message" (much less the "content" of a

message):

> "virtual addresses are determined based on the type of information in the data
> block and <u>user subscription data</u> from the subscriber database 130" ('279, 22:16-
> 17);

> "The communication server…provides <u>diagnostic data</u> on received messages for
> software debug purposes" ('279, 22:59-66).

Furthermore, in the prior case, Google's invalidity expert testified that the ordinary meaning of

"data" includes "<u>any</u> data" and that nothing in the patent limits "data" to a message or any other

particular structure of information:

> 8 Q. So is the data [recited in the parsing step] limited in any way to the
> 9 actual payload of a message, for example, the message
> 10 or content of that message, or can it be any data from
> 11 an information source?
> 12 A. <u>It's **any data**</u>. <u>There is nothing here that</u>
> 13 <u>limits it to a message or any particular structure of</u>
> 14 <u>information</u>. It's data from an information source.

Ex. 17 (Eastburn deposition) at 166:8-14 (emphasis added). Likewise, Google's 30(b)(6)

witness Mr. Nerieri testified that "data" "is a very broad term"; and that the "registration ID"—a

component of the header of messages delivered using Google's accused system—meets the

general definition of "data":

> 18    Q.  Data includes electronic bits that convey
> 19   information; right?

> 20    A.  Sure.
>
> […]
>
> 3    Q.  <u>The registration ID meets the general</u>
>
> 4  <u>definition of "data," doesn't it</u>?
>
> 5    A.  Registration -- <u>sure</u>.

Ex. 18 (Nerieri 30(b)(6) deposition) at 172:18-173:5.

Accordingly, the Court should adopt SimpleAir's proposed construction, which gives "data" its ordinary meaning:

> "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. <u>There are only two exceptions to this general rule</u>: 1) <u>when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.</u>"

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (emphasis added) (internal citations omitted).

## B.    "data from an information source"

The parties did not seek a construction for the phrase "data from an information source" in the prior case. It does not need to be construed because its meaning is clear: it requires that the claimed "data" be "from an information source". Knox Decl. ¶ 24.

Google proposes to replace the word "from" in the claim with the phrase "created at": "data ~~from~~ <u>created at</u> an information source." But "from" does not mean "created at." Knox Decl. ¶¶ 25-26. "From" is a preposition that specifies the point or source from which the central broadcast server receives the claimed "data." *See, e.g.,* Random House Webster's Dictionary 289 (4th ed. 2001) ("*from:* 1. (used to specify a starting point in space): *ran away from home*…5 (used to indicate a source, origin, agent, or cause): *came from the Midwest*"); The American Heritage Dictionary 339 (3rd ed. 1994) ("*from*: *prep.* 1. used to indicate: a. A place or time as a starting point: *from six o'clock on*…c. A source, cause, agent, or instrument: *a note from me*").

7

This does not require the source of the data to have "created" the data. For example, a gallon of milk "from the grocery store" is not <u>created at</u> the grocery store. *Id.*

Nothing in the phrase "data from an information source" specifies what occurred at the information to cause the presence of the data, much less is there any requirement that the data be "created" at the information source. Moreover, no limitation in the '279 patent addresses how the data arrived at the information source and the '154 patent contains an express limitation that the data was "generated"—not "created"—at the information source. (As discussed in the next section, "generating" data is also not limited to "creating" data.)

Accordingly, Google's proposed construction should be rejected.

### C. "generating data"

The phrase "generating data" appears in the first step of the '154 patent as "generating data at the information source." The parties agree that what must be "generated" is the "data to be transmitted to the central broadcast server." Google, however, seeks to limit "generating data" to "creating data"—so that it can argue that the information source must "create" from scratch *the information* that is contained in or used to produce the "data." That is incorrect.

In the context of computing and communications, "generating data" encompasses both producing by creating data out of nothing (*i.e.*, creating the information contained in the data as well as the instance of data, such as a data packet) as well as producing by combining or reproducing data items created somewhere else. Knox decl. ¶¶ 33-34. *Webster's New World Dictionary of Computer Terms* 158 (6th ed. 1997) ("generate": "To produce something by setting in motion an automatic procedure. For example, after marking the entries and indicating the table, list, and index locations, one can generate a table of contents, a lists of figures, and an index in a word processing program when one chooses the generate command."). For example, in computer science, "generating" a software routine is accomplished by combining previously

existing components. *The IEEE Standard Dictionary of Electrical and Electronics Terms* 451 (6th ed. 1996) ("generate": "(computer) To produce a program by selection of subsets from a set of skeletal coding under the control of parameters."); *Modern Dictionary of Electronics* 320 (7th ed. 1999) ("generator" "4. In computer operation, a routine for producing specific routines from specific input parameters and skeletal coding.").

Moreover, Google's proposal is inconsistent with the preferred embodiment. For example, the specification explains that information sources such as "Quote.com" "provide data feeds to the central broadcast server" and that the data provided can include lotto, stock quotes, and E-mail. *See* '279, 6:14-23; 8:6-29; Fig. 24(d). But such data is not necessarily <u>created at</u> the information sources that provide the data feeds. Rather, the information source may simply collect this data, compile it, and provide it to the central broadcast server via a data feed. For example, Quote.com does not *create* the information in the stock quote data feed it provides to the central broadcast server. That information is created by market transactions and recorded by a stock exchange. Quote.com merely collects and transmits that data. Similarly, a lottery information website may produce data that consists of winning lottery numbers. The underlying number data used to produce the lotto website data was created by lottery systems, not by the lotto website. Accordingly, the "generating data" does not require producing data by "creating data." [3]

## IV.     "a central broadcast server"

| SimpleAir's construction | Google's construction |
|---|---|
| *a central broadcast server*: one or more servers | *a central broadcast server*: one or more |

---

[3] In preparing this brief, we realized that our proposed constructions for certain terms (i.e., those set forth in the P.R. 4-3 statement) could be improved. We similarly concluded the Court would likely benefit from a competing construction for certain terms that, previously, only Google sought to construe. More specifically, we have modified our constructions for "a central broadcast server" and "a viewer" and now offer a construction for "generating data" and an additional explanatory phrase for "receiver".

| | |
|---|---|
| that are capable of receiving data from a plurality of information sources and processing the data prior to its transmission to one or more selected remote computing devices. | servers that process the content of a message for transmission to multiple remote computing devices. |
| *server*: one or more pieces of computer equipment and the software running on the equipment used to provide services for one or more other computers or computing devices. | *server*: Plain and ordinary meaning. |

The Court construed the phrase "a central broadcast server" in the prior case. Ex. 4 (*Google I Markman* Order) at 41. The only difference between the Court's prior construction and SimpleAir's construction is that the phrase "configured to receive…and process" is changed to "capable of receiving…and processing," as highlighted in the following table:

| Court's prior construction | SimpleAir's construction |
|---|---|
| one or more servers <u>that are configured to receive data</u> from a plurality of information sources <u>and process</u> the data prior to its transmission to one or more selected remote computing devices. | one or more servers <u>that are capable of receiving data</u> from a plurality of information sources <u>and processing</u> the data prior to its transmission to one or more selected remote computing devices. |

As explained below, this change accounts for an additional claim limitation in the '279 patent that is absent from the '914 claims. With this change, the Court should adopt this construction again for the reasons it adopted it in the prior case. Ex. 4 (*Google I Markman* Order) at 41; *see* ex. 8 (*Google I* Opening Markman Brief) at 34-35; ex. 10 (*Google I* Reply *Markman* Brief) at 14. Google proposes to change the Court's construction in four ways. We address each in turn.

### A. omitting "capable of receiving data from a plurality of information sources"

Google proposes to delete altogether the requirement that the central broadcast server be capable of/configured to receive data from a plurality of information sources.

One of the core attributes of the claimed invention is a "central broadcast server" that can receive data from many sources and then broadcast data to many devices. *See, e.g.,* Ex. 3 ('914 patent) at 6:46-52. The word "central" in "central broadcast server" conveys this attribute.

While a single transmission may take data from just one information source and transmit it to just one remote computing device, the "central" broadcast server itself must be capable of receiving data from a plurality of information sources for transmission to one or more of a plurality of remote computing devices. Both this Court in *Google I* and the *AWS* Court gave meaning to the word "central" by construing the "central broadcast server" to be "configured to receive data from a plurality of information sources." As the *AWS* Court explained:

> The specification explains that "information sources…provide the information basis for outgoing broadcast," *id*. at 11:56-57, and the central broadcast server "operates effectively as network operations center," *id*. at 6:10-12, where "the information [is] consolidated," *id*. at 12:1-2, before its transmission to "one or more personal computers 14 or other computing sources via selective receivers." *Id*. at 12:26-27…. defining "central" in accordance with the term's use in the '433 and '914 Patents will assist the jury in making its infringement determinations.

Ex. 5 (*AWS Markman*) at 15-16.

Likewise, the "<u>central</u> broadcast server" in the '279 and '154 patents must be capable of receiving and processing data from multiple information sources. However, claim 1 of the '279 patent contains an additional limitation that the recited central broadcast server need only be "configured" to receive data from "<u>at least one</u> information source"—not "a plurality." SimpleAir's construction includes the requirement that the central broadcast server be "central" (*i.e.*, capable of receiving data from a plurality of information sources) while accounting for the limitation in the '279 patent that the central broadcast server need only be actually configured to receive data from one information source. Google's proposal, however, eliminates the word "central" from the claim (as if the claim read "broadcast server"—*i.e,*. a server that can transmit to one or more devices—rather than "central broadcast server").

## B.     replacing "data" with "the content of a message"

As demonstrated above, "data" as used in the claims is not limited to the content of a message. Accordingly, "data" should not be replaced with "the content of a message."

**C.** **replacing "transmission to <u>one or more</u> selected remote computing devices" with "transmission to <u>multiple</u> remote computing devices"**

Google attempts to revive an unsuccessful argument made in *Google I*: that the <u>same data</u> processed at the central broadcast server must be transmitted to <u>multiple remote computing devices</u>. *See, e.g.*, ex. 16 (*Google I* 1/13/2014pm trial transcript at 59:3-6, 70:4-71:1); ex. 15 (Google JMOL re infringement) at 22 (same). This change should be rejected for two reasons.

(1) Defendants argue that the <u>same data</u> processed at the central broadcast server must be sent to multiple computing devices because a subsequent claim limitation recites the transmission of data "to receiv<u>ers</u> [plural] communicatively coupled to the remote computing devic<u>es</u> [plural]." *See* '279, claim 1[c]. But there is no need for the <u>same data</u> to be transmitted to multiple receivers to meet this limitation. The term "data" is not a singular term. Rather, it is traditionally a plural term (the plural of "datum") and is commonly used to represent both the singular and the plural. *E.g.,* Microsoft Press Computer Dictionary 105 (2nd ed. 1994) ("*Data:* Plural of the Latin *datum*, meaning an item of information"); Webster's New World Dictionary of Computer Terms 130 (6th ed. 1997).

Accordingly, transmitting data (*i.e.,* multiple "datums") to receivers may be done by transmitting datum A to receiver 1, datum B to receiver 2, and datum C to receiver 3. Or it may be accomplished by transmitting data A, B, and C to all 3 receivers. Thus, as the Court concluded in the *Google I* case, "nothing in the claims requires that a single group of data blocks [be] transmitted to multiple receivers (*i.e.*, by sending a single message at the same time to multiple devices).") Ex. 14 (Order re JMOLs) at 19.

(2) "[I]t is axiomatic that a claim construction that excludes a preferred embodiment . . . 'is rarely, if ever correct and would require highly persuasive evidentiary support.'" *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003). The

specification of the asserted patents describes a "pointcast" embodiment, where data is transmitted only <u>to a single user device</u>:  The present invention, unlike other wireless systems provides for a combination of broadcast, narrowcast, and pointcast transmission.  That is, information can be transmitted wirelessly to everyone (broadcast), to a subset of users (narrow cast) <u>or to one user (pointcast)</u>."  '279, 3:10-15.  Defendants' proposed change would exclude this embodiment.  It should be rejected for this additional reason.

### D.    omitting the construction of "server"

The Court should construe "server" as it did before.   The jury will benefit because it is the type of term many people are used to hearing and think they understand but often do not.  Moreover, it is likely that Google seeks to displace the Court's previous construction with "no construction" so that Google's expert can then impose a different construction under the guise of "plain meaning."  Accordingly, construing the term now will foreclose any potential claim construction dispute.  The Court should adopt its previous construction.  Ex. 4 (*Google I* Markman Order) at 39 n. 4.  Knox Decl. at 36-41.

### V.    "process data [with/using] at least one parser" [4]

| SimpleAir's construction | Google's construction |
|---|---|
| using one or more computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon. | using one or more computer software programs that each respectively correspond to the content of the message to break or divide data into components. |

The Court previously construed a similar phrase, "parsing said data with parsers corresponding to said central broadcast server."  The Court's prior construction defined "parser" to mean "computer software program, routine, or function that breaks or divides data received

---

[4] The parties agree that "process data with at least one parser" and "process data using at least one parser" have the same meaning.  Dkt. 59-1, dkt. 59-2 (drawing no distinction between these two phrases).

from an information source into components whose content or format can be analyzed, processed, or acted upon." Ex. 4 (*Google I* Markman Order) at 31. SimpleAir's proposed construction [5] incorporates the Court's definition of "parser," and the Court should adopt SimpleAir's proposal for the same reasons it adopted its prior construction. *Id.* at 28-31; *see* ex. 8 (*Google I* Opening Markman Brief) at 6-9; ex. 10 (*Google I* Reply *Markman* Brief) at 10-11.

Google seeks to change the Court's construction in two ways, which we address in turn.

## A. "programs"

Google proposes to change "programs, routines, or functions" to "programs," so that it can then argue that a parser "program" cannot be a routine, function, or smaller program within a larger "program." This change should be rejected; a "parser" can be a portion of a program, such as a routine or function. McGraw-Hill Dict. of Scientific and Tech. Terms 1450 (5th ed. 1994) ("*parser:* The portion of a computer program that carries out parsing operations."); Wiley Elect. and Electronics Engineering Dict. 554 (IEEE 2004) ("*parser*: A routine or algorithm that performs parsing."). And nothing in the claim language or specification requires the claimed "parser" to be a stand-alone "program." *See* '279, 8:15-29 (providing examples of parsers and stating "any type of information source and corresponding parser may be used").

## B. "correspond to the content of the message"

Google also proposes to add the requirement that the parser (or parsers) "each respectively correspond to the content of the message." This proposal should also be rejected.

The specification describes parsers that are specific to the type of content received, and Google relies on this description to support this proposed limitation. '279 at 8:15-21; *id.*, Fig. 2.

---

[5] SimpleAir's proposal differs slightly from the Court's prior construction of the entire phrase "parsing said data with parsers" to account for the fact that the phrase at issue here recites "at least one parser" (singular) rather than "parsers" (plural). '279 claim 1, '154 claim 1. That part of SimpleAir's construction is undisputed: Google agrees that the construction should include "one or more computer software programs" rather than "multiple software programs."

However, the claims may not be limited to this embodiment. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Moreover, the very passage that describes this embodiment itself cautions: "The present invention is not limited to the information sources or parsers described herein." '279 at 8:25-27.

The defendants in *Google I* and *AWS* both attempted to limit the claims to the content-specific embodiment of parsers disclosed in the specification. Ex. 9 (*Google I* Responsive brief) at 18-23 (arguing that "parsers" must "each respectively correspond to the type of information that was received"); ex. 12 (*AWS* Responsive brief) at 21-22 (arguing that "parsers" must categorize data "based on the type of content"). Both this Court and the *AWS* Court rejected this attempt. Ex. 4 (*Google I Markman* Order) at 31 ("Though the specification includes an embodiment in which the parsers are matched to the information source (stock quote, weather, email, etc.), the claim language is explicitly not so limited."); Ex. 5 (*AWS* Markman Order) at 20-21. The Court should reject it again.

## VI.  "an information gateway…the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks"

| SimpleAir's construction | Google's construction |
|---|---|
| one or more software programs (or a portion of a program) that build data blocks from the parsed data and assign addresses to the data blocks. <br> [no additional construction necessary] | whole phrase: [indefinite] <br><br> *assign addresses to data blocks*: assign multiple receiver addresses to each data block. |

The Court previously construed a similar limitation. As the following chart shows, the only substantive difference is that the language at issue here adds the explicit requirement that the data blocks to be built "from the parsed data":

| '914 claim 1 | '279 claim 1 and '154 claim 1 |
|---|---|
| an information gateway **for** building data blocks and assigning addresses for data blocks | "an information gateway…**configured to** build data blocks **from the parsed data** and assign addresses to the data blocks" |

SimpleAir's proposal is very similar to the Court's prior construction. The only difference is that SimpleAir adds a requirement that the data blocks be built "from the parsed data" to account for his additional explicit requirement. *See* Knox Decl. ¶¶59-61. The Court should adopt SimpleAir's construction for the same reasons it adopted its prior construction. Ex. 4 (*Google I* Markman Order) at 31-37; ex. 8 (Opening Markman Brief) at 13-15; ex. 10 (Reply *Markman* Brief) at 12. Google's two contrary arguments are addressed in turn below.

A.    indefiniteness

Google argues that the "information gateway" phrase is indefinite. To show that the asserted claims are indefinite, Google must show that "the claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2124 (2014).

As explained above, the "information gateway" phrase has the meaning set forth in the Court's prior construction. Knox Decl. ¶¶59-61. This would inform one of ordinary skill in the art of the scope of the invention with reasonable certainty. *Id.* Indeed, no one—not Google, Microsoft, Apple, or RIM, or any other prior defendant, or their respective experts—has ever had any trouble understanding or applying the closely related "information gateway" limitation recited in the '914 patent in the prior cases. In addition, Google and its experts have not had any trouble understanding or applying this limitation in connection with the two recently filed Petitions for *Inter Partes* review and four recently filed Petitions for Covered Business Method review of SimpleAir's patents (including the ones asserted in this case) that include this limitation. In fact, in each of these Petitions, Google and its experts actually adopt the Court's

prior construction that SimpleAir's construction closely tracks and that Google contests here. [6]

Accordingly, the "information gateway" phrase is not indefinite.

**B.** **"assign addresses to data blocks"**

The phrase "assign[ing] addresses to data blocks" was not separately construed in the *Google I* case and requires no further construction. Knox Decl. ¶¶63-64. Google's proposed construction adds two requirements to the claim language. We address them in turn.

(1) "<u>receiver</u> addresses"

Google seeks to limit the claimed "addresses" to "<u>receiver</u> addresses." This is incorrect. The term "addresses" appears in the claims in the context of addresses applied to data blocks in the course of transmitting data to computing devices. The ordinary meaning of "addresses" in this context is not "<u>receiver</u> addresses." *E.g.* Microsoft Computer Dict. 17 (3rd ed. 1997) ("address": "2. A name or token specifying a particular site on the internet or other network.").

Nor does the surrounding claim language require that the assigned addresses are "receiver addresses." The claims state that addresses are assigned to data blocks at an information gateway. '279 claim 1. The addressed data blocks are then "prepare[d] … for transmission" at a transmission gateway, which "initiate[s] transmission of the addressed data blocks to the receivers." *Id.* The claim contains no requirement that the addresses be receiver addresses. Nor would the address assigned at the information gateway need to be the receiver's address for the transmission to arrive at the receiver. For example, the assigned address may be that of the input end of a portal whose output end is the receiver. *See* Ex. 16 (1/13/14 trial transcript) 162:9-

---

[6] Ex. 25 (Google's 10/29/14 Petition for IPR of '154) at 10-12; Ex. 24 (Google's 10/29/14 Petition for CBM of the '154 patent) at 15-17; Ex. 23 (Google's 10/29/14 Petition for IPR of the '279 patent) at 10-11; Ex. 22 (Google's 10/29/14 Petition for CBM of the '279 patent) at 15-17; Ex. 21 (Google's 8/6/14 Petition for CBM of '914) at 12; Ex. 20 (Google's 12/23/13 Petition for CBM of '914) at 20; Ex. 29 (Order Denying 2nd Petition for CBM) at 11-12; *see also* Ex. 28 (Order Denying 1st Petition for CBM) at 10-11.

163:6.  (The physical analogy would be the address of the input end of a mail delivery tube whose output end is the intended recipient.)  Or the address assigned at the information gateway may be an intermediate address, with the final address assigned by the transmission gateway. *See* Knox Decl. ¶66.

Nor does the specification contain a definition or clear disavowal limiting "addresses" to "receiver addresses."  Figure 4 of the patent discloses an embodiment of the information gateway that assigns paging receiver "capcodes" to the data blocks.  *See* Fig. 4.  However, the claims may not be limited to this embodiment.  *Phillips*, 415 F.3d at 1303.

Accordingly, the claimed "addresses" are not limited to "receiver addresses".  [7]

 (2) assigning <u>multiple</u> addresses to <u>each</u> data block

Google's proposal would require assigning "<u>multiple</u> receiver addresses to <u>each</u> data block."  This is incorrect.  The claims do recite assigning "addresses" plural.  But they recite assigning them to "data block<u>s</u>" plural, not to "a single data block" or to "each data block."  The use of the plural for both "addresses" and "data blocks" indicates that multiple addresses must be assigned to *multiple* data blocks—not that multiple addresses must be assigned to the *same* data block.  *See* Knox Decl. ¶¶67-69.[8]  Thus, the asserted claims do not require assigning multiple addresses to each data block.

## VII.    "a transmission gateway"

| SimpleAir's construction/Court's prior | Google's construction |
|---|---|

---

[7] Google made a similar argument and in its post-trial briefing—that the claimed "addresses" in the '914 patent were limited to "<u>destination</u> addresses".  The Court held: "The Court is not persuaded that the phrase 'assigning addresses to said data blocks' requires the assignment of destination addresses, as Google argues.  No such limiting language is found in the claims at issue, and SimpleAir's expert testified that that addresses identified in the claims were not required to be so limited."  Ex. 15 (Order denying JMOL) at 11.

[8] In *Google I*, Google made this same argument.  The Court rejected it and noted: "Nothing in the claims requires that <u>multiple addresses</u> be assigned to a single group of data blocks."  *See* ex. 15 (Order denying JMOL) at 19.

| construction | |
|---|---|
| *transmission gateway*: one or more software programs (or a portion of a program) that prepare the data blocks for their transmission to receivers and interface with other resources used to transmit the preprocessed data.<br><br>[no additional construction necessary] | [indefinite] |

The '279 and '154 patents recite the "transmission gateway" elements. They have slightly different attributes, as indicated by the underlining below:

> '279: "a transmission gateway … the transmission gateway configured to prepare the addressed data blocks for transmission to receivers communicatively coupled to the remote computing devices and <u>initiate transmission of the addressed data blocks to the receivers</u>" ('279 claim 1, element [c][1]);

> '154: "<u>at least one</u> transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured <u>to cause the addressed data blocks to be transmitted to the receivers</u>" ('154 claim 1, element [c][iii][1]).

The Court has previously construed the phrase "a transmission gateway for preparing said data blocks for transmission to receivers" to mean "one or more software programs (or a portion of a program) that build data blocks and assign addresses to the data blocks." Ex. 4 (*Google I Markman* Order) at 37-39. This construction includes each of the general requirements of a "transmission gateway". Knox Decl. ¶72. The Court should adopt this construction for the term "a transmission gateway," for the same reasons it adopted it in the *Google I* case. *Id.* at 37-39; *see* ex. 8 (*Google I* Opening Markman Brief) at 16-18; ex. 10 (*Google I* Reply *Markman* Brief) at 13.

The additional requirements of the particular transmission gateways recited in the asserted claims—*i.e.* "configured to…initiate transmission of the addressed data blocks" and "configured to…cause the addressed data blocks to be transmitted to the receivers"—are easily understood, and both parties agree that this additional language need not be construed.

Google asserts that the "transmission gateway" phrase is indefinite. Google will not be able to make this showing. One of ordinary skill in the art would understand the scope of the invention with reasonable certainty because he or she would understand a "transmission gateway" to have the meaning set forth in the Court's prior construction. Knox Decl. ¶72. Moreover, all parties and their experts—including Google—have been able to understand and apply this term in prior cases. *See* above. Furthermore, Google has been able to apply this phrase—and has adopted and applied the Court's construction of this phrase—in six petitions for post-grant review that it recently filed with the PTAB. *See* Petitions cited above.

## VIII.  "communicatively coupled"

| SimpleAir's construction | Google's construction |
|---|---|
| connected or associated in a way that permits communication. | [indefinite]. |

The term "communicatively coupled," was not previously construed. It is used in the claims as follows:

> "an information gateway <u>communicatively coupled</u> to the central broadcast server," '279, claim 1[b];

> "a transmission gateway <u>communicatively coupled</u> with one or both of the central broadcast server and the information gateway," '279, claim 1 [c][1];

> "receivers <u>communicatively coupled</u> with the remote computing devices," '279, claim 1[c][2], '154 claim 1[c]. [9]

The phrase therefore appears in the context of one computer or transmission related component being "communicatively coupled" with another. In this context, the ordinary meaning of "communicatively coupled" is "connected or associated in a way that permits communication." Knox Decl. ¶74-75. This meaning is reflected in technical dictionaries from the time of the invention:

---

[9] The quoted language is from the asserted claims of the '279 patent. The term is used in the same way in the asserted claims of the '154 patent. *See*, '154 claim 1[c]; *id*, claim 1[c][i].

coupling: "…(3) (data transmission) the <u>association</u> of two or more circuits or systems <u>in such a way that</u> power or signal information may be transferred from one to another." IEEE Standard Dictionary of Electrical and Electronics Terms 229 (6th ed. 1996)

coupled systems: "Computer systems that share equipment and can exchange information." McGraw Hill Dictionary of Scientific and Technical Terms 475 (5th ed. 1994),

There is no special definition or disclaimer in the specification or in the prosecution history that would change or limit the ordinary meaning of the term.  Moreover, the specification confirms that—consistent with ordinary meaning—the components that are "communicatively coupled" in the claims are connected or associated in a way that permits communication.  Knox Decl. ¶¶75-79; *see, e.g.,* '279, 8:62-65 ("The content manager 114 [one of the servers that makes up the central broadcast server] communicates with the information gateway 134"); '279, 5:66-6:1, 13:64-14:3; Fig. 2 (depicting the association between the information gateway, the wireless gateway (an embodiment of the transmission gateway), and the content manager (one of the servers that makes up the central broadcast server in the Figure 2 embodiment).  Accordingly, the Court should adopt SimpleAir's construction, which gives the term its ordinary meaning.

Google argues that "communicatively coupled" is indefinite.  Google will not be able to make this showing.  As discussed above, the meaning of "communicatively coupled" was known to those of ordinary skill in the art.  Knox Decl. ¶¶74-80.  In addition, in its recently filed post-grant review petitions, Google and its expert had no trouble understanding and applying this term (and even assert that the ordinary meaning of "communicatively coupled" is "coupled for communication"—which is consistent with SimpleAir's construction).  Ex. 25 ('154 IPR Petition) at 13 ("Petitioner construes the phrase 'communicatively coupled' based on its plain language under the broadest reasonable interpretation to mean 'coupled for communication' including e.g. coupled to allow communication between functions or processes on the same or

different servers."); *see* Petitions cited above.

## IX. "receivers"

| SimpleAir's construction | Google's construction |
|---|---|
| [no construction necessary]<br><br>explanatory phrase: The receiver and the remote computing device may form part of a consumer electronic device. | a receiving device attached to the remote computing device for receiving the data blocks. |

"Receivers" was a disputed term in *Google I*. The Defendants sought a construction that required the claimed "receiver" to be a "device" that is "attached" to the remote computing device (imposing an implicit requirement that the receiving device and computing device cannot be components within a larger machine, *e.g.* components within a smartphone)—the same requirement that Google proposes here. SimpleAir argued that no construction of this term was necessary and opposed Google's implied limitation. The Court rejected Google's proposed construction and ruled that the receiver and computing device need not be "formed in entirely different structures." The Court should reach this same result again, for the same reasons as in *Google I*. Ex. 4 (*Google I* Markman) at 17-20; *see* ex. 8 (*Google I* Opening Markman Brief) at 18-20; ex. 10 (*Google I* Reply Markman Brief) at 8-9.

Moreover, Google's "attached" limitation is expressly refuted by the claim language itself in the '279 and '154 patents. Claim 1 of the '279 patent and claim 1 of the '154 patent both recite "receivers <u>communicatively coupled to</u> the remote computing devices." This defines the relationship between the receivers and the computing devices and requires them to be "communicatively coupled," not "attached."

In addition, dependent claim 30 of the '279 patent and 29 of the '154 patent (which each depend from claim 1 in their respective patent) adds the limitation that "the receiver and the remote computing device [recited in claim 1] form part of a consumer electronic device."

Because the dependent claim requires that the receiver and computing device form part of a consumer electronic device, it necessarily follows that claim 1 (which has broader scope) encompasses receivers and computing devices that form part of a consumer electronic device.

Accordingly, the Court should reject Google's proposal and, to avoid potential jury confusion and preclude future claim construction disputes, the Court's construction should include the explanation that "The receiver and the remote computing device may form part of a consumer electronic device."

**X.    "whether said devices are online or offline from a data channel associated with [the/each] remote computing device"**

| SimpleAir's construction/Court's prior construction | Google's construction |
|---|---|
| entire phrase: whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers.<br>A device is not online to an associated data channel merely because it is able to receive data transmissions (directly or indirectly) from the central broadcast server.<br>*a data channel*:  one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network. | Indefinite. |

SimpleAir's construction is the Court's prior construction of this phrase. [10] *See* ex. 4 (*Google I Markman* Order) at 14, 17.  Accordingly, the Court should adopt its prior construction, for the reasons it adopted it in *Google I. Id.* at 8-17; *see* ex. 8 (*Google I* Opening *Markman* Brief) at 21-26; ex. 10 (*Google I* Reply *Markman* Brief) at 1-7; Knox Decl. ¶¶87-105.

Google asserts that this phrase is indefinite.  Google will not be able to make this showing because one of ordinary skill in the art would understand the phrase to have the

---

[10] In this limitation, the '279 and '154 patents refer to a "remote computing device" while the '914 patent refers to "said computing devices."  As Google conceded in the prior case, the phrases "computing device" and "remote computing device" are used interchangeably in the SimpleAir patents.  Ex. 4 (*Google I* Markman Order) at 20.  Accordingly, these differences do not change the meaning of the phrase.

meaning set forth in the Court's prior construction. Knox Decl. ¶106. Moreover, no party or expert has ever had trouble understanding and applying this term in prior cases. *See* above. Furthermore, Google has been able to apply this phrase—and has adopted and applied the Court's construction of this phrase—in six petitions for post-grant review that it recently filed with the PTAB. *See* Petitions cited above.

## XI. "a viewer"

| SimpleAir's construction | Google's construction |
|---|---|
| one or more applications or programs for viewing a category (or subcategory) of information received from an information source that provides data to the central broadcast server. | Plain and ordinary meaning. |

The term "a viewer" was not previously construed. Google does not propose a construction for the term. However, it is a term that is not likely to be familiar to a jury. SimpleAir's construction has three parts: [1] one or more applications or programs; [2] for viewing a category (or subcategories) of information [3] received from an information source that provides data to the central broadcast server. Each part is addressed in turn below.

[1] <u>one or more applications or programs</u>: A representative claim where the term "viewer" appears is claim 14:

> wherein the remote computing device is further configured to launch a viewer associated with the transmitted data upon a response by a user to the visual alert.

The term is therefore used in the context of something that is "launch[ed]" by a "computing device," which necessarily means it is a computer application or program. The specification also describes viewers as "software" on the user's remote computing device. '279, 23:31-54 (explaining that the user interface alert panel is the "main user interface for the applications software" including "a viewer 48"). The prosecution history also referred to the viewers as "viewer applications that provide access to the data channels." Ex. 31 (Inventor declaration

submitted 11/28/2012).  This part of SimpleAir's construction is correct.

[2] for viewing a category (or subcategories) of information:  The "viewer" as recited in

the claims is "associated with the transmitted data."  Claims 14, 18, 31, 48.  Thus, the claim

language requires that viewer is not generic software for viewing all data.  Instead, the claimed

viewer is "associated with" particular data.  Accordingly, the viewer must be for viewing a

category (or subcategories) of information.

The specification likewise states that "There are separate viewers for each of the different

types of information provided over the network."  '279,  28:59-67.  "[I]nformation is broken into

logical information categories at the central broadcast server 34 end which matches viewers 48

which exist on the user end."  *Id*., 28:9-11.  Each particular viewer can display only the particular

category of information that it corresponds to.  '279:28:23-27 ("Thus a viewer that is capable of

displaying baseball information only receives baseball information.").  There are several

examples of viewers disclosed in the specification, each for viewing a particular category (or

subcategory) of information.  For example, the specification describes a market scoreboard

viewer (for viewing stock information), a football viewer (for viewing football information), and

a newspaper viewer (for viewing news information).  *See* Fig. 24; *see* Knox Decl. ¶110-111.

Moreover, the prosecution history, describes the viewers as "applications that provide

access to the data channels the user has subscribed to," where the "data channels" are

communication channels for viewing a category or subcategory of information. Ex. 31 (Inventor

declaration submitted 11/28/2012).  Accordingly, this part of SimpleAir's construction is correct.

[3] received from an information source that provides data to the central broadcast server.

As explained above, viewers correspond to, and are for displaying, particular information

categories.  These "categories" are data feeds regarding "electronic mail (E-mail) and other

personal alert notifications, news, sports, and financial stories, premium and special event

feeds…<u>On-line services and other information sources</u>, provide [these] data feeds, including real time data feeds" to the central broadcast server. '279 at 7:67-8:2. Accordingly, the data that is displayed by the viewers is received from an information source that provides data to the central broadcast server. Knox Decl. ¶112. Moreover, as noted above, the prosecution history also referred to the viewers as "applications that provide access to the data channels," and data channels are for viewing a category or subcategory of information that is provided by an information source. Ex. 31 (Inventor declaration submitted 11/28/2012). Therefore, this part of SimpleAir's construction is correct.

Accordingly, each part of SimpleAir's construction is correct, and the jury will benefit from a construction for "a viewer". The Court should adopt SimpleAir's construction.

## XII.    "contextual graphics"

| SimpleAir's construction/Court's prior construction | Google's construction |
|---|---|
| graphics relating to the context of the preprocessed data that has been received. | [indefinite].<br><br>*Alternatively*: Plain and ordinary meaning. |

The Court has previously construed this term, and SimpleAir's proposal is the Court's prior construction. Ex. 4 (*Google I Markman* Order) at 45. The Court should adopt it for the same reasons it adopted it before. *Id.* at 44-45; ex. 10 (*Google I* Reply *Markman* Brief) at 14; Knox Decl. ¶¶114-116.

Google asserts that this phrase is indefinite. Google will not be able to make this showing because one of ordinary skill in the art would understand the phrase to have the meaning set forth in the Court's prior construction. Knox Decl. ¶120. Moreover, the parties and their experts—including Google and its experts—have been able to understand and apply this term in prior cases. *See* above. Furthermore, Google has been able to apply this phrase—and has adopted and applied the Court's construction of this phrase—in six petitions for post-grant review that it

recently filed with the PTAB.  *See* Petitions cited above.

## XIII.  "subscriber database"

| SimpleAir's construction | Google's construction |
|---|---|
| [no construction necessary]. | database to determine which subscribers receive which types of content. |

A "subscriber database" is simply a database of subscribers.  Knox Decl. ¶119.  This meaning is apparent from the claim language itself.  Accordingly, the phrase requires no construction.

Google seeks to limit the term to a subscriber database that is used "to determine which subscribers receive which types of content."  But a subscriber database need not be used for this purpose.  For example, an online newspaper that delivers the same content to each of its subscribers might maintain a subscriber database that includes only a list of subscribers.  This database is not "to determine which subscribers receive which types of content," but it is still a subscriber database.  Moreover, there is nothing in the claims that would require the claimed subscriber database to be used for this purpose; nor is there any express definition or disavowal that limits the meaning of the term in this way.

Accordingly, the Court should reject Google's proposed construction.

## XIV.  The Court's prior constructions control because they were adopted as express definitions in the prosecution history.

The prosecution history controls the construction of a claim term when the patentee has made a clear and unambiguous disavowal of claim scope.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007); *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("Prosecution history disclaimer plays an important role in the patent system.  It 'promotes the public notice function of the intrinsic evidence and protect[] the public's reliance on definitive statements made during prosecution.'")  A disclaimer

may occur by express definition of a term during prosecution. *Lennon Image Technologies, LLC v. Macy's Inc.*, 2:13-CV-235-JRG, 2014 WL 3830136, 2 (E.D. Tex. Aug. 1, 2014) ("a patent applicant may … define a term in prosecuting the patent") (quoting *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004)).

The prosecution history includes the original examination of the patent and any statement made to the PTO in post-grant review proceedings. *Golden Bridge Tech., Inc. v. Apple Inc*., 758 F.3d 1362, 1366 (Fed. Cir. 2014); *E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co*., 849 F.2d 1430, 1439 (Fed. Cir. 1988) ("The district court seemed to ignore arguments made during the reissue/reexamination proceeding … Statements made during reissue are relevant prosecution history when interpreting claims").

Moreover, a prosecution history disclaimer applies not only to the patent at issue in the proceeding where the disclaimer occurred, but also to any related patents that have the same specification and include the same claim term. *Gemalto S.A. v. HTC Corp*., 754 F.3d 1364, 1371 (Fed. Cir. 2014) ("when multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation") (internal quotes omitted). Accordingly, disclaimers made in the prosecution history of the '914 patent apply to the same claim terms that appear in the '279 and '154 patents.

Under controlling Federal Circuit law, a patent owner's adoption of a district court's claim construction order in a submission to the PTO during post-grant review proceedings constitutes a disclaimer by express definition, and controls the construction of the claim terms in any subsequent litigation. *Golden Bridge Tech., Inc. v. Apple Inc*., 758 F.3d 1362, 1366 (Fed.

Cir. 2014. [11]

The Court's prior constructions were submitted and adopted by SimpleAir during post-grant review proceedings before the PTO. Google filed two petitions for Covered Business Review of the '914 patent. In both petitions, Google submitted the Court's prior constructions to the Patent Office. Ex. 20 (Google 12/23/13 CBM Petition) at 19-20 ("Petitioner [*i.e.* Google] believes that the constructions adopted by the District Court are commensurate with the broadest reasonable interpretation of these terms for purposes of this proceeding."); Ex. 21 (Google 8/6/2014 CBM Petition) at 11.

In its response to the first petition, SimpleAir attached the Court's Markman Order, expressly stated that it did not dispute those constructions, and then expressly applied those constructions as the basis to distinguish prior art. Ex. 26 (4/9/14 Preliminary Response) at 7. Ex. 26 (4/9/14 Preliminary Response, ex. 2001 (prior Markman Order))*; see, e.g.,* Ex. 26 (4/9/14 Preliminary Response) at 26-27 (applying the Court's prior construction of "a data channel"). In its response to the second petition, SimpleAir once again adopted Google's proposed constructions—which, again, were the Court's prior constructions—and applied them in arguing that Google's prior art grounds should be denied. *See, e.g.* Ex. 27 (11/13/14 Preliminary Response) at 31 (stating that a data channel "is 'one or more communications channels or paths for accessing or viewing a category or subcategory of information that is provided by an

---

[11] In *Golden Bridge*, the district court (E.D. Tex.) had issued a claim construction order adopting certain agreed constructions and resolving other disputed terms. 758 F.3d at 1364. In a subsequent reexamination of the patent, the patent owner "submitted to the [PTO] as part of an Information Disclosure Statement (IDS) the claim construction order from the Texas Litigation." *Id.* Meanwhile, a second infringement suit had been concluded in Delaware and the patent owner appealed the court's construction of "preamble." The Federal Circuit held that the patent owner's "submissions during prosecution of its stipulated construction for the term preamble constitute disclaimer." *Id.* at 1366. The court reasoned that the patent owner "never notified the PTO that it sought a meaning of preamble that was different from its stipulated construction." *Id.* Therefore, "[t]his is a clear and unmistakable assertion by the patentee to the PTO of the meaning and scope of the term preamble." *Id.*

information source over a communication network'" and citing the Court's constructions set forth in Google's Petition).

Moreover, recognizing that both parties had adopted the Court's prior constructions, the Patent Trials and Appeals Board adopted these constructions in denying each of Google's Petitions. Ex. 28 (5/13/2014 Order denying CBM) at 9-11 ("Both parties suggest that the Board adopt the district court's constructions, at least for purposes of this Decision to Institute…we adopt the district court's constructions of the claim terms reproduced in the table above."); Ex. 29 (1/22/2014 Order denying CBM) at 10-12. Thus, each of the Court's prior constructions was submitted in the two post-grant review proceedings initiated by Google and were adopted by SimpleAir in those proceedings. [12]

Accordingly, in the prosecution history of the '914 patent, SimpleAir submitted and expressly assented to the constructions in the Court's Markman order. For each of those terms, that constitutes an unambiguous disclaimer by express definition. SimpleAir's express adoption provided notice to the public of the meaning of these terms, and the public will be able to rely on these definitions. Thus, those definitions control the construction of the terms in this case. [13]

*Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1366 (Fed. Cir. 2014).

---

[12] SimpleAir also submitted the *AWS Markman* Order and expressly adopted the *AWS* Court's constructions during the re-examination of the '914 patent. Ex. 32 (Comments on Statement of Reasons for Patentability and/or Confirmation submitted Feb 5, 2013, filed in Re-examination 90/009,906); *see* ex. 31 (Inventor declaration submitted 11/28/2012) (applying the Court's construction of the "data channel" terms).

[13] In addition, Google recently submitted four Petitions for post-grant review of the presently asserted '279 and '154 patents. *See* ex. 22, 23, 24, and 25. SimpleAir's responses are due before the date of the *Markman* hearing in this case. SimpleAir anticipates that, in its responses, it will define each disputed term to have the meaning that SimpleAir has proposed I this brief. Accordingly, under controlling Federal Circuit law, each of those definitions will constitute an unambiguous disavowal by express definition and will be binding. SimpleAir will provide the Court the relevant filings as exhibits when it files its Reply brief.

Date: February 5, 2015                    Respectfully submitted,

                                          By:  /s/ Simon Franzini

                                          Simon Franzini
                                          CA State Bar No. 287631
                                          (admitted to practice before the U.S. District
                                          Court for the Eastern District of Texas)

                                          John Jeffrey Eichmann
                                          CA State Bar No. 227472
                                          (admitted to practice before the U.S. District
                                          Court for the Eastern District of Texas)
                                          DOVEL & LUNER, LLP
                                          201 Santa Monica Blvd., Suite 600
                                          Santa Monica, CA 90401
                                          Telephone: 310-656-7066
                                          Facsimile: 310-657-7069
                                          Email: simon@dovellaw.com

                                          S. Calvin Capshaw
                                          State Bar No. 03783900
                                          Email:  ccapshaw@capshawlaw.com
                                          Elizabeth L. DeRieux
                                          State Bar No. 05770585
                                          Email:  ederieux@capshawlaw.com
                                          Capshaw DeRieux LLP
                                          114 E. Commerce
                                          Gladewater, Texas 75647
                                          Telephone:  (903) 236-9800
                                          Facsimile:  (903) 236-8787

                                          ATTORNEYS FOR PLAINTIFF
                                          SIMPLEAIR, INC.

**Certificate of Service**

I certify that this document is being filed electronically and, as a result, is being served on counsel of record through the Electronic Filing System on the filing date listed above.

/s/ Simon Franzini
Simon Franzini