IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SIMPLEAIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:14-cv-00011-JRG |
| | ) | |
| GOOGLE INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| YOUTUBE LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| SIMPLEAIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:13-cv-00937-JRG |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

Page

I.    *AN INFORMATION SOURCE* (ALL CLAIMS) ..............................................................1

II.   *DATA* (ALL CLAIMS) .............................................................................................2

III.  *DATA FROM AN INFORMATION SOURCE / GENERATING DATA* (ALL
      CLAIMS) ................................................................................................................7

IV.   *CENTRAL BROADCAST SERVER* (ALL CLAIMS) .......................................................8

V.    *PROCESS DATA [WITH/USING] AT LEAST ONE PARSER* (ALL CLAIMS) ..............13

VI.   *INFORMATION GATEWAY CONFIGURED TO BUILD DATA BLOCKS FROM
      THE PARSED DATA AND ASSIGN ADDRESSES TO THE DATA BLOCKS* (ALL
      CLAIMS) ..............................................................................................................15

VII.  *TRANSMISSION GATEWAY* TERMS (ALL CLAIMS) ................................................18

VIII. *COMMUNICATIVELY COUPLED* (ALL CLAIMS) ....................................................20

IX.   *RECEIVER* (ALL CLAIMS) ..................................................................................23

X.    *ONLINE OR OFFLINE FROM A DATA CHANNEL* (ALL CLAIMS) ...........................24

XI.   *VIEWER* ('279: 14, 18, 20, 28, 31, 48, 54, 62; '154: 14, 20, 31) ....................................27

XII.  *SUBSCRIBER DATABASE* ('279: 2, 30; '154: 2, 30) ....................................................28

XIII. SIMPLEAIR MISREADS THE FEDERAL CIRCUIT'S RULING IN *GOLDEN
      BRIDGE* ...............................................................................................................29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aristocrat Techs. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008)...................................................................16

*August Tech Corp. v. Camtek, Ltd.*,
655 F.3d 1278 (Fed. Cir. 2011)...................................................................8

*Burns, Morris & Stewart Ltd. P'Ship v. Masonite Int'l Corp.*,
401 F. Supp. 2d 692 (E.D. Tex. 2005)........................................................1

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*,
939 F. Supp. 2d 649 (E.D. Tex. 2013).......................................................10

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014).................................................................11

*Golden Bridge Tech. Inc. v. Apple Inc.*,
758 F.3d 1362 (Fed. Cir. 2014).................................................................30

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)..................................................................8

*Interval Licensing LLC v. AOL Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)...........................................................19, 21

*In re Katz Interactive Call Processing*,
639 F.3d 1303 (Fed. Cir. 2011).................................................................16

*Lucent Techs, Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008).................................................................12

*Mass. Inst. of Tech. v. Abacus*,
462 F.3d 1344 (Fed. Cir. 2006).................................................................16

*Mondis Tech. Ltd. v. Hon Hai Precision Indus. Co. Ltds.*,
2:07-c 2011 WL 245507 (E.D. Tex. Jan. 24, 2011)...................................27

*Nautilus Inc. v. Biosig Instruments, Inc.*,
__ U.S. __, 134 S. Ct. 2120 (2014).................................15, 18, 19, 20, 25, 26

*Phillips v. AWH Corp*,
415 F.3d 1303 (Fed. Cir. 2005)...............................................................4, 7

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)..................................................................6

*Robert Bosch, LLC v. Snap-On Inc.*,
769 F.3d 1094 ........................................................................16, 17, 20

*Trading Techs. Intern., Inc. v. eSpeed, Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010).................................................................................9

*Vantage Point Tech., Inc. v. Amazon.com, Inc.*,
   No. 2:13-CV-9090-JRG, 2015 WL 575167 (E.D. Tex. Feb. 10, 2015) ..................16

*Welker Bearing Co., v. PHD, Inc.*,
   550 F.3d 1090 (Fed. Cir. 2008).............................................................................16

*White v. Dunbar*,
   119 U.S. 47 (1886)..................................................................................................6

*In re Yamamoto*,
   740 F.2d 1569 (Fed. Cir. 1984)............................................................................30

*Z4 Techs. Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007)............................................................................12

## Statutes

35 U.S.C. § 112................................................................................................................26

# NOTE ON CITATIONS

- References to *Plaintiff's Opening Claim Construction Brief* (Dkt. 68) are indicated by the abbreviation "Br.," followed by the page number being cited. "Br. 5" therefore refers to page 5 of Plaintiffs' opening brief.

- The patents-in-suits, U.S. Patent. Nos. 8,572,279 and 8,601,154, were attached as Exhibits 1 and 2, respectively, of *Plaintiff's Opening Claim Construction Brief*. U.S. Patent No. 8,572,279 is referred to as "the '279 patent", and U.S. Patent No. 8,601,154 is referred to as "the '154 patent".

- References to the patents-in-suits are indicated by column and line number, or by claim number. Since the two patents share substantially identical specifications, all references are to the specification of the '279 patent unless otherwise stated. A reference to "3:15-17" therefore means column 3, line 15 through line 17 of Dkt. 68, Exhibit 1, U.S. Patent No. 8,572,279.

- Patent claims are referred to by patent number and claim number. A reference to "'279:1" therefore means claim 1 of the '279 patent.

- References to the Court's May 20, 2013 Memorandum Opinion and Order in Case No. 2:11-cv-0416-JRG, Dkt. 379, which was attached as Exhibit 4 to Plaintiff's Opening Brief, are referred to as "*SA1 Markman*."

- References to the February 18, 2015 Deposition of James Knox, excerpts are attached as Exhibit 1, are referred to by "Knox" followed by the page and line numbers.

SimpleAir relies primarily on the Court's prior claim construction order in *SimpleAir I* to justify its positions, but ignores fundamental differences between this litigation and the last. The two asserted patents in this case were not at issue in *SimpleAir I*. Many terms in dispute were never addressed in any prior litigation. Moreover, the Supreme Court has now rejected the indefiniteness standard that was in place when claims were construed in the prior litigation. And where terms were previously construed, Defendants propose new constructions and offer new evidence to respond to the Court's previously-articulated concerns and address changes in the law. Thus, the Court's prior constructions are instructive but not binding. *Burns, Morris & Stewart Ltd. P'Ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005). The issues raised in this case must be decided *de novo*. *Id.*

## I.    *AN INFORMATION SOURCE* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| one or more content or on-line service providers, including all content providers on the Internet, that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages or e-mails.[1] | one or more content or on-line service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages or e-mails. |

The Court previously construed "an information source" when considering whether the "mere network connection" of the Internet could be an "information source." (*SA1 Markman* at 27.) In its Order, the Court found that "the **physical medium** of the Internet, absent content" could **not** be an "information source." (*Id.*) Defendants' construction seeks only to clarify that the "**content providers** on the Internet" – not the medium – constitute an "information source." This accords with the specification, which describes "the Internet" as an information source: "information sources 12, **such as the Internet**, on-line services and other information sources,

---

[1]   To narrow the disputes between the parties, Defendants have modified several of their constructions, including modifications that respond to constructions SimpleAir first offered in its opening brief. *See* Br. 9 n. 3.

provide data feeds, including real time data feeds, to a network of servers 33 in the central

broadcast server 34." (7:59-62; *see also* 3:30-35, 6:46-52, 30:58-63.) This clarifies that "the

network by itself is not information, but rather ***the content on the network is the information***."

(*SA1 Markman* at 27 (emphasis added); *see also* Wicker Decl. ¶ 38.)[2]

## II.   *DATA* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| *data*: content of a message (such as news, weather, sports, or financial information) | *data*: any type of digital information suitable for digital transmission or computer use. |

Though the Court has not previously issued a construction of "data" in the context of

these patents, it has made clear, in analyzing other claim elements, that what is passed from the

information source to the remote computing devices in the invention is the "content" from the

information source. (*SA1 Markman* at 13 ("access ***to the content*** within the information sources

is what is important"); 27 ( "information sources" refer to the "***content*** on the network" and not

the mere electrical or "physical medium" of the Internet)).[3] Despite this prior finding, and the

clear intrinsic teaching that "data" must be the content transmitted by the information source to

the remote computing devices, SimpleAir maintains that "data" encompasses ***any*** type of digital

information. This overly-expansive construction ignores the asserted claims and the

specification, which specify that the "data" transmitted from the information source, parsed by

---

[2] SimpleAir's proposed construction limits "an information source" to a subset of content or on-line service providers that provide data to the central broadcast server ("CBS"). Nothing in the claim language or the intrinsic record supports this restriction.

[3]   The Court's prior construction of "contextual graphics"—which relate to the ***context*** of the data received—further accords with the claims' requirement that "data" be content, as headers do not have context for meaningful graphics. (*SA1 Markman* at 44-46.) Even SimpleAir assumes that the relevant "data" is content rather than header information in urging the Court to adopt its construction of "viewer." SimpleAir argues that since "the claimed viewer is 'associated' with particular data"—that is, the data received by the remote device that originated at the information source—"the viewer must be for viewing ***a category (or subcategories)*** of information." (Br. 25 (emphasis added).) Plainly, only content from the information source can be classified into categories or subcategories.

the parsers, and received by the receivers is the content of the message – not other information, such as the headers or metadata.

The specification repeatedly distinguishes between "data" and "non-data" (*e.g.* header) information, and describes "data" as the content passed from the information source to the remote computing devices. For example, the information source transmits content such as "electronic mail (E-mail) and other personal alert notifications, news, sports, and financial stories, premium and special event feeds, advertisements/promotions, graphics, sounds, and scheduled updates." (7:66-8:3; *see also* 8:15-19, 8:24-25; 12:10-14). The information gateway then builds "data blocks" around parsed data to enable transmission of that data to receivers coupled to remote computing devices. (11:37-40; 15:28-32.) In these "data blocks," the patent ***expressly distinguishes*** content from the headers.[4] *See, e.g.*, Fig. 5:

Figs. 5-1, 5-2: Information Notification Data Blocks

| Item | Size | Description |
|---|---|---|
| **Header:** | | |
| CRC | 2 bytes | Standard Cyclical Redundancy Code to verify data block integrity. |
| Header Type | 1 bit | If bit clear, then this is a message header. If bit set, then this is the data block header. |
| Custom Header Flag | 1 bit | If bit clear, no custom header. If bit set, then a custom header is included in the data block. |
| Version Number | 4 bits | Protocol version used. |
| Private Data Block Flag | 1 bit | If bit clear, then this data block will be passed on to the Alert Panel for processing and display. If bit set, then this is a private data block to be processed internally by the Communications Server. |
| Virtual Capcode Flag | 1 bit | If bit clear, then this data block is not targeted for a specific virtual capcode and no virtual capcode is included in the data block. If bit set, then this data block contains a virtual capcode. |
| Data Block Type | 1 byte | The value of this byte specifies the type of data contained in the data block. If Private Data Block Flag is clear: 1 = plain text, 2 = AirMedia Live data feed format. If Private Data Block Flag is set: 1 = Capcode reprogramming message, 2 = Binary file transfer. |
| Data Block Version | 4 bits | The version number of this data block's format. |
| Use Compression Flag | 1 bit | If bit clear, then this data block is not compressed. If bit set, then compression is used and the compression type is specified in the Compression ID item. |
| Use Encryption Flag | 1 bit | If bit clear, then this data block is not encrypted. If bit set, then this data block is encrypted. |
| Spare | 2 bits | Reserved for future use. |
| Compression ID (optional) | 1 byte | Included only if Use Compression Flag is set. Indicates the type of compression used. |
| Virtual Capcode (optional) | 1 byte | Included only if Virtual Capcode flag is set. Contains the virtual capcode to which this data block is targeted. |
| Size of Custom Header (optional) | 1 byte | Included only if Custom Header Flag is set. Contains the size in bytes of the custom header. |
| Custom Header (optional) | variable | Reserved for future enhancements to data block protocol. Size determined from previous item. |
| **Contents:** | | |
| **Data Block Contents** | **variable** | **Information notification data from the information source to be processed by AirMedia Live software.** |

---

[4] Figure 5 lists "data block contents" corresponding to "data from the information source." In contrast, the header information in the other fields is generated by the broadcast server, and thus cannot constitute the "data from an information source" required by the claims. (15:28-42; *see also* Knox 78:24 to 79:1 ("Q. So here there's a distinction between the header and the packet data; is that right? A. That is correct.").)

The specification further provides that the "data block" is then enclosed in one or more "data packets." (11:44-64, 13:27-54.)[5] Here again, the specification clearly distinguishes between the "packet *contents*," which are the "*data* portion of the packet," and the non-data headers information. *See, e.g.*, Figs. 5-8 (and accompanying descriptions); *see also* 12:64-13:15 (describing notification data blocks (Fig. 6) to be packetized for transmission); 13:35-54 (describing single packet data block (Fig. 9) as "the packet header is followed by the data block header and data block contents"):

*FIG. 6* - Data block containing personal alert information

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Alert Length | 1 byte | The size of the alert data in bytes. |
| Alert Type | 1 byte | The value of this item defines the alert type (e.g. new e-mail arrival alert). Up to 256 predefined alert types are allowed. |
| Contents: | | |
| Alert Data | variable | Personal alert notification data. Size of data is determined by the Alert Length item. |

*FIG. 9* - Single Packet Data Block

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Packet Type | 4 bits | The value of this item indicates the packet type: 0 = Standard AirMedia Live Packet; 1 = Single Packet Data Block; if the left most bit (high bit) is set, then this is a Binary Alert Packet. |
| Data Block ID | 12 bits | The ID of the data block contained in this packet. |
| Contents: | | |
| Packet Contents | variable | The header and contents of the data block contained in this packet. |

The claims themselves further support construing "data" as the "content of the message." "[T]he claim language itself and the interaction of different portions of the claim language . . . provide significant guidance" regarding a claim term's meaning. *SA1 Markman* at 16 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)). The claims explicitly require transmitting "data" from an information source to remote computing devices. (32:46-47; 34:57-

---

[5] The specification explicitly details that one of the components of the "data *packet*" is "[t]he header and contents of the data *block* contained in this packet" (Fig. 9), and further details that the data block itself also contains header and content information. (Figs. 5-6.) It is the contents of the data block that were parsed from the "data from the information source" recited in the claims (Fig. 5; *compare* 32:46). The header of the data block or the header of the data packet, in contrast, were generated by the CBS or one of the gateways. (11:31-42.)

58.)  The claims further specify that the CBS be configured to receive the "data" from the information source and to process the received "data" with a parser (32:48-50; 34:59-61), that an information gateway be configured to build data blocks from the parsed "data" (32:53-55; 34:64-65), and that a transmission gateway be configured to transmit the blocks containing parsed "data" to receivers communicatively coupled to remote computing devices.  (32:57-61; 35:1-5.)[6] These components all process and transmit **content** in the specification.

SimpleAir proposes that "data" is "any type of digital information suitable for digital transmission or computer use."  (Br. 3-4.)  This expansive construction of "data" ignores **all** of the intrinsic evidence regarding what is actually sent in the claimed "invention," and relies on a quote from the specification regarding **data packets** – packets with data in the payload, and non-data elements in the headers.  (Br. 6.)

SimpleAir's argument ignores grammar, just as it ignores intrinsic evidence.  A "data packet" is not itself "data," for the same reason that a "milk carton" is not itself "milk."  Using "data" as an adjective to modify "packet" only means that the packet *contains* data, not that it is itself "data" (a noun).  The patent itself illustrates this, depicting a "data packet" that contains header information and identifying "***the data portion of the packet***" in Fig. 8:

---

[6]  The sole independent claim of the '154 patent likewise recites a "method to **transmit data from an information source** [] **to remote computing devices**" ('154 at 32:38-40), and requires that the "data" be parsed, packaged into blocks, and transmitted to receivers communicatively coupled to the remote computing devices.  (*Id*. at 32:46-50, 32:57.)  At his deposition, SimpleAir's claim construction expert James Knox confirmed that "in the context of this claim, the data that they're talking about is data going from an information source to a remote computing device."  (Knox 69:4-8; *see also id.* 71:2-16.)

FIG. 8 - Binary Format Data Packet

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Packet Type | 4 bits | The value of this item indicates the packet type: 0 = Standard AirMedia Live Packet; 1 = Single Packet Data Block; if the left most bit (high bit) is set, then this is a Binary Alert Packet. |
| Total Packets Flag | 1 bit | If bit is clear, then the Total Data Packets and Total Error Correction Packets items are not present. If bit is set, then the Total Data Packets and Total Error Correction Packets items are present. |
| Message ID | 11 bits | The number of the message to which this packet belongs. |
| Packet Number | 1 byte | The position of this packet in the message (packet sequence number). |
| Total Data Packets | 1 byte | Total number of data packets in the message (does not include error correction packets). |
| Total Error Correction Packets | 1 byte | Total number of Reed-Solomon forward error correction packets in the message. |
| Contents: | | |
| Packet Contents | variable | The data portion of the packet. |

SimpleAir's other cites to the specification are similarly unrelated to the "data from an information source" – the "data" described and required by the claims. (Br. 6.) For example, the "user subscription data" cited by SimpleAir is transmitted from a user to the CBS, not from an information source to a remote computing device. (8:34-40.) Similarly, the "diagnostic data [] for software debug purposes" is generated at the "communications server" on the remote computing device. (22:59-67.)[7]

SimpleAir's dictionary definitions and other extrinsic evidence cannot contradict the patents' own descriptions of "data."[8] Yet SimpleAir suggests in its brief that since "the specification contains no express definition or disclaimer," the intrinsic record cannot be limiting. (Br. at 5.) This simply adopts "the *Texas Digital* approach [that] limits the role of the

---

[7]   That Google's *invalidity* expert supposedly adopted SimpleAir's expansive interpretation of "data" (Br. 6.) is irrelevant: invalidity experts are entitled to use the same claim scope used by the patentee for infringement to prevent patent owners from turning the claims into a "nose of wax" to be twisted one way to preserve a patent's validity and another way to catch an alleged infringer. *White v. Dunbar,* 119 U.S. 47, 51-52 (1886); *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1310-11 (Fed. Cir. 2008). Mr. Nerieri's interpretation of "data" was made outside of the patent claims and specification. (Br. 6.)

[8]   In support of its extrinsic-evidence-only claim construction approach, SimpleAir cites to *Aventis Pharm.'s* brief discussion of claim construction principles, which in turn cites to *Phillips*. (Br. 5; *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).) But as the cited portion of *Phillips* makes clear, claim terms are given their ordinary and customary meaning to a person of skill in the art who has "read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. SimpleAir's subsequent *Thorner* citation properly recites the governing standard. (Br. 7.)

specification in claim construction to serving as a check on the dictionary meaning of a claim term." *Phillips*, 415 F.3d at 1320. As *Phillips* found, "[a]ssigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term.'" *Id*. at 1320-21.

### III. *DATA FROM AN INFORMATION SOURCE / GENERATING DATA* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| *data from an information source*: data created at or combined by an information source | *data from an information source*: [no additional construction necessary] |
| *generating data*: the information source creating data to be transmitted to the central broadcast server ('154 Patent only) | *generating data*: producing data to be transmitted to the central broadcast server by creating or combining data |

Unlike the claims of the '914 and '279 patents, which do not explicitly recite where the transmitted data is created, claim 1 of the '154 patent recites that the "data from an information source" be generated "***at*** the information source." ('154 patent at 32:38-47; *compare* '914 patent at 33:16-19, 38:37-40; '279 patent at 32:46-49, 34:57-60.) Defendants' constructions reflect this explicit teaching in the patent by proposing that "data from an information source" means creating or combining data while "generating data" means creating data.

SimpleAir's proposed construction of "generating data," which it expressly contends includes "combining data" is aimed at reading "generating" out of the claims. As made clear in the specification (and Defendants' proposed construction), an ***information source*** must "create or combine" the data it transmits in order to be the "source" of that "information." (*See* Wicker Decl. ¶¶ 56-59; *see also* Knox 104:17 to 105:9 ("one skilled in the art would not generally consider a router [] to be an information source. Because it is just passing it through, in spite of the fact that it does build new data blocks and packets and so on.").) Thus, for the term

"generating data" to have any independent meaning, and not simply be redundant of "data from an information source," it must require data creation. SimpleAir opposes this construction, but in doing so never considers or even mentions the language of the claims. Instead, SimpleAir selectively quotes dictionary definitions – none of which describe generating **data** as opposed to programs, tables of contents, or other non-data components. (Br. 8-9; *see also* Knox 93:22 to 94:2 ("Q. There's no extrinsic evidence that expressly uses or defines the larger phrase 'generating data'; is that fair? A. I believe that is correct, yes.") (objection omitted).) SimpleAir also asserts that interpreting the "generating data" limitation to require creating data reads out one embodiment. (Br. 9.) But every claim need not cover every embodiment, particularly when there are **three** earlier patents in the family that may do so. *See e.g.*, *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011). Different terms in patent claims are presumed to mean different things. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004). The applicants plainly knew how to draft claims that do not specify where the information source obtained its data – yet the applicants deliberately drafted claims that require the information source to create the relevant data. SimpleAir's effort to re-draft the claims should be rejected.[9]

## IV.  *CENTRAL BROADCAST SERVER* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| *central broadcast server*: one or more servers that process the content of a message for transmission to multiple remote computing devices. | *central broadcast server*: one or more servers that are capable of receiving data from a plurality of information sources and processing the data prior to its transmission to one or more selected remote computing |

---

[9]  The "data from an information source" specified in the preamble of claim 1 of the '154 patent is the "generated data" specified in the body of the claims. ('154 patent at 32:38-43, 32:46-47.) For example, the first step of claim 1 of the '154 patent requires "generating data at the information source." Thus, the "method to transmit data from an information source" according to the claim is the method to transmit "generated data."

| devices. |
| --- |

In its brief, SimpleAir relies heavily on the Court's construction of "central broadcast server" in the prior case. But SimpleAir's own proposal diverges from the Court's prior construction, and the issues presented by the parties differ from those addressed in *SimpleAir I*. Here, the parties dispute (1) whether the CBS must transmit the processed data to all available receivers (*i.e.*, a broadcast to many receivers), or whether transmission to only one of many available receivers is sufficient; and (2) whether the CBS must receive data from more than one information source.[10]

***Broadcast:*** The parties' dispute as to whether a "central broadcast server" must actually broadcast was not addressed in *SimpleAir I*. The applicants deliberately choose to classify the relevant server as a "broadcast server," which the patents explain means "transmit[ing] to ***everyone***." (3:13-15; 6:25-28.) Consistent with this definition, the specification states that "[i]n accordance with the present invention, the notification centric portions of that information that lives in an electronic medium is wirelessly ***broadcast on a nationwide basis*** to wireless receiving devices which are attached to personal computers or other computing devices." (2:66 to 3:3; *see also* 3:31-35, 3:61 to 4:3, 6:46-52, 12:3-7.) Thus "***the present invention***" uses broadcast technology like the pager network to transmit messages to receivers. (9:29-32; *see also* 13:16-

---

[10] The parties' dispute regarding whether the "data" processed by the central broadcast server refers to the content passed through and processed by the broadcast server or whether it can refer to any other non-data components, such as header information, is discussed above. In sum, since the "data" in the claims does not include header information, processing the headers cannot meet limitations that require processing "data." And as discussed in the "process data" section below, SimpleAir's attempt to expand the claims to cover processing header information is contrary to the specification and effectively reads those limitations out of the claims. The central broadcast server must process the *content* it receives from the information source(s), in accordance with Defendants' construction. It does not appear that the parties have a real dispute regarding the meaning of "server," and SimpleAir's own expert acknowledged that one of ordinary skill would know what a "server" refers to without requiring further construction from the Court. (Knox 107:13-16.)

23, 21:9-15.)[11] *See, e.g., Trading Techs. Intern., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-55

(Fed. Cir. 2010) (description of "present invention" "strongly suggests" that the claim should be

construed in keeping with that description). The specification similarly states that the "broadcast

server" portion of the present invention broadcasts to receivers like pager devices, while never

once saying that the broadcast server narrowcasts (*i.e.*, transmits to a few recipients) or

pointcasts (*i.e.*, transmits to only one recipient) to the receivers. (Abstract; 7:59-66; 12:20-33;

14:13-17; 14:42-46; 20:4-7; 23:31-34; 31:18-20.) The claims also state that the data blocks

created from the incoming data are prepared "for transmission to receive<u>r</u>s communicatively

coupled to the remote computing device<u>s</u>." (32:58-60; 35:1-4; '154 patent at 32:48-50.) This

use of the plural form encompasses **only** methods and apparatuses with more than one of that

term. *Cheetah Omni LLC v. Alcatel-Lucent Inc.*, 939 F. Supp. 2d 649, 655-57 (E.D. Tex. 2013).

Further, during the prosecution of the parent '433 patent, the applicants explicitly

distinguished the Rossman prior art reference for using "one to one communication" rather than

"broadcast[ing] from a server to a plurality of receivers":

> The present invention provides for the "***broadcasts***" of URLs to a plurality of
> receivers. Nowhere does Rossman teach or suggests [sic] broadcasting URLs to a
> plurality of receivers. In contrast, Rossman requires a user to generate URLs
> which then are sent it to a server [sic] in ***a one-to-one communication***
> ***link***....[This is] a ***fundamental*** difference between the present invention and
> Rossman…

(Ex. 2, February 16, 1999 Request for Reconsideration at 21-23 (emphasis in original).)[12] As

SimpleAir itself has argued, its representations with respect to the parent '433 patent apply

---

[11] Notably, despite listing over seven different means of broadcasting ***from*** the broadcast server, the applicants did not list the Internet as a medium, despite preferring the Internet for sending information ***to*** the broadcast server. (9:18-28; *compare* 11:44-64.)

[12] In the *Apple* litigation, the Court distinguished the claims withdrawn by the patentee based on the Examiner's reference to Rossman from those at issue in that case on the basis that the asserted claims "explicitly require that the computing device be ***instantaneously notified*** (i.e., alerted) of the receipt of data whether the computing device is on or off." (Pl. Ex. 5, *AWS* Order

equally to the patents-in-suit: "when multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Gemalto S.A. v. HTC Corp.,* 754 F.3d 1364, 1371 (Fed. Cir. 2014) (*quoted at* Br. 28.) Defendants' construction thus requires that the "broadcast server" ***broadcast***, as mandated by the claims themselves, the specification, and the prosecution history. (*See also* Wicker Decl. ¶¶ 63-66.)

SimpleAir provides no extrinsic support for its construction of "central broadcast server"—nor can it, as the term was coined for this patent. ('914 Re-exam, Dec. 12, 2012 Declaration at 7 n.5: "None of the Air Media Live source code or early internal documents that we have reviewed refer to the NOC as a 'central broadcast server.' ***We believe that term and others were later coined*** as a result of our discussions with the patent attorneys in early 1996." (emphasis added).) SimpleAir's citation to the intrinsic record also fails to provide any support for its proposed construction. SimpleAir asserts that "broadcast" cannot mean "broadcast" because of a supposed pointcasting embodiment. (Br. 12-13.) But there are no embodiments where the broadcast server ***itself*** does not broadcast. To target specific devices (*e.g.*, a subset or even one), attached receivers will receive broadcasts and filter them: "The paging network addresses an individual or group ***by broadcasting*** on a particular address or capcode." (10:5-7.) "Physical address filtering ***in the receiver hardware*** is then used to determine whether the message should be passed on for further virtual address filtering (step 202)." (21:66 to 22:2; *see also* 22:26-28.)

---

at 11.) Hence, the Court concluded that the claims could be read to "cover 'push' technology." *Id.* However, that distinguishing claim language does not appear in the asserted claims in this case, and there is nothing similar that suggests push technology is encompassed within their scope. Accordingly, for the patents here, patentees are bound by their prosecution disclaimer of pushing data to a client system.

SimpleAir's construction ignores not only the patent, but also logic. It would render the claimed invention superfluous: if the broadcast server can itself pointcast to receivers, then there is no need for the receivers to filter a broadcast based on addresses. The patents' entire architecture is built around a broadcast delivery system. In fact, the patents explicitly define "addresses" as something used by *receivers* in order to sort through broadcasts. Addresses are "numbers used by wireless *receiving devices* to identify messages targeted to a user," and "the message will be ignored" by the *receiver* if the broadcast was not addressed to the user. (20:10-21; *see also* Wicker Decl. ¶ 68).)

The patents mention pointcasting and multicasting only to distinguish broadcasting from these alternative forms of communication. (3:12-15.) The only portion of the specification SimpleAir relies on expressly distinguishes broadcast from narrowcast and pointcast and, therefore, supports Defendants' interpretation of the claim term. (*Compare* Br. at 13.)[13]

**_Multiple Information Sources_:** SimpleAir suggests that because the word "central" modifies "broadcast server," it must mean that the CBS is "capable of receiving data from a plurality of information sources."[14] (*Id*. at 11.) Not so. Unlike the claims at issue in *SimpleAir I*, the asserted claims here explicitly recite "a central broadcast server configured to receive data *from at least one information source*." (32:48-49; 34:59-60.)[15] Accordingly, the asserted

---

[13] Even if the specification did include a broadcast server that did not broadcast to receivers—which it does not—the express claim language cannot be rewritten to preserve an embodiment. *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214-16 (Fed. Cir. 2008).

[14] If anything, "central" means a centralized component of the system (e.g., geographically central or centralized hub).

[15] SimpleAir also argues that because "data" is a plural noun, a specific piece of datum need not be transmitted to all receivers. (Br. 12.) This is a red herring. The claims' explicit recitation of a "central *broadcast* server" as opposed to a "central server" mandates broadcasting, regardless of the singularity or plurality of the incoming "data." In any event, the claims specify that "data *blocks*" containing parsed data are transmitted to the receivers, not "data." ('279 claims 1, 35; '154 claim 1.)

claims cover a CBS that can only receive data from a single information source, as well as a

broadcast server that can receive data from multiple sources.[16]

## V. *PROCESS DATA [WITH/USING] AT LEAST ONE PARSER* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| using one or more computer software programs that each respectively correspond to the content of the message to break or divide data into components. | using one or more computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon. |

In *SimpleAir I*, the defendants argued that the "parsers" recited in the '433 and '914

claims must "correspond to the type of information" from the information source. (*SA1 Markman* at 29; see also *SA1* Dkt. 329 at 19-23.) The Court observed that the claims in that case

recite "parsers corresponding to said central broadcast server" or "said servers," and held that the

parsers correspond to the server, but nothing more. (*SA1 Markman* at 30-31.) However, the

asserted patents in this case do not recite the "corresponding" language. Instead, they require

that the "***parsed data***" be encapsulated in data blocks, not the original unparsed "data" of the

'914 and '433 claims. The "parsing" limitations in this case are thus materially different,

rendering the Court's prior ruling inapplicable.

First, the parties dispute whether parsers are programs respectively corresponding to the

content parsed (Defendants) or merely routines or functions independent of the data (SimpleAir).

As the patents explain, the claimed invention uses different parsers depending on the format of

---

[16] SimpleAir attempts to explain away the claim language by creating from whole cloth a distinction between being "configured to receive data" and being "capable of receiving data," absent any reference to the claims or the specification. (Br. 11.) SimpleAir's proposed distinction is meaningless: a server capable of receiving data from only one information source can obviously be configured to do just that. SimpleAir's attempt to interpret "from at least one information source" to mean "a plurality of information sources" should be rejected. *Z4 Techs. Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1349 (Fed. Cir. 2007) ("[T]he use of the phrase 'at least one' means that there could be only one . . . .") (internal cites and quotes omitted).

the incoming data: "The data, which can include but is not limited to stock quotes, weather, lotto, E-mail, etc. *is then respectively parsed by parsers*, such as the stock quote parser 106, weather parser 108, lotto parser 110 and mail parser 112. . ." (8:15-19; *see also* 8:24-25 & Figure 2.) The specification explains that "any type of information source *and corresponding parser* may be used." (8:27-28.) This content-specificity is needed to parse data from different information sources. For example, stock ticker data looks very different than weather data or news, and must be divided in different ways. (*See also* Wicker Decl. ¶ 78.)

SimpleAir asserts that *any* "breaking or dividing" of data is sufficient to meet the "parser" limitation, even if that division ignores the content-specific format of the data. Its sole support is catch-all language in the specification stating that "[t]he present invention is not limited to the information sources or parsers described herein." (Br. 14-15.) But the *very next sentence* of the specification states: "Rather, any type of information source *and corresponding parser* may be used." (Br. 15; 8:26-28.) SimpleAir's content-independent interpretation is entirely unsupported and should be rejected. (*See also* Wicker Decl. ¶ 78.)

The parties also dispute whether the parser is a software program or module (Defendants) or a subcomponent of a program like a routine or function. (SimpleAir.) Figure 2, which is "a block diagram of the wireless communication network" (4:20-21), uses separate blocks (programs) for each of the parsers. The specification similarly describes the parsers as separate programs from other programs in the CBS. (8:12-22.) Yet SimpleAir seeks to construe "parser" such that it could be met by *components* of the program blocks listed in Figure 2, *including those which the patent does not considers parsers*. In fact, Dr. Knox asserted that the "FTP Server" and "SMTP Server" in Figure 2—the means by which the CBS receives information from the Internet (8:12-15, 11:44-47)—would meet the "parser" limitation under SimpleAir's

proposed construction, rendering the "parser" language superfluous. (Knox 126:9-16.)

SimpleAir's construction is thus intended to give it leeway to argue that a necessary step in

"receiv[ing] data from at least one information source"[17]—which the applicants explicitly listed

as a ***separate*** claim limitation—is sufficient to meet the "parser" limitation. SimpleAir's attempt

to read "parser" out of the claims should be rejected.[18]

## VI. *INFORMATION GATEWAY CONFIGURED TO BUILD DATA BLOCKS FROM THE PARSED DATA AND ASSIGN ADDRESSES TO THE DATA BLOCKS* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| whole phrase: [indefinite] | one or more software programs (or a portion of a program) that build data blocks from the parsed data and assign addresses to the data blocks. |

SimpleAir claims that "information gateway" cannot fail the legal test for definiteness

because "no one . . . has ever had any trouble understanding or applying" the term "information

gateway" in the prior cases. (Br. at 16-17.) This is a red herring. The Court has never addressed

whether "information gateway" is indefinite. (*SA1 Markman* at 31-37.) SimpleAir's position

directly ignores *Nautilus, Inc. v. Biosig Instruments, Inc.*, __ U.S. __, 134 S. Ct. 2120 (2014),

which explicitly ***rejected*** SimpleAir's approach: even if "a court [or a party] can ascribe ***some***

meaning to a patent's claims," this is ***irrelevant*** to indefiniteness. *Id*. at 2130 (emphasis in

original). Definiteness under 35 U.S.C. § 112 "require[s] that a patent's claims, viewed in light

of the specification and prosecution history, inform those skilled in the art about the scope of the

invention with reasonable certainty." *Id*. at 2129. The "information gateway" term fails this test.

---

[17] SimpleAir's expansive construction of parse could be read to encompass the components of the central broadcast server that are ***not*** labeled 'parsers'. (Knox 126:9-16.)

[18] SimpleAir's assertion that "nothing in the claim language or specification requires the claimed 'parser' to be a stand-alone 'program'" is a red herring. (Br. 14.) Defendants' construction does not include the phrase "stand-alone" and is thus not limited to "stand-alone" programs.

"Information gateway" is not a term of art, and does not connote to one of ordinary skill in the art any particular structure. As SimpleAir's construction proposes, and as its expert admitted, the term could include *any* software that performs the subsequent functional limitations of "build[ing] data blocks from the parsed data and assign[ing] addresses to the data blocks." (Wicker Decl. at ¶¶ 82-84; Knox 162:20-23, 165:21-166:17; *see also* Dkt. 68, Pl. Ex. 31 ¶ 16 (acknowledging that "information gateway" was a term "created and used internally" by AirMedia).) Claims with this type of "purely functional limitation" are invalid as indefinite unless the specification provides "the structure that performs the recited function." *Welker Bearing Co., v. PHD, Inc.*, 550 F.3d 1090, 1095 (Fed. Cir. 2008); *see also Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099. (Fed. Cir. 2014).[19] Moreover, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor" – an algorithm, specific hardware configuration, and/or other specific corresponding structure is required. *Aristocrat Techs. Austl. Pty Ltd., v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008); *In re Katz Interactive Call Processing*, 639 F.3d 1303, 1314-15 (Fed. Cir. 2011) .

In *Vantage Point Tech., Inc. v. Amazon.com, Inc.*, No. 2:13-CV-9090-JRG, 2015 WL 575167 (E.D. Tex. Feb. 10, 2015), this Court found that the term "a snooper" was purely functional and that the plaintiff had failed to identify any structure corresponding to "a snooper" in the specification. *Id.* at *17. As the Court recognized, (1) structure in the specification is

---

[19] There is no magic language that must appear in a claim for it to fall within the scope of § 112, ¶ 6. If a claim limitation does not expressly use the words "means," there is a rebuttable presumption against construing the claim as a functional claim. *Mass. Inst. of Tech. v. Abacus*, 462 F.3d 1344, 1353-54 (Fed. Cir. 2006). However, this presumption can be overcome if a claim "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (citations omitted). Moreover, if a claim is directed at purely functional language, to invoke the protections of 35 U.S.C. § 112(6), the patentee must identify the corresponding structure with sufficient specificity and clarity to apprise a person of ordinary skill of the claim's scope. *Id.*

"corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the claimed function; (2) a "black box" illustration that represents function without any mention of structure does not provide sufficient corresponding structure; and (3) a challenge of indefiniteness cannot be defeated merely by demonstrating that a person of ordinary skill could find a way to practice the invention. *Id*.

The same analysis applies here. The claim language recites only what the "information gateway" ***does***, not what it ***is***. SimpleAir's construction of "information gateway configured to build data blocks from the parsed data and assign addresses to the data block" only underscores this point, as SimpleAir merely substitutes "one or more software programs (or a portion of a program)" for "information gateway" and leaves the remaining functional limitations intact.[20] At his deposition, SimpleAir's expert opined that ***anything*** performing the remaining claim limitations would meet SimpleAir's construction of "information gateway." (Knox. 132:21 to 133:7). He further confirmed that there would be no restriction on either the hardware components or the algorithms employed by the software. (Knox. 167:24 to 168: 16.) Since the "information gateway" term amounts to pure functional claiming, it is indefinite. *Robert Bosch*, 769 F.3d at 1102.

Nor can SimpleAir invoke § 112(6) to salvage the claim from indefiniteness, as it cannot identify any corresponding structure. The specification and file histories disclose no corresponding algorithm for the "information gateway" function, nor any particular hardware required for implementing it. Instead, in describing the "information gateway," the specification identifies only ***functions*** that the "information gateway" ***may*** perform. (8:52-9:17 ("the

---

[20] In other words, under SimpleAir's construction literally any software program, collection of programs, or part of a program could be an "information gateway." The facial absurdity of this position only underscores the indefiniteness of the claim.

information gateway's 114 duties include, but are not limited to…").[21]) There is no discussion of **how** the functions are carried out.[22] Likewise, the patent figures show the information gateway only as a "black box" performing the recited functions, without corresponding structure. (Figs. 2, 3, 12, 13 (Box 134), Fig. 4 (Box 115), Fig. 15 (top-right box).)

For these same reasons, the "information gateway" terms are indefinite for failure "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. 2120, 2124 (2014). As explained above, the specification discloses only the functions performed by the information gateway, but not what the information gateway actually is. One of skill in the art reading the specification would not be able to determine the "metes and bounds" of this limitation – he or she would merely understand that a "black box" performs the functions of "build[ing] data blocks from the parsed data and assign[ing] addresses to the data blocks," without knowing what electronic hardware or software constituted the black box. Thus, the "information gateway" limitations are indefinite. *Nautilus*, 134 S. Ct. at 2124.

## VII. *TRANSMISSION GATEWAY* TERMS (ALL CLAIMS)[23]

| Defendants | SimpleAir |
|---|---|
| [indefinite] | one or more software programs (or a portion of a program) that prepare the data blocks for their transmission to receivers and interface with other resources used to transmit the preprocessed data. |

---

[21] Due to space constraints, certain portions of the specification that list potential functionalities, that the "information gateway" may "include but are not limited to" have been excluded. (*Id.*; *see also* 11:33-36, 22:13-21.) Suffice to say, none of these disclosures provide any structural details or disclose **how** the "information gateway" may be implemented.

[22] The only algorithm briefly discussed relates to managing a data budget, which is not a function recited in the claims.

[23] '279 claim 1 recites "transmission gateway configured to prepare the addressed data blocks for transmission to receivers [] and initiate transmission of the addressed data blocks to the receivers." '279 claim 35 recites "transmission gateway configured to prepare the addressed data blocks for transmission to receivers [] and cause the addressed data blocks to be transmitted to the receivers." '154 claim 1 recites "transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers."

The words "transmission gateway" do not appear anywhere in the specification, and both experts agree that the term is not well-known or frequently used in the art. (Wicker Decl. at ¶¶ 98-100; Knox 162:20 to 163:11.) In *SimpleAir I*, the Court found this term definite under the now-defunct "insolubly ambiguous" standard. (*SA1 Markman* at 38-39.) In its Order, the Court relied on two grounds for finding the claim definite: (1) "the *AWS* Court and even the *AWS* Defendants" found it "sufficiently definite to construe" and (2) the specification discloses a non-limiting "wireless gateway" which "is an embodiment of a transmission gateway that prepares data blocks for transmission to receivers." (*Id*.) The Supreme Court's *Nautilus* decision requires revisiting the prior construction of this phrase. Under *Nautilus* and its progeny, "transmission gateway" is clearly indefinite.

The ability to "ascribe *some* meaning to a patent's claims" is not sufficient to overcome an indefiniteness challenge. *Nautilus*, 134 S. Ct. at 2130. To the contrary, the "definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application," ***not*** the understanding of a court, much less interested litigants, "viewing matters *post hoc*." *Id*. Thus, that prior Courts may have construed "transmission gateway" under the old standard (which only considered whether claims were "amenable to any reasonable interpretation") is irrelevant to the indefiniteness inquiry today. Since "transmission gateway" is ***not a term of art*** and the ***specification never uses the term at all***, there are no relevant sources of information that define the term's scope. (Wicker Decl. ¶¶ 98-100; Knox 161:9 to 162:14.) Because a person of skill in the art could not discern the "metes and bounds" of the claim, the "transmission gateway" limitations are indefinite. *Nautilus*, 134 S. Ct. at 2127, 2130.

Similarly, the disclosure of "wireless gateways" in the specification provides no basis for finding the claim definite. Even if the wireless gateway is an embodiment of a transmission

gateway, this "lone example" would still leave a skilled artisan "to wonder what other forms" of "transmission gateways" fall within the scope of the claim. *Interval Licensing LLC v. AOL Inc.*, 766 F.3d 1364, 1373-74 (Fed. Cir. 2014). Indeed, this Court has expressly found that the term "transmission gateway" is ***broader in scope*** than the "wireless gateway" embodiment and, moreover, that the claim language requires "no particular specific ways" for preparing the data blocks for transmission. (*SA1 Markman* at 39.) Thus, the specification "leaves the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion'" regarding the potential meaning of "transmission gateway." *Interval Licensing*, 766 F.3d at 1374. "Such ambiguity falls within the 'innovation-discouraging ***zone of uncertainty*** against which [the Supreme Court] has warned." *Id*. (quoting *Nautilus*, 134 S. Ct. at 2130).

Like "information gateway," the "transmission gateway" term amounts to purely functional claiming without any corresponding structure. The claim language recites only the ***functions*** of the "transmission gateway." SimpleAir's proposed construction fails to identify any structural limitations beyond "software" that perform the rest of the claim limitations. In fact, SimpleAir's expert admitted that no specific structural requirement is claimed. (Knox 181:4-9: "Q. Again, I think I know the answer to this, but just to round it out, in your opinion, a transmission gateway does not require a specific algorithm, for example; is that right? A. That would be correct." (objection omitted).) As the "transmission gateway" limitations are purely functional and do not have any corresponding structure in the specification, which defines the terms, they are indefinite. *See Robert Bosch*, 769 F.3d at 1102.

## VIII.   *COMMUNICATIVELY COUPLED* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| [indefinite] | connected or associated in a way that permits communication. |

The phrase "communicatively coupled" never appears in the specification and has never been construed by the Court.  The word "coupled" appears in the specification only once:  "The user computer 14 of the present invention includes a microprocessor **connected to a system bus** and supported by read only memory (ROM) and random access memory (RAM) **which are also coupled to the system bus**."  (7:20-23.)  The specification further states that "[i]n accordance with **the present invention**, the notification centric portions of that information that lives in an electronic medium is wirelessly broadcast on a nationwide basis to wireless receiving devices **which are attached** to personal computers or other computing devices."  (2:66 – 3:3; *see also* 20:58-60.)  While the patent thus uses "coupled" to mean that two things are "connected" or "attached," the specification provides no guidance as to what it means to be "**communicatively** coupled" as distinct from merely "coupled."

SimpleAir claims that Figure 2 and the accompanying description in the specification depict the information gateway 134 being "communicatively coupled" to the wireless gateway 136 and content manager 114. [24] (Knox Decl. ¶¶ 75-77; Knox 193:10-219:19; *see also* Wicker Decl. ¶ 106.)  But as SimpleAir's expert acknowledged,  in the Figure, all three components are **part of** the CBS.  (*Id*.)  The claims require that the CBS be "communicatively coupled" to the information gateway.  Thus, in order to meet the claims' requirements, the CBS would have to be "communicatively coupled" **to part of itself** – *i.e.*, the information gateway.  Dr. Wicker and Dr. Knox agree that a system cannot "communicatively couple" to itself.  (Wicker Decl. ¶¶ 108-109; Knox 196:14-197:1.)  Thus, one of ordinary skill could not ascertain the scope or meaning of "communicatively coupled" with reasonable certainty.  *Interval Licensing*, 766 F.3d at 1373-74 (contradictions and ambiguities in the specification mean that the term "unobtrusive manner' .

---

[24]   This is the only disclosure that SimpleAir points to that allegedly reflects "communicatively coupled" components.

. . has too uncertain a relationship to the patents' embodiments;" and the embodiments do "not provide a reasonably clear and exclusive definition of the term" to render it definite).

SimpleAir's proposed construction only underscores the ambiguous scope of the term. SimpleAir expands the meaning of "coupled" to include "associated," though it identifies no intrinsic support for its position. (Br. at 20-21.) Yet SimpleAir's own extrinsic definitions of "coupled" make clear that the term requires a direct connection – not a mere association.[25] (*Id*.) For instance, the IEEE definition of "coupled" requires "the association of two or more circuits **in such a way** that power or signal information may be transferred from one to another." (*Id*.) A mere "association" is insufficient; the association must enable two circuits to transfer power or signals, by connecting them. Similarly, the McGraw definition of "coupled systems" recites systems **that share equipment**, because they are connected to each other. (*Id*.)

SimpleAir's construction makes "communicatively coupled" meaningless. It would presumably render the information sources "communicatively coupled" to the remote devices, because the data from the information source is ultimately communicated to the device. SimpleAir's proposed construction would allow it to (improperly) argue that **any** two computers on the Internet were "communicatively coupled," because they are capable of communicating with each other via the Internet. (Wicker Decl. ¶ 110.) But SimpleAir's own expert acknowledged that "communicatively coupled" requires something more than a mere association permitting indirect communication: "[The named inventor] does not use the term 'communicatively coupled' in describing that type of very indirect connection." (Knox 208:19-23; *see generally id*. at 206:20 to 210:7.) While both parties appear to agree that an indirect "association" of components is insufficient to constitute a communicative coupling, SimpleAir's

---

[25] The extrinsic evidence SimpleAir relies on relates exclusively to the term "coupled" and provides no guidance regarding what it means to be "**communicatively** coupled." (Br. 20-21.)

proposed construction imposes no meaningful bounds to the term nor does it define the scope in a manner that would provide sufficient notice to a person of ordinary skill in the art.

## IX.    _RECEIVER_ (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| a receiving device attached to the remote computing device for receiving the data blocks. | [no construction necessary]<br><br>explanatory phrase: The receiver and the remote computing device may form part of a consumer electronic device. |

In *SimpleAir I*, the Court declined to construe the term "receiver" – but as the Court previously observed, "the receiver and the remote computing device **are separate structures** and one is not a 'subcomponent' of the other." (*SA1 Markman* at 18 (emphasis added); *id*. at 19 ("The parties **do not dispute** that the 'receiver' and the 'remote computing device' are presented in the claims **are separate devices**.").)[26]  The Court should construe "receiver" in this case because it is a significant point of dispute between the parties, and because SimpleAir's new positions contradict the Court's findings in *SimpleAir I*.

SimpleAir maintains that a "receiver" is not actually a device, but only a sub-component of a device.  This is inaccurate.  Neither the receiver nor the remote computer are mere "subcomponents"; they are **devices**, and thus must be capable of independent function.  As the Court already found, the receivers and the claimed remote computing devices must be distinct devices:  this is self-evident from the claim language.  The claims require the receiver to be communicatively coupled to the remote computing device, and further require that the receiver receive data blocks from the transmission gateway.  (32:57-61; 35:1-5; '154 patent at 32:47-51.)

---

[26]  The Court further found that the receiver and remote computing devices need not be "formed in entirely different structures," a distinction that Defendants are not challenging in this case. (*SimpleAir I Markman* at 17-20.)  Indeed, Defendants' proposed construction in this case does not foreclose common physical components shared between the receiver and the remote computing device, but instead specifies that the receiver and remote computing device are "attached."

Moreover, the specification notes that by filtering incoming packets at the receiver, the claimed invention is able to conserve the resources of the remote computing device, because the filtered packets never reach the remote computing device. (21:59-61, 21:66 to 22:2.) Thus, the patent treats the receiver and remote computing device as two separate devices.

The file history reinforces this conclusion. In reexamination of the parent '433 patent, the applicants stated that the receiver and the computing device must be functionally separate:

> That notification would occur whether the computing device was on or off *because the receiver card had its own power source* (batteries). In other words, the receiver did not rely upon the power from the remote computing device and therefore the receiver was able be on [sic] to receive messages and notify the computing device of their receipt even when the computing device was off

('433 Reexam, Feb. 1, 2013 Declaration at 38 (*quoted at SA1 Markman*, 24-25).) This allows the receiver to receive messages when the remote computing device is turned off, an explicit requirement of the '433 patent claims. (*SA1 Markman* at 23-25.) The independent functionality of these two devices is a key benefit of the alleged invention: one could operate while the other is not powered on.

SimpleAir's "explanatory phrase," which it contends is not a "construction" but should nonetheless be read to the jury by the Court, erroneously suggests that the receiver and the remote computing device need not be independent devices. This construction-in-disguise should be rejected.

## X.     *ONLINE OR OFFLINE FROM A DATA CHANNEL* (ALL CLAIMS)

| Defendants | SimpleAir |
|---|---|
| entire phrase: [indefinite] | entire phrase: whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers. A device is not online to an associated data channel merely because it is able to receive data transmissions (directly or indirectly) from the central broadcast server. |

| | *data channel*: one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network. |
|---|---|

The Court previously construed these terms. (*SA1 Markman* at 8-17.) SimpleAir relies on the Court's previous ruling.[27] (Br. 24.) Here, all asserted claims require that either the transmission or notification of data blocks occur "whether the remote computing devices are online of offline from a data channel associated with each remote computing device." (32:60-64, 35:9-13; '154 patent at 32:64-67.) The term "data channel" does not appear anywhere in the specification, and as a consequence, these terms have engendered many disputes in the various ligations. (*SA1 Markman* at 9.) In light of the Court's prior rulings and the intervening *Nautilus* opinion, Defendants focus here on additional reasons why these terms are indefinite.

SimpleAir's alleged invention is directed to transmitting content to a remote computing device whether the device is connected to the Internet or some other online service (online) or not (off-line). (*SA1 Markman* at 16.) It accomplishes this by providing an alternative path through a "receiver" by which information can be transmitted even when a computing device "is off-line (i.e. not connected to the Internet or some other on-line service)." (7:10-13; *see also* Ex. 3, 914 Re-exam, Nov. 23, 2012 Interview Request at 9-10.) But there is nothing in the specification to show the metes and bounds of "online or offline *from a data channel*," as recited in the claims. "Data channel" does not appear in the specification, and SimpleAir does not dispute that the term was first added to the claims in April 2004. (*See SA1* Dkt. 329 at 4.) Thus the specification provides no guidance on what it means to be "online or offline from a data channel associated with each remote computing device." Moreover, "online or offline from

---

[27] Defendants incorporate Google's previous arguments regarding the proper constructions (*SA1*, Dkt. 329 at 3-13).

a data channel" was not a term of art, and its meaning would not be clear to one of ordinary

skill.  (Wicker Decl. ¶ 122.)  Thus, one of ordinary skill would have no way of determining the

scope of the term "online or offline from a data channel associated with each remote computing

device" with any reasonable certainty.  *Nautilus*, 134 S. Ct. at 2129.  The claim terms are

indefinite.[28]

SimpleAir's proposed construction fails to give any meaning to the limitation in dispute,

and furthermore is not supported by the intrinsic evidence.[29]  According to SimpleAir, Under

SimpleAir's construction, which states only what "a data channel" is used for, "a data channel"

could be ***any part or parts*** of ***any connections*** between the remote computing device and ***any***

***information sources***.  It follows that a device receiving information is always ***both*** "online"

from "one or more communication channels or paths" associated with the device while also ***at***

***the same time*** "offline" from "one or more communication channels or paths" associated with

the device.  SimpleAir's expert admits this consequence.  (Knox 278:9-14:  "Q. So in the context

of this claim, you can be both online to some data channels and offline to some data channels; is

that right?  A. As I understand it, yes, that is correct." (objection omitted).)  But SimpleAir's

construction leaves the jury with no identification of ***which*** channel or path associated with the

device matters for determining infringement.[30]  The *Nautilus* court held such ambiguity in patent

---

[28]  It is irrelevant that petitions for post-grant review have informed the PTAB of the Court's
prior constructions.  (Br. 24.)  SimpleAir offers no authority to suggest otherwise.

[29]  In its previous constructions, the Court did not rely on SimpleAir's expert declaration
regarding the word "channel," which incorrectly addressed the word's usage postdating the
alleged date of the invention.  (*See SA1* Dkt. 328 at 8; *SA1 Markman* 13-14.)  Nor should it do so
here.

[30]  To avoid this problem, Google previously sought to clarify that the data channel must
exclude any path through the receiver—because the device must receive information through the
receiver even when offline from the data channel.  (*See SA1*, Dkt. 329 at 5-7, 10).  The Court
twice acknowledged Google's argument (*SA1 Markman* at 11, 15), but did not address it in its
analysis.  (*Id*. at 13-14 and 16-17.)  Defendants respectfully request that if the Court finds the
terms definite, it include the clarification that the data channel must exclude any path through the
receiver.

claims is contrary to Section 112 and must be eliminated by finding claims indefinite. 134. S. Ct. at 2129.

Furthermore, SimpleAir fails to provide intrinsic evidence that supports its constructions, citing only portions of the specification with no connection to "data channel" and indeed unrelated to any "channels or paths" that the receiver might be online or offline from. For example, "data feeds" are provided to the central broadcast server, not the receiver; the ability to "subscribe" or set "preferences" or select "subcategories" discloses no "channels or paths;" and whatever message is "broadcast to the preferred viewer" application does not use the recited data channel because the message must reach the device when the device is offline from the data channel. (*See SA1 Markman* at 13 (citations omitted)). The absence of support in the specification is further proof the term is indefinite. *See* 35 U.S.C. § 112.

## XI. *VIEWER (*'279: 14, 18, 20, 28, 31, 48, 54, 62; '154: 14, 20, 31)*[31]

| Defendants | SimpleAir |
|---|---|
| Plain and ordinary meaning. | one or more applications or programs for viewing a category (or subcategory) of information received from an information source that provides data to the central broadcast server. |

Certain dependent claims require that a "viewer associated with the transmitted data" be launched and/or display that data. The patent explains that different viewers may process different types of media (3:26-29), and/or that viewers may be customized to the information source. (Fig. 24.) A viewer thus enables the user of the remote device to "view" the transmitted content from the information source. No further construction of the term is necessary.

SimpleAir attempts to read three limitations into the "viewer terms." First, it asserts that because some claims require that viewers be "launched," the viewer must be one or more

---

[31] "Viewer" was not construed in the prior litigation.

applications or programs.  (Br. 24.)  But "applications or programs" are not the only things that can be launched:  a service or window, for example, might be launched by a remote computing device.[32]  Second, SimpleAir argues that the viewer must be "for viewing a category (or subcategory) of information received from an information source."  (Br. 25.)  This simply adds language to the claims, which recite a "viewer" – not "a viewer of a category or subcategory."  And the patent discloses viewers that display *all* information from an information source, regardless of category, including a "stock ticker viewer" that displays *all* stock ticker information from a stock information source (Fig. 24(d)) and an "email viewer" capable of reading *all* incoming email.  (30:14-18.)  While the specification does disclose that a viewer *may* filter based on message category and content (21:36-58), such optional functionality cannot be mandatory for a "viewer."  (*See also* Wicker Decl. ¶ 133.)  Finally, SimpleAir argues that the viewer must operate on information received from an information source by way of the CBS.  (Br. 25-26.)  But this is an inherent limitation of "data" as used in the claims (supra at Section II).  It would be redundant to require that viewers operate on "information received from an information source that provides data to the CBS."  SimpleAir's proposed construction must therefore be rejected.  (*See also* Wicker Decl. ¶ 134.)

## XII.  *SUBSCRIBER DATABASE* (*'279: 2, 30; '154: 2, 30*)[33]

| Defendants | SimpleAir |
|---|---|
| database to determine which subscribers receive which types of content. | [no construction necessary] |

---

[32]  SimpleAir attempts to buttress its arguments with prosecution history statements made *after* the first case against Google was filed.  (Br. 24-26.)  The Court should give no weight to these contemporaneous statements.  *Mondis Tech. Ltd. v. Hon Hai Precision Indus. Co. Ltds.*, 2:07-cv-565-TJW-CE, 2011 WL 245507, *31 (E.D. Tex. Jan. 24, 2011) ("papers filed with the PTO during litigation might very well contain merely self-serving statements which likely would be accorded no more weight than testimony of an interested witness or argument of counsel") (internal cites and quotes omitted).

[33]  "Subscriber database" was not construed in the prior litigation.

The specification explains that "a subscriber database [] is utilized by the CBS to determine which subscribers receive which types of content" (8:37-40). More specifically, "all applicable real and virtual addresses are determined based on the type of information in the data block and user subscription data from the subscriber database." (22:14-18.) Defendants' construction accords with the specification's requirement that subscription information includes information on which subscribers receive which types of content.

SimpleAir points to no intrinsic or extrinsic evidence that a "subscriber database" would not determine which users had subscribed to which content. (Br. 27.) Instead, SimpleAir relies on attorney argument that an online newspaper may maintain a list of newspaper recipients in a "subscriber database," all of whom receive every newspaper. (*Id*.) But this hypothetical newspaper database, not mentioned anywhere in the intrinsic or extrinsic database, does not identify the types of content only because there is only one type of content – a single edition of the newspaper. When the subscribers are able to receive different types of content, as is the case disclosed in the patents, then the subscriber database must record which subscribers receive which types of content. Using SimpleAir's own example, if the newspaper has morning and evening editions and the subscribers only subscribe to one of the editions, then the database must identify which subscribers receive which edition of the paper. SimpleAir's construction should be rejected. (*See also* Wicker Decl. ¶ 138.)

## XIII. SIMPLEAIR MISREADS THE FEDERAL CIRCUIT'S RULING IN *GOLDEN BRIDGE*

SimpleAir asserts that the Court must adopt certain constructions because SimpleAir disclaimed any broader meaning during contemporaneous CBM petitions. (Br. 27-30.) For

instance, SimpleAir argues that the Court must adopt SimpleAir's proposed construction for "data channel" because SimpleAir adopted that construction in a CBM proceeding. (Br. 29.)

SimpleAir confuses the law of claim construction disclaimer, which prevents a *patentee* from reclaiming scope surrendered before the PTO. Nothing in claim construction disclaimer prevents this Court from adopting a *narrower* construction. A patentee cannot treat its own self-serving statements as binding *on an accused infringer* who contends the claim is narrower than the patentee's proposed construction.[34]

*Golden Bridge* held that *a patentee* who had submitted a court's *Markman* order to the PTAB was subsequently bound by that submission as it constituted a disclaimer. *Golden Bridge Tech. Inc. v. Apple Inc.*, 758 F.3d 1362 (Fed. Cir. 2014). In that case, the patentee submitted a prior stipulated *Markman* order to the PTAB to help it construe "preamble." *Id.* at 1364. In a subsequent district court case, the patentee argued that "preamble" was broader than the prior *Markman* construction. *Id.* at 1365. The Federal Circuit held that by representing to the PTAB that that the *Markman*'s "preamble" construction was the broadest reasonable interpretation, the *patentee* had disclaimed any broader interpretation of the term. *Id.* at 1366-67.

Nothing in *Golden Bridge* precludes an accused infringer from seeking a *narrower* construction than that "broadest reasonable interpretation." Indeed, because district courts use a narrower claim construction standard than the PTO, claim terms will *often* be of narrower scope in litigation than they are in prosecution. *See, e.g.*, *In re Yamamoto*, 740 F.2d 1569, 1571-72 (Fed. Cir. 1984) (noting PTO uses "broadest reasonable interpretation" standard in reexamination proceedings, which differs from the standard applied by district courts).

---

[34] In fact, SimpleAir asserts that the Court will be bound to accept claim construction proposals SimpleAir hasn't even adopted yet. (Br. 30 n.13.)

DATED: February 27, 2015          QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   */s/ Charles K. Verhoeven*

J. Mark Mann
State Bar No. 12926150
G. Blake Thompson
State Bar No. 24042033
MANN | TINDEL | THOMPSON
300 West Main Street
Henderson, Texas 75652
(903) 657-8540
(903) 657-6003 (fax)

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven
   charlesverhoeven@quinnemanuel.com
Michelle A. Clark
   michelleclark@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Patrick D. Curran
   patrickcurran@quinnemanuel.com
51 Madison Avenue, 22nd Floor,
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Google and YouTube*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 27, 2015.

_____/s/ Jason L. Liu_____

Jason L. Liu