| | | |
|---|---|---|
| **SIMPLEAIR, INC.** | § | |
| | § | |
| | § | |
| **vs.** | § | **CASE NO. 2:14-CV-0011-JRG** |
| | § | |
| | § | |
| **GOOGLE, INC. and YOUTUBE LLC.** | § | |
| | § | |
| ------------------------------------------------------- | § | |
| **SIMPLEAIR, INC.** | § | |
| | § | |
| | § | |
| **vs.** | § | **CASE NO. 2:13-CV-0937-JRG** |
| | § | |
| | § | |
| **GOOGLE, INC.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiff's Opening Brief on Claim Construction (Dkt. No. 68), Defendants' response (Dkt. No. 76), Plaintiff's reply (Dkt. No. 82), and Defendants' sur-reply (Dkt. No. 87). The Court held a claim construction hearing on April 2, 2015.

## BACKGROUND AND THE PATENTS-IN-SUIT

Plaintiff SimpleAir, Inc. ("SimpleAir") brings action against defendants Google Inc. and its subsidiary YouTube LLC (collectively "Google"). The action alleges infringement of U.S. Patent No. 8,572,279 ("the '279 Patent") and U.S. Patent No. 8,601,154 ("the '154 Patent") (collectively, the "patents-in-suit"). The patents-in-suit have a common direct parent application and share a substantially common specification.[1] The patents-in-suit stem from a patent family that includes a series of continuation applications and multiple provisional applications with priority dates spanning back to 1996.

Two prior Eastern District of Texas claim construction orders involved patents in the same patent family. Most recently, on May 20, 2013, a claim construction order was issued in *SimpleAir, Inc. v. Microsoft Corp., et al.*, 2:11-cv-0416, Dkt. No. 379 (hereinafter, *Google I* Claim Construction Order). The *Google I* Claim Construction Order related to U.S. Patent No. 6,021,433 ("the '433 Patent") and U.S. Patent No. 7,035,914 ("the '914 Patent"). Prior to the *Google I* Claim Construction Order, on September 2, 2011, a claim construction was issued in *SimpleAir Inc., v. Apple Inc., et al.*, 2:09-cv-289, Dkt. No. 240 (hereinafter, *AWS* Order). The *AWS* Order likewise addressed the '433 Patent and the '914 Patent (as well as two other patents not directly relevant to this Order).

The parties raise fifteen claim disputes. Several of the claim disputes raise indefiniteness issues under 35 U.S.C. § 112. Many of the claim terms in dispute were addressed in either the *Google I* Claim Construction Order or the *AWS* Order. The patents-in-suit are subject to requests for six post-grant reviews, including *Inter Parties* Reviews (IPR) and Covered Business Method (CBM) Reviews.

---

[1] Unless otherwise indicated herein, citations to the specification will be made to the '279 Patent.

In general, the '279 Patent and the '154 Patent relate to methods of processing and transmitting internet-based content and real-time notifications (e.g., breaking news alerts, financial news, email notifications, sports scores, weather alerts, etc.) to remote computing devices. *Google I* Claim Construction Order at 2. The '279 Patent abstract recites:

> A system and method for data communication connecting on-line networks with on-line and off-line computers. The present system provides for broadcast of up to the minute notification centric information thereby providing an instant call to action for users who are provided with the ability to instantaneously retrieve further detailed information. The notification centric portions of information is wirelessly broadcast to wireless receiving devices which are attached to computing devices. Upon receipt of the information at the personal computer, the user is notified through different multimedia alerts that there is an incoming message. Wirelessly broadcasted URL's, associated with the data, are embedded in data packets and provide an automated wired or wireless connection back to the information source for obtaining detailed data.

'279 Patent Abstract.

## APPLICABLE LAW

### 1. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of

ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d

1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

### 2. Claim Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007).

The definiteness standard of 35 U.S.C. § 112, ¶ 2 requires that:

[A] patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129–30 (2014) (internal citations omitted).

### 3. Construing Claim Terms that Have Previously Been Construed by This Court or Other Courts

As indicated above, this is not the first opportunity for this Court to construe some of the disputed terms. *See AWS* Order; *Google I* Claim Construction Order. Although the disputes in this case present some of the same issues that have already been resolved in the cases mentioned above, the Court still carefully considered all of the parties' arguments in construing the claims in this case. *See Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005) (describing that although a previous construction may be instructive and provide the basis of the analysis, particularly when there are new parties and those parties have presented new arguments, the previous construction is not binding on the court). As indicated by *Burns*, however, the previous constructions in those cases, and particularly from

those in this District, are instructive and will at times provide part of the basis for the analysis. *See id.*

## DISPUTED TERMS

**1. "an information source" ('279 Patent claim 1, '154 Patent claim 1)**

| SimpleAir | Google |
|---|---|
| one or more content or online service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages or emails. | one or more content or online service providers, including all content providers on the Internet, that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages or emails. |

Both parties propose a construction similar to that adopted in the *Google I* Claim Construction Order. Google seeks to add to the *Google I* construction the phrase "including all content providers on the Internet."

Positions of the Parties

SimpleAir notes that Google's briefing asserts that the added phrase "including all content providers on the Internet" clarifies that the content providers on the Internet, not the medium, constitute an information source. (Dkt. No. 82 at 1 (citing Dkt. No. 76 at 1)). SimpleAir asserts, however, that Google's expert contradicted this statement by stating that this phrase has the opposite effect, as it "allows for the Internet itself to be an information source where as [SimpleAir's construction] does not." (Dkt. No. 82 at 1 (quoting Wicker Depo. 150:3–8, Dkt. No. 82, Ex. 38).

Google acknowledges that in *Google I* the Court found that "the physical medium of the Internet, absent content" could not be an "information source." Google asserts that its construction merely seeks to clarify that the "content providers on the Internet," not the medium itself, constitute an "information source." (Dkt. No. 76 at 1). Google asserts that this conforms

to the specification and clarifies what was stated in *Google I*: "[T]he network by itself is not information, but rather the content on the network is the information." *Google I* Claim Construction Order at 27. At the oral hearing, Google further reiterated that it was not contending that the Internet medium itself is an information source. (Claim Construction Hr'g Tr. 8:7–18).

<u>Analysis</u>

In *Google I*, SimpleAir asserted a position that information sources are located on the Internet rather than an information source being the Internet itself. The *Google I* defendants asserted that the Internet medium itself may be an information source. *Google I* Claim Construction Order at 25–26. The Court found in *Google I* that in context of the entire specification the Internet was not equated to an information source by stating: "[T]he network by itself is not information, but rather the content on the network is the information." *Id.* at 27. Despite the comments of Google's expert, Google's current response brief and oral hearing statements make clear that Google's current position conforms to the finding in *Google I*. Thus, there is no disagreement between the parties as to this issue. (Dkt. No. 76 at 1–2); (Dkt. No. 82 at 1); (Claim Construction Hr'g Tr. at 8:7–18). For the same reasons as discussed in the *Google I* Claim Construction Order at pages 27 through 28, the Court reaffirms that in context of the entire specification the Internet itself is not equated to an information source, but rather the content on the network is the information. In light of the Court's ruling here, *Google I*, and the lack of a genuine dispute regarding this issue, Google's "clarification" and change to the *Google I* construction is unnecessary.

**The Court construes "an information source" to be "one or more content or online service providers that provide data to the central broadcast server, such as an online**

source of news, weather, sports, financial information, games, personal messages, or emails."

### 2. "data" ('279 Patent claim 1, '154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| any type of digital information suitable for digital transmission or computer use | content of a message (such as news, weather, sports, or financial information) |

The parties dispute whether the meaning of "data" includes any information suitable for digital transmission or is limited to only the content or "payload" of the message.

<u>Positions of the Parties</u>

SimpleAir asserts that the term appears in the context of data that is transmitted "to remote computing devices." SimpleAir cites to the specification passage at 3:30–35 as conforming to its construction: "[D]ata parsed from a plurality of incoming data feeds from existing information sources is prepared for optimized wireless transmission and then transmitted nationwide to . . . computing devices." SimpleAir asserts that in this context the ordinary meaning of data applies. (Dkt. No. 68 at 4 (citing expert declaration and dictionary definitions)).

SimpleAir asserts that Google's limitation of the term to the content of a message is meant to limit the term only to the "payload" and exclude all other data. SimpleAir asserts that in *Google I*, Google argued at trial and in post-trial motions that "data" in the phrase "parsing said data with parsers" meant "payload." (Dkt. No. 68 at 5 n.2). SimpleAir asserts that the Court rejected such arguments in the *Google I* Order on Judgment as a Matter of Law: "[T]he Court is not persuaded that Google must parse only the payload of a message in order to meet the 'parsing' limitation." (Dkt. No. 68 at 5 n.2 (quoting *SimpleAir, Inc. v. Microsoft Corp. et al.*, No. 2:11-cv-416, Dkt. No. 765 (E.D. Tex. Dec. 10, 2014) (hereinafter, *Google I* JMOL Order)). At

the oral hearing, SimpleAir made clear that it could accept "no construction" for the term, but that SimpleAir seeks its construction to prevent Google from raising a "payload" construction argument at trial similar to the argument raised at trial in *Google I*.

SimpleAir further asserts that there is a "heavy presumption" that a term carries its ordinary meaning unless (1) a patentee sets out a definition and acts as a lexicographer, or (2) disavows the full scope of a claim term. (Dkt. No. 82 at 1–2 (citing *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856–57 (Fed. Cir. 2014))). SimpleAir asserts that Google merely attempts to limit the term based on specification embodiments. SimpleAir asserts that Google's own fact witness and experts have acknowledged that the ordinary meaning of the term is not limited to "content." (Dkt. No. 68 at 6–7); (Dkt. No. 82 at 2).

SimpleAir asserts that the specification uses the term "data" to refer to any type of digital information, and that even in the preferred embodiments, the "data" that is transmitted from the information source to the central broadcast server includes information that is not "content." Rather, SimpleAir asserts such "data" includes headers, packet data, data to ensure proper transmission, and error correction:

> Data is transmitted from an information source to the central broadcast server 34 as discrete message blocks using E-mail or a well-known high speed protocol . . . . In particular, each data packet transmitted by the information source 12 includes a header, packet data and information to ensure proper transmission to the central broadcast server 34. Additionally, an error correction code is typically added to each packet prior to transmission.

'279 Patent 11:44–55. SimpleAir also notes that the specification refers to "data" in the context of "subscription data" (*id.* 22:16–17) and "diagnostic data" (*id.* 22:59–66)—data that is not even part of a message, much less the content of a message. (Dkt. No. 68 at 6).

Google asserts that although the *Google I* Claim Construction Order did not construe "data," the order made clear with regard to other terms that what is passed from the information

source to the remote computing device is "content" from the information source: "access to the content within the information sources 12 is what is important" (*Google I* Claim Construction Order at 13) and "information sources" refers to the "content on the network" and not the mere physical medium (*Google I* Claim Construction Order at 27). Google asserts that SimpleAir's construction is overly expansive and ignores the asserted claims and the specification. (Dkt. No. 76 at 2).

Google asserts that the specification teaches transmission of content such as "electronic mail (E-mail) and other personal alert notifications, news, sports, and financial stories, premium and special event feeds, advertisements/promotions, graphics, sounds and scheduled updates." '279 Patent 7:66–8:03. Google asserts that the information gateway then builds "data blocks" around parsed data to enable transmission of the data. (Dkt. No. 76 at 3 (citing '279 Patent 11:37–40, 15:28–32)). Google cites to Figures 5-1 and 5-2. In particular, Google notes that "data block contents" in Figure 5-2 is described as "data from the information source." '279 Patent fig.5-2. Google asserts that the figures distinguish the content from the headers. (Dkt. No. 76 at 3). Google further asserts that the specification provides that the "data block" is enclosed in one or more "data packets." (Dkt. No. 76 at 4 (citing '279 Patent 11:44–64, 13:27–54)). Google further points to Figure 9, which states that the "Packet Contents" are "the header and the contents of the data block contained in this packet." Google asserts that the specification clearly distinguishes between the "packet contents," which are the "data portion of the packet," and the non-data headers information. (Dkt. No. 76 at 4 (citing '279 Patent fig.5-8; *id.* 12:64–13:15, 13:35–54 (describing the Figure 8 and 9 packet data blocks as "the packet header is followed by the data block header and the data block contents"))). Google also asserts that it is the contents of the data block that were parsed from the "data from the information source"

11

recited in the claims. (Dkt. No. 76 at 4 n.5). Google asserts that the header (either the data block header or the data packet header), in contrast, were generated by the central broadcast server or one of the gateways. (Dkt. No. 76 at 4 n.5 (citing '279 Patent 11:31–42)).

Google further points to the claims. Google asserts that the claims explicitly require transmitting "data" from an information source to remote computing devices. Google asserts that the claims further specify (1) that the central broadcast server can be configured to receive "data" from the information source and to process the received "data" with a parser ('279 Patent 32:48–50, 34:59–61), (2) that an information gateway be configured to build data blocks from the parsed "data" (*id.* 32:53–55, 34:64–65), and (3) that a transmission gateway be configured to transmit the blocks containing parsed "data" to receivers coupled to the remote computing devices (*id.* 32:57–61, 35:1–5). (Dkt. No. 76 at 5). Google asserts that these components all process and transmit content in the specification. *Id.* Google also notes that SimpleAir's expert acknowledged that "in the context of this claim, the data that they're talking about is data going from an information source to a remote computing device." (Dkt. No. 76 at 5 n.6 (quoting Knox Depo. 69:4–8, Dkt. No. 76, Ex. 1)).

Google asserts that SimpleAir ignores what is actually sent from the information source and relies on a quote from the specification regarding "data packets." Google asserts that data packets are packets with data in the payload and non-data elements in the headers. (Dkt. No. 76 at 5). Google asserts that a "data packet" is not itself data, for the same reason a "milk carton" is not itself milk. (Dkt. No. 76 at 5). Google asserts that Figure 8 makes this clear as the "data packet" contains a "Header" and "Contents" and the "Contents" includes "Packet Contents," which are called "the data portion of the packet." Google also asserts that "subscription data" and "diagnostic data" cited by SimpleAir are not transmitted from the information source but

from the central broadcast server and a communications server, respectively. (Dkt. No. 76 at 6 (citing '279 Patent 8:34–40, 22:59–67)).

Google asserts that SimpleAir is merely adopting a dictionary definition in contradiction to the patent's own descriptions of "data." Google asserts that terms must be given their ordinary meaning in context of the claim and the specification. (Dkt. No. 76 at 6). Google asserts that SimpleAir is ignoring the context of both.

<u>Analysis</u>

As Google acknowledged at the hearing, the ordinary meaning of "data" to one skilled in the art is broader than the construction Google proposes. In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. The court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312. To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. The claims merely utilize the term "data" from the information source. The language of the claims does not limit "data" to message content or payload.

Google asserts that the embodiments in the specification limit "data" to the content of a message. Though there are instances of "data" being used to refer to the contents of a message, there is no disclaimer or disavowal in the intrinsic record limiting the term to require reading in the preferred embodiment. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim

scope using words of expressions of manifest exclusion or restriction" (citation omitted)).

Moreover, the specification is not clear that "data" with regard to the messages would exclude

other types of data. For example, Figure 7 illustrates a format for the messages in which the

"Contents" are listed as "Message Contents" described as "the data portion of the message."

'279 Patent 4:39–40 & fig.7. Figure 8 describes the packets and lists, under the item "Contents,"

the item of "Packet Contents," which are described as "the data portion of the packet." *Id.* 4:41–

42 & fig.8. Figure 9 illustrates single packet data blocks and lists, under the item "Contents," the

item of "Packet Contents," which are described as "the header and contents of the data block

contained in this packet." *Id.* 4:43–44 & fig.9. In this context, "data" of the packet contents may

include header and "contents" of the data block. Similarly, the specification describes "data is

transmitted from an information source" "as discrete message blocks" in a packet protocol and

the data packets include a header, packet data, and information to ensure transmission. *Id.*

11:44–53. The Court notes that the "data" transmitted is not clearly limited to just the "packet

data" but includes header, information to ensure proper transmission, and error correction codes.

*See id.* 11:44–55. In the overall context of the specification, "data" is not clearly limited to only

the message contents. Elsewhere in the specification with regards to other aspects of the

disclosure, "data" is similarly used in a more general manner. *See id.* 22:16–17 ("subscription

data"); *id.* 22:59–66 ("diagnostic data").

In the specification, a patentee may define his own terms, give a claim term a different

meaning that it would otherwise possess, or disclaim or disavow claim scope. *Phillips*, 415 F.3d

at 1316. That has not been done here. In the context of the specification as a whole, "data" is

not limited to the contents of a message (as opposed to its broader, understood meaning to one

skilled in the art). The Court's finding also conforms to the evidence and arguments presented in

the *Google I* JMOL Order, in which "data" was found not to be merely limited to the payload. *Google I* JMOL Order at 9–10.

**The Court construes "data" to mean "any type of digital information suitable for digital transmission or computer use."**

### 3. "data from an information source" ('279 Patent claim 1, '154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| [no additional construction necessary] | data created at or combined by an information source |

The parties dispute the meaning of "from."

<u>Positions of the Parties</u>

SimpleAir asserts that Google replaces "from" with "created at or combined by." SimpleAir asserts that "from" specifies the point or source from which the central broadcast sever receives the claimed "data." (Dkt. No. 68 at 7–8 (citing dictionary definitions of "from")). SimpleAir asserts that nothing in the term "from an information source" specifies what occurred at the information source to cause the existence of the data, much less "created or combined." SimpleAir asserts that no limitation in '279 Patent claim 1 addresses how the data arrived at the information source. SimpleAir further notes that '154 Patent claim 1 contains an express limitation regarding "generating data" at the information source. SimpleAir asserts that the "generating" limitation is the limitation that is directed toward the creation of the data, not the "from" limitation. (Dkt. No. 68 at 8 (noting that in the "generating" term discussion below SimpleAir asserts that "generating" is not limited to "created")). At the oral hearing, SimpleAir emphasized that in the claims of both the '279 Patent and '154 Patent "from" is used in a directional sense as to where the data came from, not what created or generated the data.

Google asserts that to be an "information source," the "source" must create or combine the data. Google asserts that both experts agree that to one skilled in the art something that just passes data through (such as a router) is not considered a "source." (Dkt. No. 76 at 7). Google thus asserts that its construction conforms to the "source" requirement.

Analysis

The parties have sought construction of "data" and "information source." The term in dispute merely adds "from." The claims themselves can provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. Here, the surrounding claim language provides a context to the meaning of "from" that accords with SimpleAir's arguments. The claim term is found in the context of "[a] system to transmit data from an information source to remote computing devices." Thus, "from" is used in context of where the data is transmitted from (transmitting from point A to point B) not what creates the data. In such context, the claim is directed to the point from which data is transmitted, not the particular way or place data is created. Thus, because of the clear context of the claims themselves no further construction of "data from an information source" is required. Google's arguments are more directed toward the meaning of "information source" rather than "from." Google's arguments that "from" requires details of creation or origin are explicitly rejected. As noted above, the parties have generally agreed what constitutes an information source and both parties included language that has an information source being content or online providers "that provide data."

**The Court finds that "data from an information source" does not need further construction other than the constructions of "data" and "information source" provided elsewhere herein.**

### 4. "generating data" ('154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| producing data to be transmitted to the central broadcast server by creating or combining data | the information source creating data to be transmitted to the central broadcast server |

The parties dispute whether "generating" means "creating or combining" or whether "generating" is limited to "creating."

<u>Positions of the Parties</u>

SimpleAir objects to Google limiting the term "generating" to "creating data." SimpleAir asserts that Google seeks to argue that the information source must create the data from scratch. (Dkt. No. 68 at 8). SimpleAir asserts that in the context of computing and communications, "generating data" encompasses creating something out of nothing as well as producing by combining or reproducing data items created elsewhere. (Dkt. No. 68 at 8 (citing expert declaration and a variety computing and electronics dictionaries)).

SimpleAir further asserts that Google's proposal is inconsistent with the preferred embodiment. SimpleAir cites to the example information source "Quotecom." (Dkt. No. 68 at 9 (citing '279 Patent 6:14–23)). SimpleAir asserts that such data is not necessarily created at the information source, but rather, the information source may simply collect, compile, and provide the data, noting for example that stock quotes are not "created" by Quotecom. SimpleAir asserts such information is created by market transactions and Quotecom merely transmits the data. SimpleAir also cites to data feeds to the central broadcast server that may include "lotto, stock quotes, and email." (Dkt. No. 68 at 9 (citing '279 Patent 8:6–29 & fig.24(d))). SimpleAir asserts that lottery and email information is similarly created elsewhere. (Dkt. No. 68 at 9).

Google asserts that, in contrast to the other patents, the '154 Patent claim 1 recites both "transmit data from an information source" and "generating data at the information source." Google asserts that SimpleAir's construction reads out the term "generating." Google asserts that in order to give "generating data" independent meaning from "data from," then generating must mean "creating." (Dkt. No. 76 at 7–8).

Google objects that SimpleAir selectively relies on dictionary definitions that do not describe generating "data" as opposed to generating programs, tables, or other non-data components. (Dkt. No. 76 at 8). As to the Quotecom embodiment, Google notes that every claim need not cover every embodiment, particularly when three earlier patents in the family tree may do so. Google further asserts that different terms in the patent claims are presumed to have different meanings. As Google asserts, the applicants plainly know how to draft claims that do not specify where the information source obtained the data, but in '154 Patent claim 1 the applicant specifically claimed that the information source created the relevant data. (Dkt. No. 76 at 8).

Analysis

Google's main argument is premised on the assertion that data "from" a source is "creating or combining," and thus, the subsequent recitation in '154 Patent claim 1 of "generating data at" the source must be limited to "creating." In effect Google argues that aggregating data is not "generating" data. Google's argument fails. First, the basic premise that Google relies upon—that "from" means "created or combined" and that "generating" must then be limited to something less (just "created")—fails because as discussed above "from" is not limited to "created or combined." Further, though Google is correct that every claim need not cover every embodiment, a construction that excludes disclosed embodiments "is rarely correct."

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005). Here, Google

would exclude multiple disclosed embodiments. For example, embodiments are disclosed which

include stock quotes, weather, lotto, email, market condition reports, sports scores, and news

services. *See* '279 Patent 8:15–17 & figs.24(a)–(d). Google's construction would exclude not

only stock quotes, but also weather data, lotto, email, market condition reports, and sport scores,

all of which would likely have data not initially created by the information source. The Court

further notes that even Google acknowledged such: "As made clear in the specification (and

Defendants' proposed construction), an information source must 'create or combine' the data it

transmits in order to be the 'source' of that 'information.'" (Dkt. No. 76 at 7 (citing an expert

declaration and expert deposition)). It is this broader concept that "generating data at the

information source" is directed toward.

**The Court construes "generating data" to mean "producing data to be transmitted to the central broadcast server by creating or combining data."**

### 5. "a central broadcast server" ('279 Patent claim 1, '154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| one or more servers that are capable of receiving data from a plurality of information sources and processing the data prior to its transmission to one or more selected remote computing devices. | one or more servers that process the content of a message for transmission to multiple remote computing devices. |

### "server" ('279 Patent claim 1, '154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| one or more pieces of computer equipment and the software running on the equipment used to provide services for one or more other computers or computing devices. | No construction necessary. |

The disputes between the parties focus on (1) Google's limitation that the server process "the content of a message," not just data, (2) whether the same data must be transmitted to multiple remote computing devices, and (3) whether the central broadcast server must receive data from more than one information source, and SimpleAir's related change of the *Google I* construction from "configured to" to "capable of" receiving.

Positions of the Parties

SimpleAir asserts it has adopted the *Google I* construction with the only differences being (1) changing "configured to" to "capable of," (2) "receive" to "receiving," and (3) "process" to "processing." SimpleAir asserts that its changes account for an additional claim limitation in the '279 Patent that was absent from the *Google I* '914 Patent claims.

SimpleAir objects to Google's construction for deleting the requirement that the central broadcast server receive data from the information sources. (Dkt. No. 68 at 10 (citing '279 Patent 6:46–52)). SimpleAir asserts that a core attribute of a central broadcast server is that it can receive data from many sources and broadcast data to many devices. SimpleAir points to the word "central" as conveying this concept. SimpleAir points to the explanation given by the *AWS* Court:

> The specification explains that "information sources . . . provide the information basis for outgoing broadcast," ['433 Patent] 11:56–57, and the central broadcast server "operates effectively as network operations center," *id.* at 6:10–12, where "the information [is] consolidated," *id.* at 12:1–2, before its transmission to "one or more personal computers 14 or other computing sources via selective receivers." *Id.* at 12:26–27. Defendants, on the other hand, contend that "central" is a common English word that needs no construction. The court, however, agrees with Plaintiff that defining "central" in accordance with the term's use in the '433 and '914 Patents will assist the jury in making its infringement determinations.

*AWS* Order at 15–16.

SimpleAir asserts that the '279 Patent claim 1 explicitly states "a central broadcast server configured to receive data from at least one information source." SimpleAir asserts that its

construction includes the requirement that the server be "central" by including the "capable" language, which still accounts for the "configured" for "at least one" limitation of the '279 Patent claim 1. SimpleAir asserts that Google's construction eliminates the "central" concept and merely relates to a "broadcast server." (Dkt. No. 68 at 11). SimpleAir also objects to Google's replacement of "data" with "the content of the message." SimpleAir asserts this is the same argument raised for the "data" term. (Dkt. No. 68 at 11).

SimpleAir further objects that Google attempts to revive a rejected argument from *Google I*: that the same data processed at the central broadcast server must be transmitted to multiple remote computing devices. (Dkt. No. 68 at 12 (citing *Google I* JMOL Order at 22)). SimpleAir asserts that Google relies on the third paragraph of the claim referencing sending data to "receiver<u>s</u> communicatively coupled to the remote computing device<u>s</u>." SimpleAir asserts that this limitation provides no reason that the same data needs to be transmitted to multiple receivers. SimpleAir notes that the term "data" is commonly used to represent the singular and plural. (Dkt. No. 68 at 12). Thus, SimpleAir asserts that transmitting "data" to "receiver<u>s</u>" may be accomplished by sending different data blocks to each receiver. SimpleAir quotes the *Google I* JMOL Order: "[N]othing in the claims requires that a single group of data blocks [be] transmitted to multiple receivers (i.e., by sending a single message at the same time to multiple devices." *Google I* JMOL Order at 19. SimpleAir also objects to Google's "multiple" construction as excluding the "pointcast" embodiment where data is transmitted to only a single user:

> The present invention unlike other wireless systems provides for a combination of broadcast, narrowcast and pointcast transmission. That is, information can be transmitted wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast).

'279 Patent 3:10–15. Finally, SimpleAir objects that Google's construction omits the construction of "server." SimpleAir asserts that the term is a term that a jury may misunderstand and that Google's attempt to require no construction implies that Google intends to impose a different construction under the guise of "plain meaning." (Dkt. No. 68 at 13).

Google asserts that the issues presented by the parties differ from those addressed in *Google I.* Google asserts that here the issues are (1) whether the central broadcast server must transmit data to all available remote devices or just one, and (2) whether the central broadcast server must receive data from more than one information source. (Dkt. No. 76 at 9).

Google asserts that the specification explains that a broadcast server relates to broadcasting to everyone: "[T]ransmitted wirelessly to everyone (broadcast)." '279 Patent 3:13–15, 6:25–28. Google also cites to the passage "broadcast on a nationwide basis." *Id.* 2:66–3:03; *see also id.* 3:31–35, 3:61–4:03, 6:46–52, 12:3–7. Google also notes that the specification states "the present invention" uses broadcast technology like the "pager network." *Id.* 9:29–32; *see also id.* 13:16–23, 21:9–15. Google asserts that the specification never states that the broadcast server only narrowcasts (i.e., transmission to a few) or pointcasts (i.e., transmission to one). '279 Patent Abstract; *id.* 7:59–66, 12:20–33, 14:13–17, 14:42–46, 20:4–7, 23:31–34, 31:18–20. Google also asserts that the claims also recite data blocks for transmission to "receivers" (plural) coupled to the remote computing "devices" (plural). Google asserts the plural usage requires methods with transmission to more than one receiver.

Google further asserts that during prosecution of the parent '433 Patent (another patent in the patent family) the applicant explicitly distinguished the Rossman prior art references for using "one to one communication" rather than "broadcast[ing] from a server to a plurality of receivers":

> The present invention proves for the "*broadcasts*" of URLs to a plurality of receivers. Nowhere does Rossman teach or suggests [sic] broadcasting URLs to a plurality of receivers. In contrast, Rossman requires a user to generate URLs which then are sent it [sic] to a server in *a one-to-one communication link* . . . .

(Dkt. No. 76 at 10 (quoting Amendment of Feb. 16, 1999 at 21–22, Dkt. No. 76, Ex. 2) (emphasis in original)).[2]

Google asserts that SimpleAir has acknowledged during the '914 Reexamination that the term was coined, and thus, SimpleAir provides no extrinsic evidence. (Dkt. No. 76 at 11). Google further asserts that SimpleAir's position is that broadcasting cannot mean broadcast because of the pointcasting embodiment. However, Google asserts that the pointcasting was different than broadcasting and there is no broadcast server embodiment that does not broadcast. (Dkt. No. 76 at 11). Google asserts that in the specification to target specific devices (or even one), attached receivers will receive the broadcasts and filter them. In particular, Google points to "the paging network addresses an individual or group by broadcasting on a particular address or capcode" and "physical address filtering in the receiver hardware is then used to determine whether the message should be passed on for further virtual address filtering (step 202)." '279 Patent 10:5–7, 21:66–22:02, 22:26–28. Google asserts that if the broadcast server can itself pointcast to receivers, then there is no need for receivers to filter broadcasts.

Google asserts that the entire architecture is built around a broadcast delivery system. (Dkt. No. 76 at 12). Google notes that the patent discloses that addresses are used by the receivers to identify messages targeted for a particular user: addresses are "numbers used by the wireless receiving devices to identify messages targeted to a user." '279 Patent 20:15–16.

---

[2] Google notes that SimpleAir has argued that representations from the '433 Patent are relevant and that the prosecution history from a patent derived from the same initial application is relevant to subsequent patents that contain the same claim limitation. (Dkt. No. 76 at 10–11 (citing *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1371 (Fed. Cir. 2014))).

Google asserts that the patent mentions pointcasting and multicasting only to distinguish broadcasting from these alternative forms of communications. *Id.* 3:12–15. Google asserts that this is the primary passage relied on by SimpleAir and that this passage distinguishes broadcasting from pointcasting, thus supporting Google. (Dkt. No. 76 at 12).

As to the word "central" and whether central broadcast server must receive data from a plurality of information sources, Google asserts that the claim explicitly states "a central broadcast server configured to receive data from at least one information source." Google asserts that, accordingly, the asserted claims cover a central broadcast server that can only receive data from a single information source. (Dkt. No. 76 at 12–13). Google asserts that SimpleAir attempts to create a distinction between "configured" and "capable" absent any reference to the specification or claims. Google asserts that a server capable of receiving data from only one source can obviously be configured to do just that. (Dkt. No. 76 at 13 n.16).

As to "server," Google asserts that the parties do not have a real dispute as to the meaning and that SimpleAir's expert acknowledged that one of skill in the art would know what a server is. (Dkt. No. 76 at 9).

In reply to Google's "broadcast" arguments, SimpleAir notes that the specification confirms that a central broadcast server can transmit to "a subset" or even just "to one user": "[I]nformation can be transmitted from a central broadcast server 34 wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast)." '279 Patent 6:25–28. SimpleAir also reiterates that the *AWS* Order rejected Google's arguments. As to the prosecution history, SimpleAir notes that the claims at issue in the '433 Patent did not include the term "central broadcast server," and thus, there was no disclaimer related to "central broadcast server" much less a clear and unambiguous disavowal. (Dkt. No. 82 at 4 n.5). As to Google's assertion

that if the broadcast server could pointcast then there would be no need for receivers to filter, SimpleAir notes that the claims do not include filtering. Further, SimpleAir notes that a system could include both filtering and pointcasting. SimpleAir agrees that the central broadcast server must transmit data to a plurality of devices. However, SimpleAir asserts that this does not mean that the server must transmit to all devices or that the same data must be transmitted to a plurality of devices. (Dkt. No. 82 at 4 n.6).

As to "capable" of receiving data from a plurality of information sources, SimpleAir asserts that the claim language does not rebut SimpleAir's construction. SimpleAir asserts that a device could be "capable" of something but still not "configured" to do so. SimpleAir asserts that the claimed central broadcast server being configured to receive data from only one information source is consistent with the requirement that the central broadcast server is "capable" of receiving data from a plurality of information sources. (Dkt. No. 82 at 5).

<u>Analysis</u>

The parties raise multiple independent disputes with regard to "central broadcast server." One dispute relates to whether the construction should reference "data" or the "content of a message." The term "central broadcast server" is found in the longer phrases "a central broadcast server configured to receive data" ('279 Patent claim 1) and "transmit data from an information source via a central broadcast server." Thus, the claim language is clear that "data" is received or transmitted. In other words, the parties' dispute relates to whether "data" requires "content of a message." That dispute has been resolved above with reference to the "data" term itself. For the same reasons stated for the "data" term, the Court finds that "content of a message" is improper for "central broadcast server."

With regard to "broadcast," the parties dispute whether the broadcast server must transmit the same data to multiple remote computing devices. In the initial *Google I* claim construction arguments, all parties asserted a construction that transmission to "one or more selected remote computing devices" was sufficient, and the issue of the same data going to multiple devices was not raised. *Google I* Claim Construction Order at 39–40. When this issue was raised in the *Google I* JMOL Order, the Court noted that nothing in the intrinsic record requires the central broadcast server to send the same message at the same time to multiple remote computing devices. *Google I* JMOL Order at 19.[3] This is consistent with the presently asserted claims themselves, as the claims just reference transmitting "data" to "receivers." The inherent claim language does require the same data to be sent to multiple receivers, as transmitting "data" would encompass transmitting different data blocks to different receivers. This is also consistent with the '279 Patent specification. The specification describes "Selection Addressing" for "one or more" destinations. '279 Patent 12:35–14:12. For example, the specification states:

> As is illustrated in FIG. 1, the data packets generated by the information sources 12 are transmitted to the central broadcast server 34, where they are internally processed before being wirelessly transmitted through a carrier 36 to **one or more personal computers 14** or other computing sources via selective receivers 32.

*Id.* 12:35–40 (emphasis added), and

> [D]ata packets are queued for wireless transmission to their respective destinations which could include one or more remote personal computers 14 or computing devices.

*Id.* 14:1–3. Elsewhere the specification also states:

> Additionally, the present invention unlike other wireless systems provides for a combination of broadcast, narrowcast and pointcast transmission. That is,

---

[3] There is no dispute between the parties that the central broadcast server transmits data to a plurality of devices and that the claims explicitly require transmitting to "receivers" plural. (Dkt. No. 82 at 4 n.6). The dispute raised is whether a particular piece of data has to be received by multiple receivers.

> information can be transmitted from a central broadcast server 34 wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast). One skilled in the art will recognize that the central broadcast server 34 operates effectively as a network operations center.

*Id.* 6:25–30. In light of the claim language and these specification passages, it is clear that any particular data block need not be sent to multiple remote devices. As to the file history cited by Google, prosecution arguments by nature are often not clear. *Phillips*, 415 F.3d at 1317 (noting that the prosecution history represents an "ongoing negotiation" and "often lacks the clarity of the specification"). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton, Inc. v. Minn. Mining and Manuf. Co.*, 311 F.3d at 1384, 1388 (Fed. Cir. 2002). Here, the claims to which the prosecution history arguments were directed did not even include the term "central broadcast server." Thus, the arguments have limited relevance to any disclaimer as to the meaning of "central broadcast server." (Amendment of Feb. 16, 1999 at 15–19, Dkt. No. 76, Ex. 2). More importantly, the passage cited by Google emphasizes the difference between a server sending information (broadcasting) to a user and a user sending the information to the server. *Id.* at 21–22. In the context of the amendment and argument as a whole, the term "central broadcast server" was not defined in the prosecution history as suggested by Google.

With regard to what a "central" broadcast server receives, the rationale of the *AWS* Order, which found that the server is configured to receive data from a plurality of information sources, is still applicable:

> The specification explains that "information sources . . . provide the information basis for outgoing broadcast," ['433 Patent] 11:56–57, and the central broadcast server "operates effectively as network operations center," *id.* at 6:10–12, where "the information [is] consolidated," *id.* at 12:1–2, before its transmission to "one or more personal computers 14 or other computing sources via selective receivers." *Id.* at 12:26–27. Defendants, on the other hand, contend that "central"

is a common English word that needs no construction. The court, however, agrees
with Plaintiff that defining "central" in accordance with the term's use in the '433
and '914 Patents will assist the jury in making its infringement determinations.

*AWS* Order at 15–16. Google asserts that requiring the term to be configured to receive data

from a plurality of information sources conflicts with a subsequent limitation in '279 Patent

claim 1, which states that the central broadcast server is "configured to receive data from at least

one information source." The Court notes that in many claims in the patent family the term

"central broadcast server" is used in claims that do not have the "at least one" language of '279

Patent claim 1. For example, the presently asserted '154 Patent claim 1 does not include the

subsequent limitation noted by Google (similarly, claims asserted in *Google I* did not include

such language). In such a situation, the Court relies upon the specification to provide the proper

context for the construction of the term generally. As quoted above from the *AWS* Order, the

specification teaches that a central broadcast server operates as an operation center for multiple

information sources. Such an arrangement is also taught with regard to Figures 1 and 2 and

passages such as "data parsed from a plurality of incoming data feeds 16 from existing

information sources 12 is wirelessly transmitted by the central broadcast server 34." '279 Patent

6:46–49. The Court therefore adopts the "configured to receive data from a plurality of

information sources" language.[4]

As to "server," the parties have not identified any disagreement as to the meaning. In

*Google I*, the parties (including Google) agreed that "server" means "one or more pieces of

computer equipment and the software running on the equipment used to provide services for one

or more other computers or computing devices." *Google I* Claim Construction Order at 39 n.5.

---

[4] The Court notes that the specification describes the "central broadcast server" (a term the parties do not
appear to dispute is not known to one skilled in the art without reference to the specification and file
history) as related to multiple information sources. Multiple information sources is not contradicted by
the '279 Patent claim 1 requirement of "at least one" information source as multiple sources satisfies "at
least one."

Google has not identified any errors regarding that construction. The Court finds that it would be helpful to provide the jury a construction for the term "server." As the Court has not been presented with any disputes as to the term, the Court adopts the prior agreed construction.

**The Court construes "central broadcast server" to mean "one or more servers that are configured to receive data from a plurality of information sources and process the data prior to its transmission to one or more selected remote computing devices."**

**The Court construes "server" to mean "one or more pieces of computer equipment and the software running on the equipment used to provide services for one or more other computers or computing devices."**

6. **"process the received data with at least one parser" ('279 Patent claim 1) & "process the generated data using at least one parser" ('154 Patent claim 1)**

| SimpleAir | Google |
|---|---|
| using one or more computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon. | using one or more computer software programs that each respectively correspond to the content of the message to break or divide data into components. |

The parties dispute (1) whether the construction should just include "programs" as opposed to "program, routine and function," (2) whether the parser must correspond to the content of the message (i.e., using different parsers depending on the format of the incoming data), and (3) whether the content can be analyzed, process, or acted upon.[5]

Positions of the Parties

---

[5] At the oral hearing, Google backed off the program argument. Google stated that as to what is a program and what is part of a program, Google does not "think that's the real issue here." (Claim Construction Hr'g Tr. 63:10–11). Further, Google argued that the Court does not "need to get into these. Then you're going to be fighting about what's a routine, what's a subroutine. It's software. We all agree its software." *Id.* 64:12–15. Google also did not emphasize the analyzed, process, or acted upon dispute.

SimpleAir asserts its construction conforms to the *Google I* construction of "parsing said data with parsers," which was found to mean "using multiple computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed or acted upon." *Google I* Claim Construction Order at 31.

As to Google's inclusion of only "programs," SimpleAir argues that Google's intent is to argue that a smaller routine, function, or sub-program within a larger program cannot be a "parser." SimpleAir cites to a dictionary definition that references "parser" as a "portion of a computer program." (Dkt. No. 68 at 14). SimpleAir asserts that nothing in the claim or specification requires the parser to be a standalone program. SimpleAir notes that the specification provides examples of parsers but states that "any type of information source and corresponding parser may be used." '279 Patent 8:27–28.

As to Google's inclusion of "each respectively correspond to the content of the message," SimpleAir asserts that Google merely relies on an embodiment disclosed in the specification at 8:15–21 and Figure 2. SimpleAir asserts, however, that this passage concludes "any type of information source and corresponding parser may be used." '279 Patent 8:27–28. SimpleAir asserts that the Defendants in both *Google I* and *AWS* attempted to limit the claims to the content specific parsers disclosed in the specification. SimpleAir notes that the *Google I* court stated, "Though the specification includes an embodiment in which the parsers are matched to the information source (stock quote, weather, email, etc.), the claim language is explicitly not so limited." *Google I* Claim Construction Order at 31. SimpleAir also cites to the *AWS* Order as rejecting such a limitation. *AWS* Order at 20–21.

Google asserts that in *Google I* the '433 Patent and '914 Patent claims included "parsers corresponding to the said central broadcasts server" or "said servers."  Google asserts that the claims thus required a correspondence to the servers and nothing more.  *Google I* Claim Construction Order at 30–31.  Google asserts that the '279 Patent and '154 Patent claims do not recite the "corresponding" language.  Google asserts that the presently asserted claims require the parsed data to be encapsulated in data blocks.  Google asserts that the parsing limitations in this case are thus materially different.  (Dkt. No. 76 at 13).

Google asserts that the specification describes using different parsers depending on the format of the incoming data:

> The data, which can include but is not limited to stock quotes, weather, lotto, E-mail, etc. is then respectively parsed by parsers, such as the stock quote parser 106, weather parser 108, lotto parser 110 and mail parser 112, and then transmitted to the content manager 114 located in the central broadcast server 34. Data is also provided to the central broadcast server 34 by sources 116 which provide software and hardware for a mainstream connection, via FM radio, with the source 118. This kind of data is also parsed by various parsers, such as Reuters 120, COMDEX 122 and TSN 126.

'279 Patent 8:15–25.  Google notes that the passage concludes with "[t]he present invention is not limited to the information sources or parsers described herein.  Rather, any type of information source and <u>corresponding</u> parser may be used."  *Id.* 8:25–29 (emphasis added).  Google asserts that the use of "corresponding" indicates a content specific parser is needed to parse data from different information sources.  (Dkt. No. 76 at 14).  Google asserts that the second sentence in the passage at 8:25–29 makes clear that just not any breaking or dividing of data is sufficient to be a "parser."

Google further objects that under SimpleAir's construction SimpleAir's expert asserted that "parser" may include components of the non-parser blocks of Figure 2 such as the "FTP server" and the "SMTP server;" elements that relate to receiving data.  Google asserts that such a

construction would render "parser" superfluous and that the claim has a separate "receiving data" limitation.  Google asserts SimpleAir's construction is an attempt to read "parser" out of the claims.  (Dkt. No. 76 at 15).

As to "receiving data," SimpleAir replies that Google's expert admitted that one can receive data without breaking or dividing the data up into components.  (Dkt. No. 82 at 5).  As to the "corresponding to the content" limitation, SimpleAir reiterates that Google is merely reading embodiments into the claim.  SimpleAir asserts that none of the differences between the present claims and the claims in the *Google I* case limit "parsers" to parsers that "correspond to the content of the message."  SimpleAir asserts that, as a result, there is no reason to change the prior ruling.

<u>Analysis</u>

With regard to the "correspond" language sought by Google, though Google asserts that the limitations in question are materially different from those of *Google I*, the Court is not persuaded.  The Court in *Google I* construed "parsing said data with parsers."  *Google I* Claim Construction Order at 31.  Such language is similar to that presented here.  Moreover, Google merely points to an embodiment within the specification without any indication that the term "parser" has been disavowed to only that embodiment.  *See Arlington Indus.*, 632 F.3d at 1254 ("[E]ven where a patent describes only a single embodiment claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction." (citation omitted)).  Further, the passage, "[t]he present invention is not limited to the information sources or parsers described herein.  Rather, any type of information source and corresponding parser may be used," does not add clarity that only parsers tied to specific content are allowed.  '279 Patent 8:25–29.  The specification thus

does not mandate Google's limitation. The claim language in question (and the surrounding claim language) do not indicate a usage limiting each parser to corresponding to specific message content.

With regard to Google's assertion that parsers must be separate programs, Google has dropped such arguments. (Claim Construction Hr'g Tr. 63–65). In any event, Google's citation to specification lines 8:12–22 and Figure 2 does not support such an assertion. Figure 2 does show different parser blocks, however, the specification does not describe such blocks as being separate programs and does not state that such blocks may not be sub-programs, routines, or the like.[6] In light of the claims and the specification, Google has not presented evidence suggesting that the *Google I* construction is not appropriate. Finally, as to the *Google I* Claim Construction Order language of "whose content or format can be analyzed, processed, or acted upon," Google did not provide any argument as to why such language should be changed, and the Court finds the *Google I* rationale appropriate.

**The Court construes "process the received data with at least one parser" ('279 Patent claim 1) and "process the generated data using at least one parser" ('154 Patent claim 1) to mean "using one or more computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon."**

**7. "an information gateway . . . the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks"**

| SimpleAir | Google |
|---|---|
| one or more software programs (or a portion of a program) that build data blocks from the parsed data and assign addresses to the data blocks. | Indefinite |

---

[6] In *Google I*, Google actually asserted that the parser was a "filter"—a term more similar to that adopted by the *Google I* Claim Construction Order as opposed to Google's current standalone program approach.

<u>Positions of the Parties</u>

Google asserts that definiteness has not been addressed in the prior litigations. Google asserts that under *Nautilus* the proper test is no longer that a court or party "can ascribe some meaning to a patent's claim." (Dkt. No. 76 at 15 (quoting *Nautilus*, 134 S.Ct. at 2130)). Google asserts that the "information gateway" fails the new, proper test: whether the term is reasonably certain.

Google asserts that "information gateway" is not a term of art and that SimpleAir's construction merely includes any software that performs the subsequently claimed functional limitations. Google asserts that such purely functional limitations are invalid as indefinite unless the specification provides structure that performs the recited function. In particular, Google asserts that the claims in question are means-plus-function limitations subject to 35 U.S.C. § 112, ¶ 6. Google asserts that even though the term "means" is not used, the presumption that the term is not a means-plus-function element can be rebutted if a claim "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing the function." (Dkt. No. 76 at 16 n.19 (quoting *Mass. Inst. of Tech. v. Abacus*, 462 F.3d 1344, 1353–54 (Fed. Cir. 2006))). Google further asserts that the Federal Circuit has made clear that the corresponding structure must be more than a general purpose computer and require an algorithm or a specific hardware configuration. (Dkt. No. 76 at 16).

Google points to *Vantage Point Tech., Inc. v. Amazon.com, Inc.*, No. 2:13-cv-909-JRG, 2015 WL 575167 (E.D. Tex. Feb. 10, 2015) as a case in which this Court found that the term "a snooper" was purely functional, and the patentee had failed to identify any structure corresponding to "snooper" in the specification. (Dkt. No. 76 at 16–17). Google asserts that the analysis here is the same. Google asserts that the claim language only recites what an

"information gateway" does, not what it is. Google asserts that, similarly, SimpleAir's construction only recites what an information gateway does, and such construction would apply to any software that performs the recited functions. Google asserts that SimpleAir's expert similarly opined that any software that performed the function would meet the "information gateway" limitation. (Dkt. No. 76 at 17). Google asserts that the term is indefinite because the "information gateway" term amounts to pure functional claiming.

Google asserts that 35 U.S.C. § 112, ¶ 6 does not salvage the claim term because there is neither a corresponding algorithm nor any particular hardware required for implementing it. Google asserts that the specification merely discloses what an information gateway does. (Dkt. No. 76 at 17 (citing '279 Patent 8:52–9:17)). Google asserts that the only possible disclosed algorithm relates to managing a data budget, which is not a function recited in the claims. (Dkt. No. 76 at 18 n.22).

SimpleAir asserts that its construction conforms to the *Google I* construction with the addition that the data blocks be built "from the parsed data" to account for the explicit claim language difference of the *Google I* '914 Patent claims. (Dkt. No. 68 at 16). SimpleAir asserts that in the prior litigations none of the defendants, including Google and their experts, had any trouble applying the information gateway limitation. (Dkt. No. 68 at 16). SimpleAir also asserts that Google and its experts were able to apply this limitation in the two recently filed IPRs and four CBM reviews. SimpleAir notes that in those post-grant filings, Google and its experts adopted the prior Court constructions. (Dkt. No. 68 at 17 n.6).

SimpleAir asserts that Google has failed to address the initial question under the means-plus-function test: Has Google rebutted the presumption that the term is not to be a means-plus-function term? SimpleAir asserts that Google has bypassed this first step entirely and presented

no argument that the presumption is rebutted. (Dkt. No. 82 at 6). SimpleAir asserts that to overcome the presumption Google must show that "gateway" is "a generic, structureless 'nonce word or a verbal construct' without any meaning, such as 'mechanism,' 'means,' 'element,' or 'widget.'" *Apple v. Motorola, Inc.*, 757 F.3d 1286, 1301 (Fed. Cir. 2014). SimpleAir also asserts that Google must show that "gateway" has not "achieved recognition" in dictionaries "as a noun denoting structure." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004). Citing to dictionaries, SimpleAir asserts that it is undisputable that "gateway" was known in the art:

> *Gateway*: "2. In a communications network, or multiple interconnected networks, a device or software which determines where packets, messages, or other signals travel to next." IEEE Press, *Wiley Electrical and Electronics Engineering Dictionary* 312 (2004).

> *Gateway*: "A point of entry and exit to another system, such as the connection point between a local-area network and an external communications network." *McGraw-Hill Dictionary of Computing and Communications* 158 (2003).

(Dkt. No. 82 at 6–7). SimpleAir also asserts that even Google's expert acknowledged that "a person of skill in the mid-90s would have understood a gateway to be an interface between two different kinds of networks." (Wicker Depo. 32:14–23, Dkt. No. 82, Ex. 38). SimpleAir also quotes the Federal Circuit: "The term 'gateway' had a well-understood meaning in the art [in the late '90s]. As evidenced by technical dictionaries, one of ordinary skill in the art would have an understood, a 'gateway' to be a connection between different networks." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014).

SimpleAir further asserts that even a generic term escapes the application of 35 U.S.C. § 112, ¶ 6 when the surrounding claim language and the specification disclose the element's operation, including its inputs, outputs, and the methods by which those outputs are achieved. (Dkt. No. 82 at 7 n.7 (citing *Apple*, 757 F.3d at 1301)). SimpleAir asserts that, here, the inputs to

the "information gateway" are "parsed data," the outputs are "data blocks," and the methods by which those outputs are achieved is by "build[ing] data blocks from parsed data" and "assigning the addresses to the data blocks." (Dkt. No. 82 at 7 n.7 (citing '279 Patent claim 1; *id.* figs.2, 4, 6 & 15; *id.* 8:62–9:17, 11:30–42 & 22:13–21).

In reply, Google asserts that SimpleAir's position that a "gateway" is known to those in the art as a connection between networks is directly contradicted by SimpleAir's positions asserted in *Google I*, in which SimpleAir argued that the gateway does not have to connect two different networks. *Google I* Claim Construction Order at 32. Google notes that the Court agreed with SimpleAir in *Google I* and found that "though Defendants point to extrinsic evidence for the proposition that 'gateway' as known in the art may connect different networks, the intrinsic record demonstrates that within the patents, the term 'gateway' is used in a broader context that includes a connection between different software components." *Google I* Claim Construction Order at 34. Google asserts that SimpleAir is estopped from now asserting otherwise. (Dkt. No. 87 at 2); (Claim Construction Hr'g Tr. 75:1–7). Google asserts that nothing in SimpleAir's construction conforms to the extrinsic evidence, and that the "information gateway" term is purely functional.

Analysis

In *Google I*, Google asserted a construction that included the term "gateway" itself. *Google I* Claim Construction Order at 34. Google has also applied the term in the various post-grant proceedings. Google points to the raised indefiniteness standard from *Nautilus* to assert reconsideration of the information gateway term. In particular, Google now asserts (for the first time) that the term is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. Under such

37

interpretation, Google asserts that the specification does not disclose a structure and corresponding algorithm and is thus indefinite.

Google's argument fails, however, to overcome the presumption that the term is not a means-plus-function limitation for the reasons articulated by SimpleAir. Google has acknowledged that the term does not use the classic "means" format and that the presumption in such cases is that the term is not a means-plus-function term. But Google has not rebutted the presumption that 35 U.S.C. § 112, ¶ 6 does not apply. *See Invention AG v. Thyssenkrupp Elev. Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011) ("[W]here, as here, the claim language does not recite the term 'means,' we presume that the limitation does not invoke § 112, ¶ 6."). As noted by SimpleAir, the term "gateway" carries an ordinary meaning to those skilled in the art, and even Google's expert acknowledged as much. (Dkt. No. 82 at 6–7); (Wicker Depo. 32:14–23, Dkt. No. 82, Ex. 38). Google has not shown that the claim term is a generic "nonce" word, and Google has not shown that the remaining intrinsic or extrinsic record provides no structural description to a person of ordinary skill in the art. *See Apple*, 757 F.3d at 1300 ("[I]f the claim merely recites a generic nonce word and the remaining claim language, specification, prosecution history, and relevant external evidence provide no further structural description to a person of ordinary skill in the art, then the presumption against means-plus-function claiming is rebutted.").[7]

Google asserts that SimpleAir should be estopped from arguing that "gateway" is a term known in the art based upon the *Google I* arguments. However, Google misses the focus of the *Google I* arguments. The parties did not argue whether the term was known in the art, but rather,

---

[7] In *Apple*, the Federal Circuit noted that "structure" in a computer software context need not be a physical structure but may be understood through, for example, algorithms, flowcharts, sets of instructions, rules, or programs as known to those of skill in the art with regard to the term. *See Apple*, 757 F. 3d at 1298, 1301.

they argued whether the ordinary meaning was particularly limited. In particular, the dispute focused on whether a connection between two networks was required. As noted above by SimpleAir, extrinsic evidence in at least some instances shows that a gateway may be "in a communications network, or multiple interconnected networks, a device or software which determines where packets, messages, or other signals travel to next." (Dkt. No. 82 at 7). Further, as described in the *Google I* Claim Construction Order, the patents utilized the term in a manner that does not limit the components to two different networks. Rather the connected components may be different software components. As described in *Google I*, the context of the ordinary meaning of "gateway" must be considered in light of the specification:

> [T]he specification provides an understanding as to the use of the term in the patents-in-suit. Figure 2 and the associated description clearly include the information gateway 134 and wireless gateway 136 within what is described as "a block diagram 100 of the software architecture for communications between the information sources and central broadcast server 34." '433 Figure 2, 7:57–59. As noted in Figure 4, the information gateway "builds data block and assigns real and virtual capcodes to a data block as required based on information in the subscriber database" and the wireless gateway "performs packetization compression, encryption, etc. to prepare data block for transmission over the wireless broadcast network." '433 Figure 4; *See also* '433 Figure 15. Similarly, with regard to Figure 12, the information gateway 134 "attaches URL tag to the message." '433 Figure 4. These tasks are described in the context of being performed within the network of servers 33 of the central broadcast server 34. '433 Figures 1 and 2, 7:43-9:14. Though the "wireless gateway 136" is described as preparing "data blocks for transmission over a wireless broadcast network," the communications between the information gateway and other portions of the software architecture 100 of Figure 2 and communications between the information gateway and wireless gateway are not described in the context of connecting two different networks. Rather, such connections are described in the context of software components of the central broadcast server. Thus, though Defendants point to extrinsic evidence for the proposition that "gateway" as known in the art may connect different networks, the intrinsic record demonstrates that within the patents, the term "gateway" is used in a broader context that includes connections between different software components. A construction which excludes a disclosed embodiment is rarely proper. *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005). As such, the term "gateway" should not be so limited.

*Google I* Claim Construction Order at 33–34. In context of the specification and in light of the ordinary meaning, it is clear that the term "gateway" connotes a software component that connects multiple different software components. The specification in this case makes clear, though, that the different software components do not have to be different network components. The term "gateway" is not merely a "nonce" word. In the context of the specification and the meaning known in the art, the means-plus-function presumption has not been rebutted. That the claim term requires a particular type of gateway, an "information gateway," does not change this analysis. As described in the *Google I* Claim Construction Order passage above, in the specification the information gateway builds data blocks and communicates with the wireless gateway. As Google has not shown that the claim term is governed by 35 U.S.C. § 112, ¶ 6, Google's indefiniteness argument fails.

It is noted that in *Google I* the Court found that the term "gateway" did not need a separate construction upon rejection of the connection between "two different networks" argument of Google. *Google I* Claim Construction Order at 33–34. Given the parties new and continued dispute regarding "information gateway" and "transmission gateway," and to limit the potential for claim construction arguments to be raised at the trial, the Court modifies the "information gateway" term to explicitly recite additional language directed at the "gateway" concept. In particular, the Court notes that the gateway acts as an interface between other software resources.

**The Court construes "an information gateway . . . the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks" to mean "one or more software programs (or a portion of a program) that act as an**

**interface between other software resources and that build data blocks from the parsed data and assign addresses to the data blocks."**

### 8. "assign addresses to data blocks"

Google originally asserted that "assign addresses to data blocks" should be construed as "assign multiple receiver addresses to each data block." SimpleAir asserted that the ordinary meaning should be applied and the term was limited to neither receiver addresses nor multiple addresses for each data block. (Dkt. No. 68 at 17–18). SimpleAir pointed out that the claim language did not require "receiver" addresses, and that the addresses could be the address of an input end of a portal whose output end is the receiver or some other intermediate address. (*Id.*) SimpleAir also noted that the claim term has the plural for both "addresses" and "blocks" and thus only requires multiple addresses for multiple blocks, not multiple addresses for the same data block. (*Id.*) In the *Google I* JMOL Order, the Court found that nothing in the *Google I* claims requires that multiple addresses be assigned to a single group of data blocks (the claims included "assigning addresses to said data blocks"). *Google I* JMOL Order at 19. Google did not address this term in its briefing. In the parties' final Joint P.R. 4-5(d) Claim Construction Chart, Google's construction for this term was "no construction necessary." (Dkt. No. 84 at 3). At the claim construction hearing, Google acknowledged that Google has "withdrawn" their prior construction and are "willing to do plain and ordinary meaning." (Claim Construction Hr'g Tr. 91:24–92:2). Thus, the parties have presented no dispute for this term, and Google has withdrawn its assertion that multiple receiver addresses must be assigned to each data block. For the reasons articulated by SimpleAir and those presented by the Court in the *Google I* JMOL

Order, the Court explicitly rejects Google's position that multiple receiver addresses must be assigned to each data block and finds that the ordinary meaning applies.

**The Court finds that "assign addresses to data blocks" has its ordinary meaning.**

### 9. "communicatively coupled" ('279 Patent claim 1, '154 Patent claim 1)

| SimpleAir | Google |
|---|---|
| connected or associated in a way that permits communication. | Indefinite |

Positions of the Parties

SimpleAir notes that the term is used multiple times in the claims: "an information gateway communicatively coupled to the central broadcast server" ('279 Patent claim 1), "a transmission gateway communicatively coupled with one or both of the central broadcast server and the information gateway" ('279 Patent claim 1), and "receivers communicatively coupled with the remote computing devices" ('279 Patent claim 1, '154 Patent claim 1). SimpleAir asserts the term is used in the context of two elements being connected or associated in a way that permits communication. SimpleAir cites to technical dictionaries for the term "coupling" in support of its construction. (Dkt. No. 68 at 20–21). SimpleAir asserts there is no definition or disclaimer in the specification or prosecution history that would change the ordinary meaning. (Dkt. No. 68 at 21). SimpleAir cites to the specification statement, "[t]he content manager 114 communicates with the information gateway" ('279 Patent 8:62–63), and Figure 2, which depicts the association of the various components.

SimpleAir cites to its expert for the proposition that the term "communicatively coupled" was known to those skilled in the art. (Dkt. No. 68 at 21). SimpleAir notes that Google and its experts had no trouble applying the term in the post-grant review petitions and even asserted that

the ordinary meaning was "coupled for communication": "Petitioner construes the phrase 'communicatively coupled' based on its plain language under the broadest reasonable interpretation to mean 'coupled for communication' including e.g. coupled to allow communication between functions or processes on the same or different servers." (Dkt. No. 68 at 21 (quoting '154 IPR Petition at 13, Dkt. 68, Ex. 25)).

Google asserts that the term "communicatively coupled" never appears in the specification and that the term "coupled" only appears once (a reference to "a microprocessor connected to a system bus and . . . random access memory (RAM) which are also coupled to the system bus)." '279 Patent 7:20–23. As to the connections of the receivers and remote computing devices, Google asserts that the patent teaches that the receivers "are attached" to the computing devices. *Id.* 2:66–3:03. Thus, Google asserts that the specification teaches that "coupled" are two things that are connected or attached. Google asserts no guidance is provided, however, as to "communicatively coupled."

As to Figure 2, Google notes that all three components are part of the central broadcast server, and thus, in order to meet the claim requirements, the central broadcast server would have to be "communicatively coupled" to part of itself. Google notes that SimpleAir's expert agreed that a system cannot be communicatively coupled to itself. (Dkt. No. 76 at 21). Google asserts that the claim and specification do not teach one how to ascertain the meaning with reasonable certainty.

Google objects to SimpleAir's use of "associated" as expanding the meaning of "coupled." Google asserts that SimpleAir's own dictionary teaches that "coupled" requires a direct connection: "Coupled - the association of two or more circuits in such a way that power or signal information may be transferred from one to another." (Dkt. No. 76 at 22 (citing the IEEE

dictionary definition)). Google asserts that a mere association is therefore not enough. Rather, the term requires an association that allows power or signals to be transferred by connecting them.

Google asserts that SimpleAir's construction would cover any two remote devices that could communicate and that any two computers on the Internet could be argued to be "communicatively coupled." (Dkt. No. 76 at 22). Google asserts that SimpleAir's expert acknowledged that the term requires something more than mere association that allows indirect communication. (Dkt. No. 76 at 2). Google asserts that while both parties agree that indirect "association" is insufficient to constitute communicative coupling, SimpleAir's construction imposes no meaningful bounds and does not define the scope.

SimpleAir notes that both experts agree that one skilled in the art would understand the meaning of the term without reference to the specification. (Dkt. No. 82 at 9 n.11). SimpleAir also notes that in the recent prosecution history, the patent holder expressly defined the term as "connected or associated in a way that permits communication." (*Id.*)

As to the information gateway being part of the central broadcast server and Google's argument that the central broadcast server cannot be coupled to itself, SimpleAir asserts that the claims are not limited to the Figure 2 embodiment and the claims do not have a requirement that the information gateway is part of the central broadcast server. (Dkt. No. 82 at 9); (Claim Construction Hr'g Tr. 94:1–23). Further, SimpleAir asserts that even if the information gateway is a component of the central broadcast server, components of an apparatus can be communicatively coupled to the apparatus; for example, a mouse and keyboard are each components of a computer system, and yet, it makes sense to describe those elements as communicatively coupled to the computer system. (Dkt. No. 82 at 9–10).

As to Google's argument that no bounds are provided, SimpleAir asserts that its construction does provide bounds in that the devices must be connected or associated. Further, SimpleAir asserts that two components that are associated (for example, in the same housing) still would not be "communicatively coupled" if the devices could not communicate with each other. (Dkt. No. 82 at 10).

Analysis

The arguments and evidence presented by SimpleAir are more persuasive.[8] The specification provides components that are coupled in a manner that provides communication between the various devices for which "communicatively coupled" is utilized in the claims. *See* '279 Patent figs.1 & 2 and associated text. Though some of the devices may be described in the embodiments as "attached" (the receivers and the remote computing devices (*id.* 2:66–3:03)), the specification does not disavow other coupling. The claims describe various devices that are "communicatively coupled." For example, '279 Patent claim 1 recites (1) "an information gateway communicatively coupled to the central broadcast server," (2) "a transmission gateway communicatively coupled to one or both of the central broadcast server and the information gateway," and (3) "receivers communicatively coupled to the remote computing devices."[9] In context of the specification as a whole, it is clear that these devices are associated together in that the claims are coupled in a manner that allows communication. The specification provides the necessary context to the claimed term. Moreover, as noted by SimpleAir, "communicatively coupled" is a term known to those in the art. (Knox Decl. ¶¶ 74–80, Dkt. No. 68, Ex. 1). Even Google's expert acknowledged that the term carries an ordinary meaning to one skilled in the art. (Wicker Depo. 76–78 & 80, Dkt. No. 82, Ex. 38.) Further, even Google applied the plain

---

[8] It is noted that SimpleAir alternatively asserts in its briefing that the claims do not encompass the Figure 2 embodiment. Dkt. No. 82 at 9–10. The Court's ruling does not rely upon such position.

[9] '154 Patent claim 1 includes similar "communicatively coupled" limitations for each of these devices.

language of the term in the '154 IPR in a manner consistent with that known in the art. (*See* Petition for *Inter Partes* Review at 13, Dkt. 68, Ex. 25.) The intrinsic record provides context to the term to a reasonable certainty. In addition, the extrinsic record shows that the term had meaning to those skilled in the art to a reasonable certainty. Under the *Nautilus* standard, the term is not indefinite.

**The Court construes "communicatively coupled" to mean "connected or associated in a way that permits communication."**

10. **"a transmission gateway . . . the transmission gateway configured to prepare the addressed data blocks for transmission to receivers communicatively coupled to the remote computing devices and initiate transmission of the addressed data blocks to the receivers" ('279 Patent claim 1)**

**"at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to receivers and configured to cause the addressed data blocks to be transmitted to the receivers" ('154 Patent claim 1)**

| SimpleAir | Google |
|---|---|
| a transmission gateway / at least one transmission gateway: one or more software programs (or a portion of a program) that prepare the data blocks for their transmission to receivers and interface with other resources used to transmit the preprocessed data.<br><br>[no additional construction necessary] | Indefinite |

Positions of the Parties

SimpleAir notes that in each claim the "transmission gateway" is configured to have slightly different attributes: "initiate transmission of the addressed data" ('279 Patent claim 1), and "to cause the addressed data blocks to be transmitted to the receivers" ('154 Patent claim 1). SimpleAir notes that the *Google I* Claim Construction Order construed "a transmission gateway for preparing said data blocks for transmission to receivers." SimpleAir asserts that the proper

construction should conform to the *Google I* construction for the same reasons as stated in *Google I*. *See Google I* Claim Construction Order at 37–39. SimpleAir asserts that the additional particular configuration requirements of each claim are recited in the claims, are easily understood, and need not be construed.

SimpleAir cites to the *Google I* Claim Construction Order and its expert declaration for support that the term is not indefinite. (Dkt. No. 68 at 20). SimpleAir also asserts that in the prior litigations no defendant, including Google and their experts, had any trouble applying the transmission gateway limitation.[10] SimpleAir also asserts that Google and its experts were able to apply this limitation in the two recently filed IPRs and four CBM reviews. SimpleAir notes that in those post-grant filings Google adopted the *Google I* constructions. (Dkt. No. 68 at 20).

Google asserts that the term "transmission gateway" does not appear in the specification and that both experts agree that the term is not well known or frequently used in the art. (Dkt. No. 76 at 19). Google asserts that the Court's construction in *Google I* was made under the pre-*Nautilus* "insolubly ambiguous" standard. Google asserts that the *Google I* construction was based on (1) the fact that the *AWS* Court and the *AWS* defendants found the term sufficiently definite, and (2) the specification disclosed a wireless gateway, which is an embodiment of the transmission gateway. (Dkt. No. 76 at 19 (citing *Google I* Claim Construction Order at 38–39)). Google asserts that under the new *Nautilus* standard the term is indefinite, as the ability to "ascribe some meaning to a patent's claims" is not sufficient. *Nautilus*, 134 S.Ct. at 2130. Google asserts that the prior constructions are therefore irrelevant to the indefiniteness inquiry.

Google asserts that since the term is not used in the specification and the term is not a term of art there are no relevant sources of information that define the term's scope. (Dkt. No.

---

[10] The Court notes that in *Google I*, Google did in fact assert that the term was indefinite and only provided an alternative construction. *Google I* Claim Construction Order at 37–38.

76 at 19).  Google asserts that, as a result, a person skilled in the art cannot discern the metes and bounds of the claim and, thus, the term is indefinite.

Google asserts that the disclosure of "wireless gateways" provides no basis for finding the claim definite, as even if a "wireless gateway" is a "transmission gateway," this lone example would still leave one skilled in the art wondering what else could be a "transmission gateway." (Dkt. No. 76 at 20).  Google asserts that furthermore, in *Google I*, the court found that "transmission gateway" is broader in scope than "wireless gateway" and the term requires "no particular specific ways" for preparing data blocks for transmission.  (Dkt. No. 76 at 20 (quoting *Google I* Claim Construction Order at 39)).  Google asserts that the indeterminate difference in scope between "wireless gateway" and "transmission gateway" is the very "zone of uncertainty" prohibited by *Nautilus*.  (Dkt. No. 87 at 3).  Google asserts that the specification "leaves the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion'" and falls within the "zone of uncertainty" that the Supreme Court has warned against.  (Dkt. No. 76 at 20 (quoting *Interval Licensing, LLC v. AOL Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014))).

Google also asserts that the "transmission gateway" term amounts to purely functional claiming without corresponding structure and that SimpleAir's construction fails to identify any structure beyond software.  Google asserts that, as a result, the term is also indefinite for the reasons "information gateway" is indefinite.

SimpleAir asserts that merely because a claim term is not in the specification and is not a term of art does not render a term indefinite.  SimpleAir asserts that the proper standard is whether the claims, read in light of the prosecution and file history, would be understandable to a reasonable certainty.  (Dkt. No. 82 at 8 (citing *Nautilus*, 134 S.Ct. at 2124)).  SimpleAir asserts that the reasoning in its expert's declaration and in the *Google I* Claim Construction Order at

pages 19 and 20 meet such a standard. (Dkt. No. 82 at 8 (citing *Google I* Claim Construction Order at 19–20)). As to "transmission gateway" being broader that "wireless gateway," SimpleAir asserts that claims are often broader then the disclosed embodiments and the mere fact that they are does not imply ambiguity or uncertainty.

As to Google's functional claiming argument, SimpleAir asserts that Google's argument fails for the same reason Google's "information gateway" argument failed: Google presents no evidence or argument overcoming the presumption that 35 U.S.C. § 112, ¶ 6 does not apply. (Dkt. No. 82 at 8–9 n.9).

Analysis

The rationale and reasoning in the *Google I* Claim Construction Order at pages 38 through 39 and the *AWS* Order at pages 24 through 26 is still applicable even under the *Nautilus* standard. Further, the specification clearly discloses a "wireless gateway 136" acting as a gateway for transmissions by the wireless broadcast network. The specification explains that the gateway performs the various functions for allowing communication with the separate wireless network. '279 Patent figs.2 & 3(a)–(b); *id.* 8:62–9:55, 10:51–11:3. This includes "wireless gateway 136 prepares data blocks for transmission over a wireless broadcast network." *Id.* 9:18–20. The gateway passages are replete with references to the "transmission" operation and preparing data blocks for transmission. *Id.* 8:62–9:55, 10:51–11:42, 3:11–4 ("Prior to transmission, at the central broadcast server 34, the data packets are encoded using a protocol suitable for the transmission of information. Data blocks are packetized for transmission over the wireless broadcast network using transmission protocols."); *see also id.* figs.2, 3(a)–(c) & 4. In context of the specification, it is clear that the wireless gateway acts as a transmission gateway, and it is in this context that the claim term must be interpreted. Though Google argues

that only a "wireless" gateway is disclosed, the claim term is drafted to cover the disclosed "transmission" concept. Moreover, even if a single embodiment is disclosed, the claims are not inherently limited to that single embodiment, particularly when here the claim term is broader than the "wireless" embodiment and drafted to the disclosed, more general "transmission" concept. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011). Furthermore, the Court notes that the specification discloses an alternative embodiment in which the information to be transmitted from the central broadcast server "can also be sent simultaneously via a wired connection" and "simultaneously placed on Web pages on the Internet," and a "user can thus connect to the Web via the Internet." '279 Patent 32:20–36. Such an alternative embodiment further counsels against mandating that all transmissions be wireless.

As to Google's more general arguments regarding the term "gateway" and functional claiming, the Court's reasoning discussed above with regard to "information gateway" is similarly applicable.

SimpleAir seeks a construction of only "transmission gateway." Construction of the entire disputed term better equips the jury and more completely addresses the issues before the Court.[11]

**The Court construes "a transmission gateway . . . the transmission gateway configured to prepare the addressed data blocks for transmission to receivers communicatively coupled to the remote computing devices and initiate transmission of the addressed data blocks to the receivers" ('279 Patent claim 1) to mean "one or more software programs (or a portion of a program) that interface with other resources used to**

---

[11] Construction of the entire term is also consistent with the *Google I* Claim Construction Order in which the entire term was construed. *Google I* Claim Construction Order at 39. As the entire phrases at issue are somewhat different between each of the claims at issue now and also between the prior claims in *Google I*, the construction for each claim is varied, but the fundamental resolution of the conflict raised by the parties remains the same.

transmit the addressed data blocks and that are configured to prepare the addressed data blocks for transmission to receivers communicatively coupled to the remote computing devices and initiate transmission of the addressed data blocks to the receivers."

The Court construes "at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to receivers and configured to cause the addressed data blocks to be transmitted to the receivers" ('154 Patent claim 1) to mean "one or more software programs (or a portion of a program) that interface with other resources used to transmit the addressed data blocks and that are configured to prepare the addressed data blocks for transmission to receivers and configured to cause the addressed data blocks to be transmitted to the receivers."

## 11. "receiver" ('279 Patent claim 1, '154 Patent claim 1).

| SimpleAir | Google |
|---|---|
| [no construction necessary]<br><br>Explanatory phrase: The receiver and the remote computing device may form part of a consumer electronic device. | a receiving device attached to the remote computing device for receiving the data blocks. |

SimpleAir

SimpleAir asserts that the *Google I* Defendants sought a construction that required a "receiver" to be a "device" that is "attached" to the remote computing device, thus imposing an implicit requirement that the receiving device and the computing device cannot be components within a larger machine. (Dkt. No. 68 at 22). SimpleAir asserts that the Court rejected Google's proposed construction in *Google I* and ruled that the receiver and computing device need not be "formed in entirely different structures." *Google I* Claim Construction Order at 19. SimpleAir asserts that the Court should apply the same reasoning as in *Google I*.

SimpleAir further notes that the claim language of the '279 and '154 Patents expressly refutes Google's position. In particular, SimpleAir points to the language "receivers communicatively coupled to the remote computing devices." SimpleAir asserts that this defines

the relationship between the receivers and the computing devices and requires "communicatively coupled," not "attached." SimpleAir asserts that, consequently, the claim language supports the conclusion that "attached" is not required. (Dkt. No. 68 at 22). SimpleAir further cites to dependent claim 30 of the '279 Patent and dependent claim 29 of the '154 Patent (each depending from their respective claim 1), which each add the limitation that the "receiver and the remote computing device form part of a consumer electronic device." SimpleAir asserts that it necessarily follows that claim 1 encompasses receivers and computing devices that form part of a consumer electronic device. SimpleAir asserts that to avoid potential jury confusion and preclude future claim construction disputes, the Court's construction should include the explanation that "the receiver and the remote computing device may form part of a consumer electronic device." (Dkt. No. 68 at 23). SimpleAir further asserts that the fact that the devices perform separate functions does not require the devices to be "attached" and does not suggest that the receiver and the remote computing device cannot be part of a larger device. (Dkt. No. 82 at 10).

Google asserts that the Court noted in *Google I* that "the parties do not dispute that the 'receiver' and the 'remote computing device' as presented in the claims are separate devices." *Google I* Claim Construction Order at 19. Google asserts that SimpleAir's positions in this case contradict the Court's findings. Google asserts that SimpleAir maintains that a "receiver" is not actually a device but only a sub-component of a device. Google asserts that neither the "receiver" nor the "remote computing device" are sub-components but rather are devices. (Dkt. No. 76 at 23). Google asserts that the Court has found that the receiver and the remote computing devices are separate devices and that this is self-evident in the claim language. Google further notes that the patent specification treats the functions of the receiver and the

remote computing device as being different and the claims require "communicative coupling" of the devices, further supporting the conclusion that the two elements are separate devices. (Dkt. No. 76 at 24).

At the oral hearing, Google stated that "attached" as used in its construction was not necessary and that "we don't have an issue with attached versus communicatively coupled . . . . The attachment is not a big issue is what I'm saying." (Claim Construction Hr'g Tr. 112:22). Google stated that the relevant issue was whether the receiver and the remote computing device are separate devices. (*Id.* at 112:24–113:5). Google further asserts that the file history supports this conclusion because in a reexamination of the '433 Patent the applicants stated:

> That notification would occur whether the computing device was on or off because the receiver card had its own power source (batteries). In other words, the receiver did not rely upon the power from the remote computing device and therefore the receiver was able be on [sic] to receive messages and notify the computing device of their receipt even when the computing device was off.

('433 Reexamination of February 1, 2013 at 38, Dkt. No. 82, Ex. 39). Google asserts that this argument allowed the receiver to receive messages when the remote computing device was turned off, an explicit requirement of the '433 claims. *Google I* Claim Construction Order at 23–25. Google asserts that this independent functionality of these two devices is a key benefit of the alleged invention. Google asserts that SimpleAir's "explanatory phrase" erroneously suggests that the receiver and the remote computing device need not be independent devices.

Analysis

Google asserts that the issue before the court is not whether the receiver and the remote computing device are "attached," but whether the devices are "separate." However, Google has not proposed a construction to this Court that addresses Google's separateness argument. Moreover, it is clear that Google intends to load the term "separate devices" with a meaning that

deviates from both the ordinary meaning of "separate" and the meaning of the coupling of the receiver and the remote computing device as described in the specification and claims. In particular, Google argues that "sub-components" of a larger system are not "separate devices" and that any "devices" must be completely distinct from each other. (Dkt. No. 76 at 23). Under Google's argument, a microprocessor and a memory of a computer are not "separate" devices. Such an interpretation is not only completely devoid from Google's proposed construction, but also lacks support under an ordinary meaning and in the specification. The specification describes a computer 14 that may include "a microprocessor connected to a system bus" and a receiver card that connects to a wireless receiver 32." '279 Patent 7:20–45 & fig.2. Receiver 32 is shown in Figure 2 as outside of the computer 14 (and externally separate from the microprocessor). However, Google has pointed to no portion of the specification mandating that the receiver must be external to the computer 14, which contains the microprocessor, and no portion of the specification that mandates that the receiver and the receiver card cannot be combined. In fact, the relevant portion of the specification then continues with the statement:

> One skilled in the art will recognize that the present invention is not limited to the particular configuration discussed above. Rather the present invention may be implemented on other computer systems and configurations, including but not limited to Macintosh or Unix computers, televisions, telephones, appliances and so forth.

*Id.* 7:46–52. The fact that the "receivers" and the "remote computing devices" are separate devices does not negate the fact that the components may form parts of a larger device or system. Though the claims now refer to the devices "communicatively coupled," as opposed to "communicating," the *Google I* analysis and discussion applies:

> The parties do not assert that "receiver" is ambiguous or that the term does not have an ordinary meaning known to one in the art. The parties do not dispute that the "receiver" and the "remote computing device" as presented in the claims are separate devices. Defendants have pointed to passages in the specification that

54

indicate that the devices in the disclosed embodiments are in different structures. Defendants assert that the claimed receiver must thus be limited to the disclosed embodiment. However, Defendants have not pointed to a disclaimer or disavowal that the separate devices must be formed in entirely different structures. *See Phillips*, 415 F.3d at 1316 (claim scope may be limited by a disclaimer or disavowal). Moreover, the specification refers to the wireless receiver 32 interacting with a receive card in the remote computing device or through the use of the computer serial port. '433 7:27-30. The next sentence in the specification then describes that "the invention" is not limited to the "particular configuration discussed above" and the specification then states that the invention may be implemented in other configurations such as televisions, telephones, appliance and so forth. '433 7:30-35 ("Rather, the present invention may be implemented on other computing systems and configurations, including but not limited to Macintosh or Unix computers, televisions, telephones, appliances and so forth.") Thus, the specification itself implies that configurations other than the illustrated remote computing device and wireless receiver are contemplated. As such, not only is there no disavowal requiring the limitations sought by Defendants, the specification provides support for rejecting Defendants' limitations.

Moreover, the claims themselves describe the relationship between the receiver and the remote computing devices. The claims state the receivers "communicating with said computing devices [said devices]. '433 Claim 1 ['914 Claim 1].

*Google I* Claim Construction Order at 19–20.[12] This also conforms to the '279 Patent claim 30 and '154 Patent claim 29, which each add the limitation that "the receiver and the remote computing device form part of a consumer electronic device."

As to Google's new argument regarding the related '433 Patent file history, that passage relates to the claim element "whether said remote computing devices are on or off." Moreover, that the receiver may have batteries and rely upon power not from the remote computing device does not indicate that the two devices cannot be part of the same larger device. Furthermore, the passage in question relates to a declaration of prior inventorship that describes the prior reduction to practice. ('433 Reexamination of February 1, 2013 at 1, Dkt. No. 82, Ex. 39). In context of the entire argument, a clear disclaimer as to "receiver," in general, has not been established. *See Cordis Corp. v.*

---

[12] Though in the claims at issue in the '279 Patent and '154 Patent the language is "communicatively coupled" rather than "communicating," the same analysis applies.

*Medtronic Ave, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) (prosecution statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal.").  In *Google I* the Court found that the ordinary meaning of the term applied.  The Court finds that the ordinary meaning still applies.  However, to make clear the resolution of Google's position that the devices cannot form a part of a common larger device, the Court adds an explanatory phrase to reject Google's "separate" construction.

**The Court finds that "receiver" needs no further construction and that the receiver and the remote computing device may form part of a consumer electronic device.**

12. **"whether the remote computing devices are online or offline from a data channel associated with [each/the] remote computing device[s]"  ('279 Patent claim 1, '154 Patent claim 1)**

| SimpleAir | Google |
|---|---|
| whole phrase: whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers, wherein the data channel is for accessing information from the information source that sent the data.<br><br>A device is not online to an associated data channel merely because it is able to receive data transmissions (directly or indirectly) from the central broadcast server.<br><br>*a data channel*: one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network. | Indefinite |

The dispute before the Court centers upon whether the term "data channel" is indefinite.

Positions of the Parties

Google asserts that the alleged invention is directed toward transmitting content to a remote computing device whether the device is connected to the Internet (or other online service) or not. Google asserts that this is accomplished by providing an alternative path through a "receiver" by which information can be transmitted when the computing device is offline ("i.e., not connected to the Internet or some other on-line service"). (Dkt. No. 76 at 25 (quoting '279 Patent 7:12–13)).

Google asserts that the term "data channel" does not appear in the specification and was first added to the claims in 2004, years after the priority dates. (Dkt. No. 76 at 25). Google asserts that thus the specification provides no guidance as to the meaning of being "online or offline from a data channel associated with each remote computing device." Google further asserts that the "data channel" is not a term known in the art, and accordingly, with no specification guidance, the term cannot be determined with any reasonable certainty under *Nautilus.*

Google asserts that under SimpleAir's construction "a data channel" could be any part or parts of any connections between the remote computing devices and any information sources. Google asserts that under SimpleAir's construction a device could always be both online and offline at the same time, as the device could be both online to some data channels and offline to some other data channels. (Dkt. No. 76 at 26). Google asserts that such ambiguity is not permissible under *Nautilus.*

SimpleAir asserts that its construction matches the *Google I* construction. SimpleAir asserts that the reasoning set forth in *Google I* demonstrates that the term is not indefinite and

that no expert in any of the other prior cases had trouble understanding and applying the term. (Dkt. No. 68 at 23–24 (citing Knox Decl. ¶ 106, Dkt. No. 68, Ex. 1)).

SimpleAir asserts that though the term "data channel" is not utilized in the specification, the claims and specification provide substantial guidance. (Dkt. No. 82 at 11 (citing *Google I* Claim Construction Order at 13–14, 16–17)); (Knox Decl. ¶¶ 87–106, Dkt. No. 68, Ex. 1). As to Google's assertion that the data channel could be any data channel, SimpleAir states that such assertion is false. SimpleAir asserts that the connection for determining whether a device is online or offline must be a connection to a data channel for the information source that sent the data through the central broadcast server. SimpleAir asserts that such an interpretation of the term makes sense in the context of the whole claim and is how the parties and experts in *Google I* consistently understood the term. (Dkt. No. 82 at 11).

SimpleAir asserts that to preclude future dispute, the Court should add the following to the end of the *Google I* construction: "wherein the data channel is for accessing information from the information source that sent the data." SimpleAir asserts that such an addition is consistent with the patentee's prosecution history statement made in the '154 Patent Covered Business Method Review:

> In light of the specification, this path or "data channel" is not a path to an information source that is unrelated to the central broadcast server notification system. Rather, it is a path for accessing information from the information source that sent the data through the central broadcast server.

('154 Patent Covered Business Method Review at 13, Dkt. No. 82, Ex. 37). Further, SimpleAir asserts that its construction fits with each claim as a whole. SimpleAir asserts that the claims recite transmitting data from an information source to a remote computing device and, to accomplish this, data from an information source is received by a central broadcast server and transmitted to the remote devices "whether online or offline from a data channel associated with

each remote computing device." SimpleAir asserts that the "online or offline" limitations have utility only because the central broadcast server provides data from an information source to a remote device even when the remote device is not online to that information source. (Dkt. No. 82 at 12).

Regarding SimpleAir's requested addition language, Google asserts that SimpleAir seeks to change the claim element from "data channel" to "the connection to the information source that sent the data." (Dkt. No. 87 at 3). Google asserts that SimpleAir cannot cite support for such change in the specification because the specification never uses the term "data channel." (Dkt. No. 87 at 4). Google asserts that the specification does not say anything about being "not online to **that** [the information source sending data to the central broadcast server] information source." Google notes that the specification merely states that data is sent to the device even while it is offline (i.e., not connected to the Internet or some other online service). (Dkt. No. 87 at 4). Google asserts that SimpleAir's post hoc redrafting is prohibited by law. (Dkt. No. 87 at 4 (citing *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002))).

Analysis

In *Google I*, Google asserted that the "data channel" was any path between the remote computing device and the Internet through which information could flow. *Google I* Claim Construction Order at 8. Google now argues that the term is indefinite because the "data path" could include any part or parts of any connections between the remote computing devices and any information sources. In particular, Google asserts that under SimpleAir's construction a device could always be both online and offline at the same time, as the device could be both online to some data channels and offline to some other data channels. (Dkt. No. 76 at 26). Google's new argument is unreasonable in light of the context of the overall claim. In context,

the claims reference transferring data from an information source through the use of a central broadcast server receiving data from the information source. This data is then parsed by a parser of the central broadcast server. The information gateway builds data blocks from the parsed data, and the transmission gateway prepares the data blocks for transmission. Only then does the claim state the transmission is made whether the remote computing devices are online or offline from the data channel. '279 Patent claim 1. In this context, it is clear that the referenced "data" is the data from the information source, and the corresponding processing steps are performed on this data. Moreover, it is clear that the "data channel" in question is the data channel affiliated with the particular data provided by the particular information source, not some other data channel and some other information source. This corresponds to the disclosure of the specification as noted in both *AWS* and *Google I*:

> The specification explains that "on-line services and other information sources, provide data feeds, including real time data feeds" to the central broadcast server regarding, for example, "news, sports, and financial stories." '433 Patent at 7:44–54. "[A] user can register and subscribe to receive broadcasts" of these data feeds from the central broadcast server, which maintains a "subscriber database . . . to determine which subscribers receive which types of content." *Id*. at 8:20–25. The specification explains that the user is able to specify "preferences at information category or specific content levels" and can even select "subcategories of information within a particular information category." *Id*. at 21:21–32. Thus, when data for a particular feed is available, it is "broadcast to the preferred viewer" application on the user's remote computing device. *Id*. at 26:15–17.

*AWS* Order at 33.

> The information sources 12 may include a variety of categories of information such as news feeds, email feeds, premium service feeds and graphic feeds. '433 Figure 1, 6:28–30. The patents are also directed toward the broadcasting of these feeds. '433 Abstract, 5:53–55. In this context, data channel is not limited as Defendants seek. Rather, access to the content within the information sources 12 is what is important. Thus, within the patents, the connection 24 provides the remote computer 14 access to the information sources 12. '433 30:55–31:14. The connection 24 is not limited to a connection to the Internet but rather it is a "connection 24 back to the information source 12 to obtain more detailed information." '433 30:62–63. Thus, in use, the connection is provided to

> "automatically establish a link back to the information source 12." '433 31:2–3.
> As such, the specification supports SimpleAir's construction . . . .

*Google I* Claim Construction Order at 13. In context of the claims themselves and the specification as a whole, it is clear that the data channel that is associated with the information source referenced in the claim as providing the data is the relevant data channel, not just any data channel. In context of the surrounding claim limitations, the term "data channel" is thus reasonably certain and therefore definite under the *Nautilus* standard. Further, in context of the specification as a whole, the term is thus reasonably certain and therefore definite under the *Nautilus* standard. The Court generally adopts the *Google I* construction with the inclusion of the concluding language "wherein the data channel is for accessing information from the information source that sent the data." The inclusion of the concluding language, though inherent from the claim itself and the specification, is provided to explicitly address the newly raised arguments of Google.

**The Court construes "data channel" to mean "one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network."**

**The Court construes "whether the remote computing devices are online or offline from a data channel associated with [each/the] remote computing device[s]" ('279 Patent claim 1, '154 Patent claim 1) to mean "whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the addressed data block is received by the receivers, wherein the data channel is for accessing information from the information source that sent the data. A device is not online to an associated data channel merely because it is able to receive**

**data transmissions (directly or indirectly) from the central broadcast server."[13]**

### 13. "a subscriber database" ('279 Patent claim 2, '154 Patent claim 2)

| SimpleAir | Google |
|---|---|
| No construction necessary | database to determine which subscribers receive which types of content. |

The parties dispute whether the database must determine which subscribers get which type of content.

Positions of the Parties

SimpleAir asserts that a subscriber database is simply a database of subscribers. SimpleAir objects to Google's construction and asserts that a "subscriber database" need not be used for the purpose of determining "which subscribers receive which types of content." SimpleAir uses as an example an online newspaper which delivers the same content to each subscriber, and thus the subscriber database is only a list of subscribers. (Dkt. No. 68 at 27). SimpleAir asserts that the claims do not require the particular function contained in Google's construction and there is no disavowal in the specification. (Dkt. No. 68 at 27). SimpleAir notes that Google's expert has admitted that Google's construction is narrower than the term's ordinary meaning. (Dkt. No. 82 at 13). SimpleAir also asserts that Google is merely relying upon disclosed embodiments and has pointed to no disclaimer or disavowal to support narrowing the claim.

---

[13] The *Google I* construction included the explanatory phrase "a device is not online to an associated data channel merely because it is able to receive data transmissions (directly or indirectly) from the central broadcast server." *Google I* Claim Construction Order at 17. Such explanatory phrase was provided to address the particular construction arguments raised in *Google I* and provide assistance to the jury in that situation. Though the arguments raised in *Google I* have not presented here, the Court still includes the explanatory language so as to be clear in case the *Google I* arguments are raised again at trial.

Google points to the specification, which states that "a subscriber database [] is utilized by the central broadcast server to determine which subscribers receive which types of content." '279 Patent 8:37–40. Google also points to the passage stating that "all applicable real and virtual addresses are determined based on the type of information in the data block and user subscription data from the subscriber databases." *Id.* 22:14–18. Google asserts that SimpleAir points to no intrinsic or extrinsic evidence. Google asserts that when subscribers are able to receive different types of content, as is the case in the patent, then the subscriber database must record which subscribers receive which types of content. Google asserts that the diagram of Figure 1 shows multiple types of content and that this figure is listed in the Description of the Drawings as being "in accordance with the present invention." *Id.* 4:18–19. Google asserts that Figure 1 and the figures that relate to Figure 1 are not merely embodiments, but also are the descriptions of the claimed invention. Thus, multiple types of content must be present, and the subscriber database must distinguish which content goes to which subscriber.

Analysis

The parties do not appear to contest that the terms "subscriber" and "database" are known to those in the art or that a "subscriber database" in ordinary usage would have a broader meaning than Google's construction. Rather, Google asserts that the embodiments shown in the specification conform to its construction. Though the primary passage relied on by Google does describe a usage of a subscriber database to "determine which subscribers receive which types of content" ('279 Patent 8:37–40), the specification does not indicate that a subscriber database must be limited to such embodiment. Further, though Figure 1 is "in accordance" with the present invention, the specification does not state that the claims are limited to only the embodiment of Figure 1. "Although the specification may aid the court in interpreting the

meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323. Google has only pointed to a particular embodiment. The Court rejects Google's requirement that the "subscriber database" must be limited to those subscriber databases that determine which subscribers receive which types of content. Rather, the ordinary meaning applies.

**The Court finds that the term "a subscriber database" does not need further construction.**

### 14. "a viewer" ('279 Patent claim 14, '154 Patent claim 14)

| SimpleAir | Google |
|---|---|
| one or more applications or programs for viewing a category (or subcategory) of information received from an information source that provides data to the central broadcast server | Plain and ordinary meaning |

SimpleAir seeks to limit the term in three ways: (1) a "viewer" is limited to software and does not include "windows," (2) a viewer is not generic software for viewing all data but instead is "associated" with the particular data category type (stock, sports, weather, etc.), and (3) the viewer displays information "received from an information source that provides data to the central broadcast server."

<u>Positions of the Parties</u>

SimpleAir asserts that the term is used in the claims in the context of something "launched" by a computing device: "[W]herein the remote device is further configured to launch a viewer associated with the transmitted data upon a response by a user to the visual alert." SimpleAir asserts that "launched" therefore necessarily means a computer application or

program. SimpleAir also asserts that the specification describes viewers as "software" on the user's remote computing device. '279 Patent 23:31–54 (the user interface is responsible for other "applications," such as "viewer server 20," and allows the user to "open viewer 48.") SimpleAir also asserts that the prosecution history referred to "viewer applications." (Dkt. No. 68 at 24). SimpleAir asserts that Google's reference to a "service" is merely a reference to a program. (Dkt. No. 82 at 12). As to a "window" as referenced by Google, SimpleAir asserts that the claims and specification make clear that software is being referred to not as a window which is part of a graphical display. SimpleAir notes that the '279 Patent dependent claim 28 recites installing, activating, and updating of the viewer. SimpleAir also cites to specification section 3:19–23, which references developers writing different viewers. (Dkt. No. 82 at 12).

SimpleAir further asserts that the claim language requires the "viewer" to be "associated with the transmitted data." Thus, SimpleAir asserts that the viewer is not generic software for viewing all data but, instead, is "associated" with the particular data category. (Dkt. No. 68 at 25). SimpleAir further points to the specification, which states that "there are separate viewers for each of the different types of information provided over the network" ('279 Patent 28:61–63) and "information is broken into logical categories at the central broadcast server 34 end which matches viewers 48 which exist on the user's end" (*id.* 28:9–11). SimpleAir further cites to the passage which states: "[T]hus a viewer that is capable of displaying baseball information only receives baseball information." *Id.* 28:25–27. Accordingly, SimpleAir asserts that the specification discloses a stock market viewer, a football viewer, and newspaper viewer. '279 Patent fig.24. SimpleAir further cites to consistent statements that SimpleAir made during prosecution. (Dkt. No. 68 at 25).

Finally SimpleAir asserts that the viewer displays information "received from an information source that provides data to the central broadcast server." SimpleAir asserts that the specification describes that the categories of information are data feeds provided from the information sources to the central broadcast server. '279 Patent 7:67–8:2. In this way, SimpleAir asserts that the data that is displayed by the viewers is received from the information source that provides data to the central broadcast server. (Dkt. No. 68 at 26).

Google asserts that different viewers may process different types of media and/or that viewers may be customized to the information source. *See* '279 Patent 3:26–29; *id.* fig.24. Google asserts a viewer thus enables a user to "view" the transmitted content from the information source. Google asserts that no further construction of the term is needed. (Dkt. No. 76 at 27).

As to SimpleAir's "applications or programs" limitation, Google asserts that other things may be launched, such as a service or a window. (Dkt. No. 76 at 28). Google asserts that SimpleAir's self-serving prosecution statements made after litigation has commenced should be given no weight. (Dkt. No. 76 at 28 n.32).

As to "categories (or subcategory) of information received from an information source," Google asserts that SimpleAir is adding language to claims that merely recite a "viewer." Google also asserts that the patent discloses viewers that display <u>all</u> data from an information source, regardless of category, including a "stock ticker viewer" that displays all information from a stock information source ('279 Patent fig.24(d)) and an "email viewer" capable of reading all incoming email from an email information source. *Id.* 30:14–18. Google also asserts that the specification teaches that a viewer may filter based on category or content but such functionality is optional. *Id.* 30:14–18.

As to SimpleAir's requirement that the viewer operate on information received from the information source by way of the central broadcast server, Google asserts that this is an inherent limitation of "data" as used in the claims and SimpleAir's limitation would be redundant. (Dkt. No. 76 at 28).

With regard to the viewing a category or subcategory dispute, SimpleAir replies that the stock ticker and email embodiments are embodiments for viewing a category of information. (Dkt. No. 82 at 13 (citing Google's expert)).

Analysis

In general, SimpleAir is seeking to import embodiments from the specification without a showing of any disclaimer or disavowal limiting the term "viewer" to those embodiments.

As to "software and applications," there appears to be no dispute that the term "viewer" may have an ordinary meaning broader than just software and applications. SimpleAir primarily relies on the claim language itself: "launch." However, clearly a window can be "launched." SimpleAir also points to the embodiments in the specification but points to no disclaimer or disavowal. Further, though described as software, the embodiments of Figures 24(a)–(d) are described, more generally, just as "viewers," and such figures provide a "window"-like appearance. '279 Patent 5:25–28, 28:59–67; *id.* figs.24(a)–(d). Though SimpleAir states that a viewer is "not a window (i.e. part of a graphical display)," (Dkt. No. 82 at 12), the specification clearly states that "a viewer can be opened through a user interface" and, in a broad sense, states "viewers 18 . . . are the means by which data received from the broadcast network is displayed to the user." '279 Patent 28:59–60. Combined with the lack of disclaimer as to the broader meaning of "viewer," the more general descriptions of "viewer" counsel against limiting the term to a software embodiment and excluding windows and the like. As to the reference to claim 28

("installation, activation, deactivation, or updating"), claim 14 does not include such language and uses the term "viewer" in a more general manner. The specification does not support limiting "viewers" to only the disclosed embodiment and excluding other embodiments, such as windows, from the meaning of "viewer."

As to viewing just selected categories of information from an information source, the patent teaches information sources that may only provide one particular type of information; for example, email from an "Internet E-mail provider" information source may be viewed on an "E-mail viewer." '279 Patent 30:4–36. SimpleAir's construction would exclude this embodiment, as such viewers would view all information from the information source, not just a selected category. A construction that excludes disclosed embodiments "is rarely correct." *SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1583). Similarly, the patent teaches stock information sources, such as "Quotecom" and a stock ticker viewer, without teaching that only a selected category of stock information is viewed. '279 Patent 5:28, 6:15; *id.* fig.24(d). Further, with regard to the other embodiments in which a viewer may be used for just a selected category of information from an information source, SimpleAir has not pointed to any portions of the specification related to such embodiments that suggest a more general usage of "viewer" has been disavowed. As such, SimpleAir is merely seeking the incorporation of embodiments without support in the specification mandating such incorporation.

Finally as to SimpleAir's attempt to require that the information viewed is provided from the central broadcast server, the claim language itself states the relationship a viewer has to the data: "a viewer associated with the transmitted data." Other claim language describes in more detail the transmitted data and origin of the transmitted data. Thus, the claim language itself

describes what data the viewer is associated with. SimpleAir has not justified why additional explanation is needed beyond that provided in the claims.

**The Court finds that "viewer" needs no further construction.**


### 15. "contextual graphics" ('279 Patent claim 17, '154 Patent claim 17)

| SimpleAir | Google |
|---|---|
| graphics relating to the context of the preprocessed data that has been received | No construction necessary |

Positions of the Parties

SimpleAir notes that its construction matches the *Google I* construction. *Google I* Claim Construction Order at 46. SimpleAir further notes that Google has adopted the Court's construction in six petitions for post-grant review. (Dkt. No. 68 at 26–27).

Google originally sought a construction that the term "contextual graphics" was indefinite and, in the alternative, sought plain and ordinary meaning. (Dkt. No. 68 at 26). Google did not argue this term in its briefing, and in the final Joint Claim Construction Chart, Google just asserted "no construction necessary." (Dkt. No. 84 at 6).

Analysis

Google has not presented any arguments as to this term. The *Google I* Claim Construction Order describes how the specification supports the construction that the graphics relate to the context of the information shown. *Google I* Claim Construction Order at 46. Google has not provided any justification to deviate from the rationale of the *Google I* construction.[14]

---

[14] The claims in *Google I* included "preprocessed data." The claims of the '279 and '154 patents reference transmitted data/data blocks, and the construction is changed appropriately so as not to provide jury confusion.

**The Court construes "contextual graphics" to mean "graphics relating to the context of the transmitted data that has been receive."**

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are **ORDERED** to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby **ORDERED**, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 27th day of April, 2015.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE